IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MARYLAND   CERTIFIED COPY

FAYE M. GOODIE, et al.,          *

        Plaintiff(s),     * Civil Action No.:

   v.                    * 1:10-CV-03478-RDB

THE UNITED STATES OF AMERICA, *

        Defendant(s).     *

- - - - - -

Deposition of ETHYL D. WELD, M.D.

Baltimore, Maryland

Friday, September 30, 2011

2:04 p.m.

Job No.:  1-204878

Pages 1 - 84

Reported by:  Rachel R. Hilker

Page 2

1    Deposition of ETHYL WELD, M.D., held at the
2  offices:
3       United States Attorney's Office
4       36 South Charles Street
5       Fourth Floor
6       Baltimore, Maryland 21201
7       (410)209-4800 (410)962-9947
8
9
10
11
12       Pursuant to notice before Rachel R. Hilker,
13  Court Reporter and Notary Public of the State of
14  Maryland.
15
16
17
18
19
20
21
22

Page 3

1           A P P E A R A N C E S
2    ON BEHALF OF THE PLAINTIFF:
3       Michael P. Smith, Esquire
4       Salsbury, Clements, Bekman, Marder &
5       Adkins, LLC
6       300 West Pratt Street, Suite 450
7       Baltimore, Maryland 21201
8       (410) 539-6633
9
10   ON BEHALF OF THE DEFENDANT:
11      Jason D. Medinger, Esquire
12      United States Attorney's Office
13      36 South Charles Street, Fourth Floor
14      Baltimore, Maryland 21201
15      (410)209-4800 (410)962-9947
16
17
18
19
20
21
22

Page 4

1           C O N T E N T S
2  EXAMINATION OF ETHYL WELD, M.D.          PAGE
3    By Mr. Smith               5
4
5
6           E X H I B I T S
7       (Retained by Mr. Smith)
8  WELD DEPOSITION EXHIBIT          PAGE
9  01   Medical Records              45
10 02   Curriculum Vitae              7
11
12
13
14
15
16
17
18
19
20
21
22

Page 5

1           P R O C E E D I N G S
2           ETHYL D. WELD, M.D.,
3    Having been duly sworn, testified as follows:
4    EXAMINATION BY COUNSEL FOR PLAINTIFFS
5  BY MR. SMITH:
6    Q.   Doctor, could you give me your full name
7  and your present home and business addresses?
8    A.   Ethyl Derby Weld, 440 Grindall Street,
9  Baltimore, Maryland, 21230. The business address
10 would be 22 South Greene Street, Baltimore, Maryland,
11 21201.
12   Q.   You are still working at the University of
13 Maryland?
14   A.   True.
15   Q.   Have you ever had the misfortune of being
16 at a deposition before?
17   A.   No.
18   Q.   Let me tell you a little bit about it. I'm
19 going to be asking you questions during the
20 deposition. Okay? You have to give verbal responses
21 because words go into this woman's ears, and they come
22 out her fingers, and she types all the stuff down, but

Page 6

1  unless we have words, it can't happen.  Okay?
2     A.   Okay.
3     Q.   For everything to work well, I need to get
4  my whole question out before you start your answer,
5  and I need to let you give your whole answer before I
6  start the next question.  So if it appears that I'm
7  interrupting your response, put your hand up to stop
8  me.
9     A.   Okay.
10    Q.   I may ask questions that you don't know the
11 answers to.  If you don't know the answers to them,
12 simply tell me.  Okay?
13    A.   Okay.
14    Q.   I don't want you to guess or speculate.
15 Okay?
16    A.   Yes.
17    Q.   If I ask a question, and you understand it,
18 then I am assuming you are going to give the answer to
19 it.  Is that fair?
20    A.   Yes.
21    Q.   If you don't understand the question, which
22 is not surprising with some of the questions I ask,

Page 7

1  you tell me, and I'll try to fix it so that you can
2  answer it.  Fair?
3     A.   Yes.
4     Q.   If we need to take breaks, just tell us.
5     A.   Okay.
6     Q.   Married?
7     A.   Yes.
8     Q.   Children yet?
9     A.   Expecting one November 27th.
10    Q.   The 27th, it could be a Thanksgiving child.
11    A.   Yes.
12    Q.   We'll celebrate with turkey.
13         You are a medical doctor?
14    A.   Yes.
15         (Exhibit 02 was marked for identification
16 and was retained by Mr. Smith.)
17 BY MR. SMITH:
18    Q.   I have a copy of your C.V., which is dated
19 September 22, 2011.  I'm assuming that, in the past
20 eight days, nothing has changed on this C.V., correct?
21    A.   You are assuming correctly.
22    Q.   What do you do at Maryland now?

Page 8

1     A.   I'm a clinical instructor of internal
2  medicine and pediatrics, and I work as an attending
3  physician hospitalist in an intermediate medical care
4  unit, which is one step down from an ICU.  I
5  occasionally attend in pediatrics on the pediatric
6  wards teaching residents and medical students.  My
7  training is in both internal medicine and pediatrics.
8     Q.   I had noticed, from looking at something
9  which I don't know what it was, that you also have an
10 interest in infectious disease?
11    A.   Yeah.  I'm a clinical fellow in infectious
12 disease at Johns Hopkins beginning in July.  You match
13 two years before you begin, so I have that position.
14    Q.   Do you know who you will be training with?
15    A.   The infectious disease department.
16    Q.   Do you know there?
17    A.   Dave Thomas is the chair of the department.
18 Bartlett is the former chair.  Stuart Ray is the
19 program director.  Basically, you rotate through with
20 the entire department.
21    Q.   So I take it, though, if I were to ask you
22 questions regarding your education, graduate training,

Page 9

1  certifications, medical licensure, employment, and the
2  like, your answers would be consistent with what's
3  contained in your CV?
4     A.   Yes.  The only thing I'm not sure about is
5  when I need to re-up my license.  I need to fill out a
6  form and send it in.  I'm licensed as of July 2010.
7     Q.   It says, "License expires 9-30-2011."
8     A.   Are you serious?
9     Q.   That's what it says.
10    A.   That's very important to know.  Thanks.  I
11 will send the form in.
12    Q.   I wouldn't have even thought of that, but
13 anyway, you certainly don't want to let that expire.
14         You are waiting to hear from the Internal
15 Medicine Board?
16    A.   True.
17    Q.   You are probably glad you don't have to sit
18 for that again.
19    A.   I'm hoping not.
20    Q.   At least not for another ten years.  In any
21 event, you are Board-certified in pediatrics?
22    A.   Yes.

3 (Pages 6 to 9)

Page 10

1    Q.   So your sole employer in medicine since
2  graduating from the University of Chicago has been the
3  University of Maryland?
4    A.   Yes, and it's a combined program in
5  residency between the Veterans Affairs Hospital and
6  the University of Maryland.
7    Q.   That, I understand, but you haven't gone
8  anywhere else?
9    A.   No.  I went to Maryland right after
10 graduating.
11   Q.   The hospitals at which you have had
12 privileges, University of Maryland, the Veterans
13 Affairs Hospitals, anywhere else?
14   A.   We also train at Mercy Hospital for part of
15 our residency.
16   Q.   Did you do training at Mercy?
17   A.   I did.
18   Q.   And 2006-'07, I think, is first-year
19 residency; '07-'08, second year, '08-'09 third year;
20 and --
21   A.   Medicine and pediatrics has four years, so
22 '09-'10 is the fourth.

Page 11

1    Q.   When were you at Mercy?
2    A.   We rotated through Mercy both for
3  pediatrics and for internal medicine all four years.
4    Q.   So then part of the time, who knows when,
5  you would be at Mercy?
6    A.   Yes.
7    Q.   Does that mean you would go directly to
8  Mercy and work there for a period of time?
9    A.   Yeah.  We would come to morning reports and
10 grand rounds at the main hospital, but with that
11 exception, we'd do most of our clinical care for that
12 month at Mercy.
13   Q.   Were you more than one month at Mercy for a
14 particular time, or were there designated months?  How
15 did it work?
16   A.   It was a smattering of months, usually not
17 two in a row, but definitely, in total, more than one
18 month at Mercy.
19   Q.   It would somehow be scheduled, you'd notice
20 it, and then you would vary your routine accordingly?
21   A.   Yes.
22   Q.   Other than Mercy, any other hospitals at

Page 12

1  which you rotated at all during your residency?
2    A.   I am a founding member of a hospital ship
3  in Africa on Lake Tanganyika, and I did a mobile
4  clinic there for a month.
5    Q.   When was that?  What month?  What year?
6    A.   It was, I believe, the second to last year
7  of residency in the summer months.
8    Q.   When you say the second to last year of
9  residency, so that would have been 2010?
10   A.   I think so.  I think so.  But you know
11 what, it might be on there.
12   Q.   If it's on there, we'll stick with what's
13 on there.  That's fine.
14        This case deals with emergency medicine.
15 Was any portion of your residency dealing with
16 rotations through the emergency department at either
17 the University of Maryland, Veterans Hospital, or at
18 Mercy?
19   A.   Yes, all of the above.  We did time in the
20 emergency room both on pediatrics and internal
21 medicine at Maryland.  Then for internal medicine, we
22 did rotations through emergency medicine at the V.A.

Page 13

1  and at Maryland, not at Mercy.
2    Q.   But never at Mercy?
3    A.   No.
4    Q.   Because University of Maryland does have
5  people who are at Mercy?
6    A.   Yeah.  You know what, I have the impression
7  it's mostly attending and moonlighting senior resident
8  in emergency medicine staffed.
9    Q.   Were you in emergency medicine similar to
10 what you had told me about Mercy on particular
11 months?
12   A.   True.
13   Q.   So you would find out through the residency
14 program that on a particular month you would be
15 rotating through the emergency department either at
16 Maryland or at the V.A.?
17   A.   Yes.
18   Q.   Was it always just a month?
19   A.   Pretty much.  I seem to recall that when
20 you were doing outpatient medicine, you would do
21 certain selected shifts at the ECS, which is the V.A.
22 E.R. So that would be a block that's dedicated to

ETHYL D. WELD, M.D. - 9/30/2011

Page 14

1  outpatient medicine, but you are filling in on a
2  couple shifts.
3      Q.  Do you know how many months you rotated in
4  emergency medicine in total at any hospital?
5      A.  I don't know. I think that I could check
6  that answer by looking at the Am I On schedule.
7  That's the medical scheduling software.
8      Q.  Are you able to reasonably estimate how
9  many months?
10     A.  Yeah. I would say that, on the University
11 side, you do one month as an intern and only emergency
12 medicine in the E.R. On the V.A. side, I would say
13 it's more like three months, two or three.
14     Q.  So you might have done two or three months
15 spread out over four years?
16     A.  Of adult emergency medicine, that sounds
17 about right. I would have to confirm the actual
18 numbers.
19         Just to add, in pediatrics, the emergency
20 room experience was more abundant because at Mercy the
21 emergency room serves as an urgent care that a lot of
22 people use instead of going to the clinic. So it's

Page 15

1  slightly lower acuity, but there is more time spent in
2  the emergency room when you are rotating at Mercy.
3      Q.  Since completing your residency in June of
4  2010, have you spent any time as an attending in the
5  emergency room at Maryland or at the V.A.?
6      A.  No. No, I'm not Board-certified in
7  emergency medicine. We do that as an experience to
8  broaden our practice of internal medicine.
9      Q.  Is it your understanding, to be an
10 attending either at Maryland emergency department or
11 the V.A. emergency department, you have to be Board-
12 certified in emergency medicine?
13     A.  I don't know the answer to that. I know
14 that there are only very experienced physicians that I
15 trained with in both emergency rooms, and I don't know
16 their Board certification.
17     Q.  Were there particular emergency room
18 physicians at Maryland with whom you trained when you
19 were rotating through either the ED department at
20 Maryland or the V.A.?
21     A.  Yes.
22     Q.  Who were the people that you trained with?

Page 16

1      A.  I training with any E.R. physician that was
2  on when I was working a shift. So I would call it a
3  group of 30.
4      Q.  So it could be anybody in the group?
5      A.  True.
6      Q.  As opposed to a particular two or three
7  E.R. physicians?
8      A.  That's correct. It's not like an
9  apprenticeship where you are assigned to one person.
10     Q.  This case deals with things that occurred
11 in the emergency room in October of 2007. First of
12 all, that would put you in the beginning of your
13 second year of your residency?
14     A.  Yes.
15     Q.  Do you know if prior to October of 2007 you
16 had any rotations through the emergency department
17 either at Maryland or at the V.A.?
18     A.  I would have because in internship you do a
19 month of emergency medicine.
20     Q.  And the first year is internship, right?
21     A.  True.
22     Q.  Since this deals with October of 2007, do

Page 17

1  you know whether or not you had been assigned to a
2  month in the emergency department at the V.A. in
3  October of 2007?
4      A.  I would have been, if I was working there,
5  either assigned to a month in the ECS or to shifts
6  during an outpatient month.
7      Q.  Do you know, though, one way or the other
8  whether you were assigned for the month of October
9  2007 in the V.A., or you were just doing various
10 shifts in the V.A.?
11     A.  Let me clarify. When you are doing various
12 shifts, it's up to ten to 12 shifts, so it actually
13 amounts to a large experience over the course of the
14 month. I don't know which it was, and that's
15 something I can look up on the Am I On software.
16     Q.  Is that something you can look up, tell
17 counsel here, and he can let me know?
18     A.  Yes.
19     Q.  Where is the emergency department at the
20 V.A.?
21     A.  It's on the corner of Baltimore and Greene
22 Streets. The entrance is now under construction, but

5 (Pages 14 to 17)

Page 18

1  the entrance is -- you go through an underpass right
2  on that corner.
3     Q.  Is it on the first level?
4     A.  Yes.
5     Q.  How is it that you would come to know your
6  schedule, either the shifts or your monthly schedule,
7  when you were working at the V.A.?
8     A.  So there is a website called "amion.com."
9  You put in a password that gets you to the department
10 of internal medicine 's schedule, and you have your
11 yearly schedule a year in advance, so you know what
12 you are doing each month.
13    Then the chief residents in emergency
14 medicine, perhaps two months advance, will tell you
15 the actual hour details of the shifts you work.
16    Q.  So let me see if I understand.  You would
17 know prior to the beginning of the year in the
18 residency where you would be working throughout the
19 year, but not necessarily what you would be doing.
20 Then the chief resident would then set forth what your
21 particular hours were for the month that you are
22 working at somewhat in advance of that month?

Page 19

1     A.  You would know where you would be working
2  and what you would be doing.  You would know that you
3  would be doing emergency medicine or gastroenterology
4  or a medicine floor month.
5     Q.  With respect to the actual shifts in the
6  emergency department, is it the chief resident that
7  sets it, or is it someone in the emergency department?
8     A.  It's the chief resident, as I recall, in
9  combination with the attendings at both places, and
10 they work out of shift schedule.
11    Q.  Do you recall what the shifts were in the
12 V.A. in '07?
13    A.  I believe they were ten to 12-hour shifts,
14 somewhere in there, and occasionally you would have an
15 eight-hour shift.
16    Q.  Do you know how many shifts there are in a
17 particular day?
18    A.  On a particular day, one shift.
19    Q.  No, that's not what I meant.  I meant how
20 many shifts there are on a particular day that are
21 filled up by various people during the course of the
22 day.  You might only have one shift, but there may be

Page 20

1  other people who are assigned who have other shifts,
2  and they are a total of the number of shifts.  Do you
3  have any idea?
4     A.  I'm sorry.  Are you asking me how many
5  shifts cover a 24-hour period?
6     Q.  Yes.
7     A.  I would have to look at that, but I think
8  it's either two or three.
9     Q.  When you were assigned to the emergency
10 department at the V.A. for a particular month, were
11 you the only person in residency who was assigned
12 during that month, or were there other people as well?
13    A.  There were many people.  It was a pool of
14 residents who shared the shift burden.
15    Q.  Do you know how many people were assigned
16 to particular shifts during the course of the day?
17    A.  I don't know the exact answer, but my
18 recollection is it was something like you would be
19 there with three other residents, two attendings, six
20 nurses.  You know, it would be a team.
21    Q.  It would be fair to say that you yourself
22 were not responsible for staffing the emergency

Page 21

1  department?
2     A.  No, I was not.  Are you asking for
3  scheduling the staffing?
4     Q.  Yes.
5     A.  Yeah, I didn't schedule the staffing.
6     Q.  In terms of the emergency department at the
7  V.A., were there designated areas of treatment.  By
8  that I mean, was there like an urgent care area, a
9  chest pain area, a general area, things like that?
10    A.  I believe that there was an area in the
11 back that was more urgent care, and there was an area
12 in the front closer to Greene Street that was more
13 acute.  The people would be seen outside the ER in the
14 little triage room and triaged to one or the other
15 areas.
16    Q.  So there were generally two areas, as far
17 as you know?
18    A.  Yes.
19    Q.  When you were assigned to work a particular
20 shift, were you assigned a particular area to be in,
21 or could you be in either area?
22    A.  I think what I remember is: You were

6 (Pages 18 to 21)

ETHYL D. WELD, M.D. - 9/30/2011

Page 22

1  assigned a particular area.  You were either in the
2  front or in the back, but I think that there would be
3  occasions where the back would be busier than the
4  front, so someone from the front would go back and
5  help out the back.
6      Q.  Now, the back is urgent care, and the front
7  is the acute?
8      A.  Yes.  I think that's right.
9      Q.  Do you know how many beds were in each?
10     A.  I recall around ten beds in the front, the
11 acute area, and the urgent care area would be more
12 like examining tables in rooms, and I think there were
13 maybe, I'd say, eight to 15 rooms.
14         Oh, and then there is this middle area just
15 behind where the residents sit that had four beds in
16 it, which is part of the acute area.  So that would
17 make the acute area have 14 beds, I think.
18     Q.  I take it that during any shift in which
19 you were working as a resident, there were attendings?
20     A.  Always.
21     Q.  Do you know whether the number of
22 attendings varied depending upon the time of day?

Page 23

1      A.  I don't know.
2      Q.  Did you consider your duties as a physician
3  working in the emergency department at the V.A. to be
4  any different than an attending's duties?
5      A.  Yes.
6      Q.  What is the difference?
7      A.  My duties were to collect clinical data and
8  to present it to the attending and discuss it with the
9  attending and come up with a treatment plan.  The
10 attending's duties were to supervise residents who
11 were doing that and verify the clinical data they had
12 collected and come up with a plan in a teaching role.
13     Q.  Were there ever occasions in which you were
14 collecting data and you had to act faster than you
15 could in terms of getting the information to the
16 attending?  In other words, you had to act before you
17 presented the entire plan?
18         MR. MEDINGER:  I'll object to form.  You
19 can answer.
20         THE WITNESS:  I'm sorry.  Can you say that
21 again?
22 BY MR. SMITH:

Page 24

1      Q.  Are there occasions where you had to make
2  decisions in terms of a plan prior to your being able
3  to present it to an attending?
4      A.  Well, in terms of a plan that related to
5  initial diagnostics, lab tests, radiologic tests,
6  sometimes you would see a patient initially.  The
7  attending would be discussing another patient with
8  another resident, and you would put in initial lab
9  orders and diagnostics, for example, but there would
10 never ever be a time when you discharged a patient
11 from the emergency room without discussing the overall
12 plan of care with the attending.
13     Q.  In terms of there being a disposition of
14 the patient, whether the patient was held for
15 observation, admitted, or discharged, that wouldn't
16 occur without conferring with an attending?
17     A.  No, that would not occur.
18     Q.  That's what I meant.  That's what you are
19 saying:  That doesn't occur.
20     A.  Right.
21     Q.  So before a decision or disposition is
22 made, you have conferred with the attending?

Page 25

1      A.  True.
2      Q.  I'm trying now to find out whether you had
3  a general method, as opposed to how you did things
4  when you were working in the E.R., from when a patient
5  is assigned to you until disposition.  Let's start
6  with how that happens.
7          How did you learn that patients were
8  assigned to you in the ED department?
9      A.  Actually, what I remember is:  You would
10 pick up charts that were sort of on the wall in the
11 rack.  You'd pick them up in the order that they were
12 put in by the nurses.  So sometimes that would be
13 the order of the patient coming in, and sometimes it
14 would be the order of acuity.  I think it was
15 something like, you know, you take the one from the
16 top of the pile.  So you would take responsibility for
17 a patient by grabbing their chart.
18     Q.  When you grabbed the chart -- well, first
19 of all, what was that chart made up of at the time
20 when you first grabbed it?
21     A.  Gosh, this is going back three years.  I'm
22 trying to remember if it was -- in University

Merrill LAD
800-292-4789                                    www.merrillcorp.com/law

Page 26

1  Hospital, it was a clipboard with initial vitals, a
2  T-sheet by the nurses, you know, some initial
3  preliminary studies.
4       What I don't remember is whether in the
5  V.A. it was all computerized or whether there was a
6  clipboard. I seem to remember there was a clipboard,
7  but the V.A.'s electronic medical records are very
8  progressive and vast, and so it would make sense there
9  was an electronic component, mainly for lab results.
10  For example, the EKG is something that you would need
11  a tangible, hard copy of, so I think they had a
12  clipboard too.
13      Q.   When a patient was assigned to you by your
14  picking up the clipboard, was there anything that you
15  reviewed prior to seeing the patient?
16      A.   No. You would take the clipboard, and then
17  you would look at their vitals, see if they needed to
18  be seen immediately without you even sitting down at
19  the computer to look at their record. Then usually I
20  would spend some time glancing at the computer to look
21  at -- I think the initial vitals were in the computer,
22  but I don't remember that exact point.

Page 27

1       So I would make sure I knew the initial
2  vitals and the presenting complaint. Sometimes I
3  would have done what we all a chart biopsy, looking
4  through the medical records before seeing them, and
5  sometimes I would do that immediately after seeing
6  them.
7       Q.   By looking through, were there times that
8  you would look through and see what was available in
9  the computer?
10      A.   Yes.
11      Q.   And that may be at any time during your
12  working with a patient?
13      A.   Yes.
14      Q.   Before you saw them? After you saw them?
15      A.   Yes.
16      Q.   And when you saw the patient, I guess you
17  took your own history?
18      A.   Yes.
19      Q.   You yourself performed your own physical
20  exam?
21      A.   Yes.
22      Q.   And you yourself would look at tests or

Page 28

1  studies that had already been done and would decide
2  upon certain tests or studies that you thought needed
3  to be done in order for you to come up with a plan?
4       A.   Yes. I myself would, and the attending
5  himself would, or herself.
6       Q.   If something is ordered, that's input in
7  the computer, or a form is filled out? Would that be
8  correct?
9       A.   Again, the nitty-gritty of how to order
10  tests at the V.A. I don't totally remember. I think
11  there was one form that you can check boxes on, and
12  then there were some tests requiring computer orders,
13  I think, such as radiologic tests.
14      Q.   If it were a paper that you had to use for
15  the order, would it contain something with your name
16  on it that you were the one ordering?
17      A.   I don't know.
18      Q.   When you did something on the computer,
19  would it be such that it would contain your name on it
20  as the person ordering?
21      A.   Yes, in the computer, definitely, because
22  you have to log in, so anything that you order in the

Page 29

1  computer is tied with your name.
2       Q.   And also the time you do it and all this
3  other stuff?
4       A.   True.
5       Q.   In connection with your working up
6  patients, do you yourself read imaging studies?
7       A.   I usually would -- in my second year of
8  residency, I would have deferred to the radiologists.
9  Now I routinely read imaging studies that are simple
10  like X-rays, and I defer to the radiologists on things
11  like complex MRIs and angiograms.
12      Q.   How about CTs?
13      A.   I always review imaging studies with my own
14  eyes, and I always discuss it with the radiologist.
15      Q.   Because it's both a learning experience and
16  so you understand what's going on with your patient?
17      A.   Yeah. Exactly right. It's also that I'm
18  not trained in radiology, but I want to look with my
19  own eyes at whatever data there is available and also
20  talk to the experts who have looked with their own
21  eyes.
22      Q.   So you can put forth the images with the

8 (Pages 26 to 29)

Page 30

1 clinical data that you have to more understand
2 what's going on?
3 A. Yeah.
4 Q. Back in 2007, October 2007, essentially in
5 the beginning of your second year of residency, what
6 knowledge, generally, did you have of vascular
7 surgery?
8 A. General knowledge, certainly not
9 specialized knowledge.
10 Q. Did you have any knowledge as to
11 complications that might ensue from endovascular
12 repairs?
13     MR. MEDINGER: I'll object to form. You
14 can answer.
15 A. I would have had the knowledge that I had
16 gleaned as an intern working as an internal medicine
17 and pediatrics resident and the knowledge that I would
18 have gleaned as a medical student.
19 Q. Did you have a general knowledge as to why
20 certain patients received endovascular repairs?
21 A. Probably I would have had the knowledge
22 that people with atherosclerotic disease or aneurysmal

Page 31

1 disease would occasionally need endovascular repairs.
2 Q. And you would have sort of an understanding
3 as to what bypass repairs were generally?
4 A. Yeah. Again, often, you know, this would
5 be from studying in medical school and from previous
6 experience, but I did not have training as a vascular
7 surgeon.
8 Q. No. That, I understand.
9 A. Nor did I have expertise in vascular
10 surgery
11 Q. Did you have an understanding as to what
12 signs and symptoms you would look for as an emergency
13 room physician for complications of someone's bypass
14 surgery?
15 A. Yes.
16 Q. Were you aware of what tests and studies
17 were available to you as an emergency room physician
18 to examine whether or not someone might be suffering a
19 complication of a bypass procedure?
20 A. Yes.
21 Q. Did you, back in October of 2007, have
22 knowledge of complications that someone might have if

Page 32

1 they developed an aortoenteric fistula?
2 A. Did I have knowledge of what symptoms they
3 would have?
4 Q. Yes.
5 A. Yes.
6 Q. And what the risks would be if they
7 developed an aortoenteric fistula?
8 A. What the risk would be?
9 Q. Yeah.
10 A. The risk would be catastrophic. Yeah. The
11 symptoms are generally sepsis and shock.
12 Q. Once the sentinel event occurs?
13 A. Yes.
14 Q. I don't want to know anything that you and
15 Mr. Medinger, or someone else from the AG's office,
16 talked about other than how to get here, but I want to
17 know what, if anything, you reviewed in preparation
18 for today's deposition. Did you review any records?
19 A. Yes.
20 Q. What records did you review?
21 A. The medical record at the V.A.
22 Q. So you reviewed V.A. records?

Page 33

1 A. Yes.
2 Q. Relating to Mr. Johnson?
3 A. True.
4 Q. You didn't review V.A. records relating to
5 some other patient?
6 A. No.
7 Q. Did you review records relating to medical
8 treatment that Mr. Johnson received at any other
9 institution?
10 A. No.
11 Q. Did you review reports prepared by other
12 physicians relating to their review of Mr. Johnson's
13 care and treatment?
14 A. Are you talking about a retrospective
15 review --
16 Q. Correct.
17 A. -- or at points along the continuum of his
18 care?
19 Q. I have produced reports of experts. I have
20 given them to Mr. Medinger.
21 A. No, I didn't review any expert reports.
22     MR. MEDINGER: And I'll just proffer for

9 (Pages 30 to 33)

Page 34

1  the record, just so you can know exactly what she was
2  given, and she can answer specific questions as to
3  what she actually looked at --
4       MR. SMITH: Well I'm not worried about
5  that.
6       MR. MEDINGER: No, no, but I just want to
7  make sure --
8       MR. SMITH: Are they the things that you
9  produced in discovery?
10      MR. MEDINGER: Yes, but not everything.
11 She was given a binder of stuff, which contained the
12 complaint, the V.A. medical records. Tab 3 was our
13 interrogatory and document request responses, and then
14 Tab 4 was your expert reports. What of that she
15 herself read, you can ask her. I'm not sure of that.
16      THE WITNESS: I have read none of it. I'm
17 sorry. I've had a busy week.
18 BY MR. SMITH:
19      Q.  But you looked at the V.A. reports?
20      A.  True.
21      Q.  Records?
22      A.  Yes.

Page 35

1       Q.  Did you look at any imaging studies?
2       A.  No.
3       Q.  You looked at reports of imaging studies,
4  but you didn't look at any imaging studies?
5       A.  No.
6       Q.  Normally, I ask you whether you looked at
7  any depositions, but I think this is the first
8  deposition in the case.
9       Have you had discussions with other people
10 at the University of Maryland regarding this case?
11      A.  I discussed the case with Dr. Flanigan, who
12 was the attending.
13      Q.  Did you discuss the case with Dr. Flanigan
14 in preparation for today's deposition?
15      A.  No. No. I discussed the case just to --
16      Q.  Way back then?
17      A.  Back then when I first heard that this case
18 had come up to review the decisions made in this
19 patient's care.
20      Q.  Did you make any notes of your discussions
21 with Dr. Flanigan?
22      A.  No, and nor do I recall details of them.

Page 36

1       Q.  Do you know a nurse by the name of Karen
2  Hall?
3       A.  That sounds vaguely familiar, but I can't
4  put a face to that name.
5       Q.  And it would be fair to say that haven't
6  had discussions with Karen Hall about this case?
7       A.  It would be definitely fair to say.
8       Q.  There is another doctor who was involved
9  with Mr. Johnson's care whose name is Comfort Onyiah,
10 I think, O-n-y-i-a-h. Have you had any discussions
11 with her about this case?
12      A.  I have not.
13      Q.  Have you yourself done any independent
14 research regarding any of the issues that you see that
15 are related to this case in preparation for your
16 deposition?
17      A.  I myself have done independent research
18 relating to this case to address the case, think about
19 the case, and think about this deposition.
20      Q.  What have you researched?
21      A.  I researched the epidemiology of
22 aortoenteric fistula; the prevalence in those patients

Page 37

1  with endovascular repair; the prevalence of various
2  conditions among patients who present to emergency
3  rooms with flank pain, nausea, and vomiting; the
4  prevalence of iron deficiency in a population of
5  alcoholics, cocaine users, and malnourished
6  individuals who are intermittently homeless; and some
7  particulars relating to measurement of hematocrit and
8  hemoglobin.
9       Q.  As a result of that, did you accumulate any
10 hard copies of materials?
11      A.  No.
12      Q.  Is this something that you are able to
13 review simply either by looking at books or by looking
14 on the computer in today's Internet world?
15      A.  It is. Electronically, you can get any
16 article you'd like through the library at Maryland.
17      Q.  Do you remember the names of any of the
18 articles which you reviewed?
19      A.  So they would have been articles that are
20 obtainable by -- via something as simple as Google
21 Scholar by typing in epidemiology of aortoenteric
22 fistula.

Page 38

1     There is one that I do remember in
2  particular that an attending I worked with referred me
3  to way before any of this happened about hematocrit
4  levels and a phenomenon called postural pseudoanemia,
5  which is written by a fellow by the name of Jacob in
6  the Mayo Clinic proceedings May of 2008.
7     Q.  Postural pseudo —
8     A.  Psuedoanemia.
9     Q.  What is postural pseudoanemia?
10    A.  It just describes the phenomenon of blood
11 measurements, red blood cell count measurements,
12 hemoglobin, hematocrit depend on posture, hydration
13 status, blood volume, many things like that. This
14 particular phenomenon is describing what happens when
15 a patient goes from an upright to a supine position
16 and then hematocrit can drop up to four points because
17 of hydrostatic pressure changes in the legs.
18    Q.  Based on your review of the records for
19 Mr. Johnson, do you think that his hematocrit level
20 was decreased because of his posture?
21    A.  Based on my review, I think that the
22 difference between the hematocrit levels on October

Page 39

1  5th and October 8th, 9th, are within the range of
2  either laboratory error or hydration or postural
3  change.
4     Q.  How about the difference in his hematocrit
5  in October 2007 and his hematocrit in January of
6  2006?
7     A.  So the two-year difference in hematocrit
8  could be explained by many different phenomena
9  including malnutrition, iron deficiency, and several
10 other things. Two years is too big a span to quantify
11 an acute drop.
12    Q.  Is it your understanding of — even though
13 we haven't gotten to Mr. Johnson yet — Mr. Johnson is
14 that he was an alcoholic?
15    A.  My understanding, having reviewed the
16 record, is that he was intermittently drinking to the
17 point of intoxication, in addition to using cocaine.
18 That's what's documented, at least, through the V.A.
19 records.
20    Q.  Do you have any understanding as to when
21 the last time is that he was drinking alcohol or using
22 cocaine?

Page 40

1     A.  I believe that we reviewed records relating
2  to that. I would have to check the records to look at
3  the dates on those.
4     Q.  How close to 2007 are we talking about?
5     A.  Do you want me to check the records to make
6  sure it's here?
7     Q.  Sure. The records are there.
8     A.  Let's see. There's a note.
9     Q.  When you get to the page you are at, tell
10 me you are there, and then I'll ask you — tell you
11 how I want you to identify the page.
12    A.  So the front is labs, and these are
13 clinical notes.
14    Q.  Those are discharge summaries. Then you
15 have consult requests. Then you have progress notes.
16 It's very weird how they put the things together.
17    A.  Can you remind me whether it's in reverse
18 or advance chronological order?
19    MR. MEDINGER:  It's in reverse.
20    THE WITNESS:  So this discharge summary, so
21 cocaine use, 15-30 pack/year smoker, discharge
22 summaries, consult requests. So it would be progress

Page 41

1  notes.
2  BY MR. SMITH:
3     Q.  Why don't you look at — what I'm looking
4  at is a progress note that says Page 65 at the bottom
5  where it actually says what the substance abuse
6  history is.
7     A.  "History of 25 years of alcohol abuse with
8  some use of cocaine and heroin; 18 months of recovery,
9  with the exception of a slip when he drank two beers
10 on 9-8-07. No drugs since '04. One previous
11 treatment MCVET in '96." Where is the one where he
12 said he was amazed at how many drugs he was doing and
13 how much alcohol he was doing?
14    Q.  I haven't the faintest idea.
15    A.  Let's see. He went to a gambling
16 counseling meeting.
17    Q.  You have to tell me what page you are on.
18    MR. MEDINGER:  Just for the record, if you
19 can mention what page you are looking at when you just
20 talk about that. It's on the bottom, right-hand
21 corner.
22    THE WITNESS:  The gambling is 62, and that

11 (Pages 38 to 41)

Page 42

1 was from October 3, 2007 at D000062. Focus on
2 compulsive gambling as it may arise in recovery.
3 BY MR. SMITH:
4   Q.  That's what the group is discussing. Does
5 it say anything about him?
6   A.  Not in this note. He attended this
7 counseling group.
8       Then let's see, "Treat for addiction with
9 routine MCVET and resources."
10   Q.  Can you say what page you are on?
11   A.  That is D000068. "Interested and willing
12 to participate in V.A. psychiatric for substance abuse
13 treatment." That's 2007. "How long have you been
14 homeless?"
15       "Six months, but less than one year," and I
16 think that nutrition is difficult when you are
17 homeless.
18   Q.  So you understand him saying homeless to
19 mean he didn't have a place to live?
20   A.  Well, it says, "Where did you sleep last
21 night?"
22       "Shelter, temporary housing program." I

Page 43

1 believe he was at MCVETS. That is a shelter that is
2 just for veterans. Then he is often at someone else's
3 apartment or a shelter for the homeless, including
4 detox centers with no medical staff on site. That was
5 four nights that he spent there.
6       MR. MEDINGER: Doctor, just for the record,
7 which page are we looking at there?
8       MR. SMITH: She is looking at Page 70.
9       THE WITNESS: Seventy, D00 --
10       MR. SMITH: You can just say Page 70. You
11 don't have to go through all those zeros. They match
12 up.
13       THE WITNESS: On Page D000071, "Do you have
14 a problem with alcohol dependency now?"
15       "Yes."
16       "During the past 30 days, how many days
17 would you say that you used any alcohol at all?"
18       "Two."
19       "During the past 30 days, how many days
20 would you say that you drank to intoxication?"
21       "Two."
22       "Do you have a problem with drug dependency

Page 44

1 now?"
2       "Yes."
3       "Have you in the past?"
4       "Yes." So those all support drug and
5 alcohol use, in my opinion.
6 BY MR. SMITH:
7   Q.  Just looking at the record, they support
8 it? Okay. I just want to make sure that's what
9 you're saying.
10   A.  Yes.
11       And again, Page 72 again, "Alcohol
12 abuse/dependency: Yes. Drug abuse dependency: Yes."
13   Q.  I don't know who the government's experts
14 are yet, so I can't ask you whether you know them.
15 There are various people who I have. This one person
16 by the name of Kenneth Larson is an emergency room
17 expert. Do you know Dr. Larson?
18   A.  No.
19   Q.  There is another internal medicine doctor,
20 but who's also an emergency room expert whose name is
21 Gary Witman. Do you know Gary Witman?
22   A.  No.

Page 45

1   Q.  There is a radiologist, who at one time was
2 at the University of Maryland, but is not there
3 anymore, whose name is Larry Holder. Do you know
4 Dr. Holder?
5   A.  I don't.
6   Q.  And then there is a doctor whose first
7 name, unfortunately, I keep forgetting. His name is
8 Skudder. He is from Massachusetts. Do you know a
9 Dr. Skudder?
10   A.  No.
11   Q.  He is a vascular surgeon.
12   A.  Okay.
13       (Exhibit 01 was marked for identification
14 and was retained by Mr. Smith.)
15 BY MR. SMITH:
16   Q.  What I'm going to do -- you can put those
17 away -- I'm going to hand you instead Exhibit 1, which
18 is an excerpt of those that primarily relate to care
19 involving you and other people in and around this
20 time. When we talk about pages, you really just have
21 to read those page numbers at the bottom. We'll get
22 to them at a certain point in time.

12 (Pages 42 to 45)

ETHYL D. WELD, M.D. - 9/30/2011

Page 46

1    The records show that the care in this case
2 on October the 9th occurred from about 1:00 or 2:00 in
3 the afternoon until close to midnight. The first note
4 that we have of yours is timed at like 18-something or
5 other. Do you know what shift you were working that
6 day?
7    A.   It would have been the shift that put me in
8 the emergency room at 1800, but beyond that, I do not
9 know without looking at Up To Date -- sorry, not Up To
10 Date, Am I On.
11    Q.   If it shows that you were still doing stuff
12 in the emergency room with respect to him at like
13 2350, would that assist you in any way as to what
14 shift you were working?
15    A.   Again, I don't remember the exact shift
16 hours. I know my shifts now are from 8:00 a.m. To
17 8:00 p.m., and I don't remember the times of the
18 shifts at the V.A. in 2007, so I would have to look at
19 Am I On.
20    Q.   Do you have any idea as to what area in the
21 ED you were working that day?
22    A.   I probably would have been working in the

Page 47

1 front.
2    Q.   You say probably, but you don't know?
3    A.   I don't know.
4    Q.   Well, you are better off saying you don't
5 know if you don't know.
6    A.   Okay. I don't know.
7    Q.   Do you have any idea as to how many
8 patients in the emergency department you saw that day?
9    A.   I don't know.
10    Q.   Do you have any independent recollection as
11 to how busy the emergency department was on October 9,
12 2007?
13    A.   No.
14    Q.   Do you yourself have any independent
15 recollection of Maurice Johnson?
16    A.   None.
17    Q.   Is the only thing you can tell me about
18 Maurice Johnson what you can see from looking at the
19 records?
20    A.   True.
21    Q.   Have you looked at the records and then
22 been able to recall additional things about Maurice

Page 48

1 Johnson that are not contained within the records?
2    A.   No.
3    Q.   Do you have any idea whether, at any time
4 prior to October 9th, you ever saw Mr. Johnson?
5    A.   No.
6    Q.   Looking at the records, is there any way
7 you can tell when the last time you spoke with him
8 was?
9    A.   No. Well, the last time I spoke with him
10 would have been the day I saw him.
11    Q.   But when during the day, we don't know.
12    A.   Probably prior to discharge. We don't
13 know.
14    Q.   From your looking at the records, were you
15 able to say what other records you accessed that day
16 to assist you in the care of Mr. Johnson?
17    A.   From looking at these records, am I able to
18 say what records I viewed the day I took care of him?
19    Q.   Yeah.
20    A.   No.
21    Q.   The fact that you knew that he had the
22 bypass surgery before, do you know whether you

Page 49

1 accessed any of his records relating to that
2 admission?
3    A.   So when a patient comes in at the V.A.,
4 they usually have a problem list that comes up right
5 under their name. So without reviewing any records,
6 you would know that he had an endovascular graft, and
7 usually that problem list is expansive. In other
8 words, anything he has ever come in for is usually on
9 that, a hangnail, an aortoenteric graft.
10    Q.   Could you access that and find out more
11 about that particular procedure for him?
12    A.   Yes.
13    Q.   Do you know whether you did that?
14    A.   My general practice is to look into the
15 relevant medical history in the V.A. I would say
16 that, with patients who have ever been served by the V.A.
17 for 20 or 30 years, it is impossible to do a complete
18 review of the record --
19    Q.   No. That, I understand.
20    A.   -- every time you see someone in the
21 emergency room, but I would say that I consider it
22 necessary to review relevant past medical history.

13 (Pages 46 to 49)

ETHYL D. WELD, M.D. – 9/30/2011

Page 50

1    Q.   He had been there the day before, a couple
2  days before.  He was there on October the 5th in the
3  emergency department.  Do you know whether you
4  accessed the records from his October the 5th visit?
5    A.   Am I correct in thinking that was actually
6  a primary care visit, October the 5th, when he saw
7  Dr. Onyiah?
8    Q.   No.  I think it was an E.R. visit.
9    A.   So I probably would have seen that visit
10 and the lab work relating to that because the lab work
11 definitely comes up when you pull up the patient, when
12 you trend the lab values over time.
13       I believe that was a visit for knee pain,
14 having reviewed the records.
15   Q.   If you turn to Page 53, let me know when
16 you are there.
17   A.   I'm there.
18   Q.   Halfway down, there is the beginning of a
19 note for October the 9th at 1859, and then it says,
20 "Author," and it lists Weld, Ethyl Derby.  Is that
21 you?
22   A.   Yes.

Page 51

1    Q.   Just looking at this note, the 1859, what
2  does that relate to?
3    A.   That probably would have been when I opened
4  up his ECS emergency department note template and
5  started typing into it.
6    Q.   Then a little further down, do you see
7  where it says, "Time seen," and then it says
8  7:10 p.m.?
9    A.   Yes, so perhaps I would have reviewed his
10 problem list and presenting vitals before going to see
11 him, or I got the time wrong.
12   Q.   I'm just trying to find out what the
13 numbers relate to because I'm sure the computer puts
14 them there.
15   A.   So the 7:10 would be something I would type
16 in, so if someone's watch is fast or something, it
17 could --
18   Q.   I'm not worried, but is it your
19 understanding that on your dated note, the date and
20 time are put in automatically by the computer when you
21 access it?
22   A.   Yeah, I think that's right.

Page 52

1    Q.   And the author automatically puts in there
2  because it knows that you are the author because you
3  have to input information?
4    A.   Because I have opened the note.
5    Q.   And you have reviewed these records
6  before.  Is this your only note with respect -- it
7  goes pretty long, but is this the only note that you
8  put in the progress notes?
9    A.   I believe so.
10   Q.   If you go to Page 55, there is a nursing
11 triage note.  Do you see that?
12   A.   Yes.
13   Q.   And that's by Karen Hall at 1550.  Do you
14 know if you would have viewed this note prior to your
15 seeing Mr. Johnson?
16   A.   I don't know, but likely I would have seen
17 it.
18   Q.   Would it have been your practice to review
19 these notes?
20   A.   Yeah, because there she has his vitals.
21 Like I said, the thing I would review first is vitals
22 in any emergency room patient.

Page 53

1    Q.   At least in her note, if you look at the
2  Karen Hall note on Page 56, it indicates, at least by
3  that time, an EKG had been done?
4    A.   Yes.
5    Q.   If an EKG had been done, would that have
6  been something you had looked at?
7    A.   Yeah, and not remembering the case, I don't
8  know if I can say the clipboard contained an EKG, but
9  you the routine of the emergency room would be for the
10 triage nurse to take vitals, take an EKG, put that, I
11 believe, on a clipboard, and then draw the patient to
12 your attention so you review that.
13   Q.   Based on your understanding, when would
14 they order EKGs for patients who came to the emergency
15 room?
16   A.   When would physicians order them?
17   Q.   Yeah.  Was it routinely they were
18 automatically done with certain patients?
19   A.   At the V.A., often they were routinely done
20 without a physician ordering them.
21   Q.   If a person came with foot pain, would they
22 get an EKG?

14  (Pages 50 to 53)

Page 54

1    A.  Sometimes.  Probably not always.

2    Q.  If a person came with any type of pain that

3    might be understood as chest pain, would you expect

4    them to get an EKG?

5    A.  Yeah.  Yeah.

6    Q.  And after your note, there is a note that

7    begins at Page 50 by someone named Audrey Pinnock.  Do

8    you know Audrey Pinnock?

9    A.  No.  I assume she is a nurse, or -- I don't

10   know her.

11   Q.  It appears to be a nursing flow note.  But

12   is it your understanding, for instance, under her note

13   they have temperature, pulse, respiration, blood

14   pressure, and next to each entry, there is a date and

15   a time, so those would indicate when those vital signs

16   were taken?

17   A.  Yes.

18   Q.  And the fact that vital signs were taken at

19   1543 would seem to indicate that the patient was at

20   the V.A. hospital at least at 1543?

21   A.  Yes.

22   Q.  Do you have any understanding, sitting here

Page 55

1    today, as to why a patient who was in the emergency

2    department at 1543 wasn't seen by you until 7:00 p.m.

3    that night?

4        MR. MEDINGER:  Objection.  You can answer.

5    A.  I would call that -- if you surveyed all

6    the emergency rooms in the country, I would say that

7    may be in line with the amount of time the typical

8    acute patient would wait, again, with certain measures

9    such as triaging them, making sure who the unstable

10   patients were, stabilizing the unstable patients, et

11   cetera, but I think everyone knows that there are

12   sometimes lengthy waits in emergency rooms.

13   Q.  Well, regardless of what happens in other

14   emergency rooms, I'm trying to find out whether you

15   know why it is that for a person who came in at around

16   1533, because that's when the EKG was, wasn't seen by

17   you until 1859 or thereafter, which is about three and

18   a half hours later.

19       MR. MEDINGER:  Objection.  Asked and

20   answered and argumentative.  You can go ahead.

21   A.  Do I have an understanding of the reasons?

22   Q.  I am just trying to find out if you know

Page 56

1    why.  If you don't know why, that's fine; just say you

2    don't know why.

3    A.  I think the answers underpinning that are a

4    complex series of operational, administrative, and

5    practical reasons relating to demand on emergency

6    rooms based on our current medical system and working

7    to the utmost within the current parameters of care.

8    Q.  But on October the 9th of 2007, do you

9    recall what the staffing in the emergency department

10   was that day?

11   A.  I don't.

12   Q.  And do you recall the number of patients

13   who were being treated in the emergency department

14   that day?

15   A.  No, I don't.

16   Q.  Do you have any idea what day of the week

17   it was?

18   A.  No.  But having been a patient in many

19   other emergency rooms, I would say that the wait time

20   between 4:00 p.m. and 7:00 p.m. is actually relatively

21   short, actually having been a patient with abdominal

22   pain in many emergency rooms, just to speculate.

Page 57

1    Q.  Your note again, which is on Page 53, the

2    one that says HPI, that's the history that you took

3    from the patient?

4    A.  History of present illness.

5    Q.  But it's the history that you took?

6    A.  Yes.

7    Q.  As opposed to the history you got some

8    someone else?

9    A.  True.

10   Q.  That's all I was trying to find out.

11       Where you have, "Denies," and you have all

12   these things that denies, was that in the part of also

13   reviewing systems?

14   A.  Yes, and review of systems can be part of

15   your HPI.

16       Which page are you on?

17   Q.  Fifty-three, which is where your note is.

18       You specifically put in the past medical

19   history of vascular disease status post aortofemoral

20   bypass, correct?

21   A.  True.

22   Q.  And, at least from your talking with him,

15 (Pages 54 to 57)

Page 58

1 that he occasionally smokes cigarettes, but didn't
2 drink alcohol or illicit drugs?
3     A.   No, that's -- what I would have written is
4 what the patient reported to me.
5     Q.   That's what I understand.  You are taking
6 the history.  You are asking the patient questions,
7 and the patient says to you he occasionally smokes, he
8 doesn't drink alcohol, and he doesn't do drugs.  He
9 had no known drug allergies?
10    A.   True.
11    Q.   If you look at 54, Page 54, which is the
12 next page, that sets forth your physical exam?
13    A.   Yes.
14    Q.   In terms of -- I just want to know how it
15 works.  In terms of the vital signs, when you are
16 putting them in the computer, do you just -- does that
17 come up automatically, or do you type it in?
18    A.   The vital signs would populate
19 automatically with the most recently measured vital
20 signs entered by a nurse.
21    Q.   Then under that it says, "General," and it
22 says, "Mild distress.  Shifting in chair.  Thin."

Page 59

1 What do you mean when you write mild distress?
2     A.   When someone has back pain, they might have
3 a grimace.  They might sort of have difficulty getting
4 comfortable in a chair.  That's what I would mean.
5     Q.   So he didn't look comfortable to you?
6     A.   Right.
7     Q.   Underneath that, where we have HEENT, then
8 cardiovascular, lungs, et cetera, that sets forth your
9 physical exam?
10    A.   Yes.
11    Q.   And you performed a rectal exam?
12    A.   Yes.
13    Q.   And that was heme-positive?
14    A.   True.
15    Q.   And you did a neuro exam, skin, and then
16 you ordered various lab tests?
17    A.   Yes.
18    Q.   ECG, he already had the EKG, and this shows
19 that you reviewed it.  It showed normal sinus rhythm,
20 no ST wave changes?
21    A.   No ST elevations or T-Wave changes.
22    Q.   And then you ordered a CT for him without

Page 60

1 contrast because that was the renal stone protocol?
2     A.   Yes.
3     Q.   Tell me why it is that you ordered a CT
4 without contrast for a renal stone protocol?
5     A.   This is a patient coming into the emergency
6 room complaining of flank pain, vomiting, difficulty
7 getting comfortable in a chair.  All of that is very
8 classic clinically for a renal stone, and I felt it
9 was reasonable to rule it out.
10    Q.   Was it very classic for a problem with the
11 bypass graft?
12    A.   No.  Back pain would not be classic for a
13 problem with a bypass graft.
14    Q.   By this time, had you -- no, you hadn't got
15 the labs yet because you ordered the labs.
16    A.   Yes.
17    Q.   Do you know whether you had the lab results
18 before you referred him for the CT?
19    A.   I don't know that.  No, actually, I would
20 have, excuse me, because I would need to know if his
21 creatinine was okay before ordering a CT of any kind.
22    Q.   Why don't we turn to Page 3 because Page 3

Page 61

1 has lab results.  This is a weird way that they print
2 out their records.
3         Do you know if you went on the computer to
4 look at lab results you would see a page similar to
5 this where it would have essentially all the blood
6 work that had been done the prior times he had been to
7 the V.A.?
8     A.   I don't know the answer to that.  I don't
9 know what the typical range that's drawn up is.  I
10 don't know whether it covers two years or 18 months.
11 I don't know what --
12    Q.   But do you recall, when you looked up on
13 the screen, you saw more than just what you had
14 ordered?
15    A.   Well, I usually for sure see the lab result
16 from today and the most proximal other lab result that
17 was drawn, so the baseline, in other words.
18    Q.   If we look at the blood results, the blood
19 test results for 10-09, which is the date we are
20 dealing with, it lists a time of 2025.  Would that be
21 the time that it was input into the computer?
22        MR. MEDINGER:  Objection.  You can answer

16 (Pages 58 to 61)

Page 62

1  if you know.
2      A.   I don't know the answer.  I don't know the
3  particulars of the computer V.A system, but I would
4  speculate that that's probably the time the labs were
5  resulted.
6      Q.   I'm just trying to find out if you know.  I
7  mean, if you don't know, you don't know.
8      A.   I don't know.
9      Q.   You don't know whether that was the time
10  the blood was drawn, or the time it was received, or
11  the time the results were ready?
12      A.   Or the time this profile was pulled up or
13  what.
14      Q.   Well, if you see, there are other results
15  for other days, and they all have times next to them.
16  So if it were for the time you pulled it up, I
17  wouldn't imagine it would have different times.
18      A.   Again, I don't know, but I don't know
19  whether it's resulted, drawn, et cetera.
20      Q.   And you haven't been in the V.A. --
21      A.   For three years.
22      Q.   -- for a while.

Page 63

1          Well, you were there after 2007?
2      A.   So I have been working as an attending for
3  a year and a half, and I did not do any V.A. rotations
4  in my last year of residency.  I was serving as a
5  chief, so that would put us at two and a half or three
6  years.
7      Q.   The last time you were there might have
8  been '08?
9      A.   Yeah, or '09 maybe.
10      Q.   Page 1, that's the CT results?
11      A.   Yes.
12      Q.   Would I be correct that you would have seen
13  the report prior to your coming to a plan of
14  discharging the patient?
15      A.   Yes.
16      Q.   Up at the very top it says, "Exam date,"
17  and it has October 9, 2007, and it says at 1957.  Do
18  you know if that's the time the CT was done or the
19  time it was reported?
20      A.   Or the time it was ordered.  I don't know.
21      Q.   Do you know if you had any discussions with
22  any radiologists regarding this report?

Page 64

1      A.   I don't know the answer to that.
2      Q.   Do you know why CTs without contrast are
3  part of the renal stone protocol as opposed to CTs
4  with contrast?
5      A.   If you give contrast, the ureter opacifies,
6  so you are not able to see the little bright white
7  opacification of the stone.
8      Q.   Okay, which makes sense.
9          Am I correct that, based on at least the
10  report, there was no evidence of intrarenal or
11  urethral calculi?
12      A.   True.
13      Q.   That there was -- a graft was noted?
14      A.   True.
15      Q.   But the radiologist is telling you he or
16  she can't tell you anything about it because of the
17  lack of contrast?
18          MR. MEDINGER:  Objection.  You can answer.
19      A.   I can read you what the report says.
20      Q.   Isn't that what it says?
21          MR. MEDINGER:  Objection.
22      A.   "Evaluation of this graft is somewhat

Page 65

1  limited, secondary to the lack of intravenous
2  contrast.
3      Q.   Do you have any understanding, sitting here
4  today, why, if you were trying to evaluate the graft,
5  you would want to have contrast as opposed to
6  non-contrast?
7      A.   I do understand contrast to be better for
8  measuring extravasation of contrast when looking for
9  vascular defects, which is a complication occurring in
10  .4 percent of these patients.
11      Q.   And that's based on something you've just
12  reviewed, right, the .4 percent?
13      A.   Yes, and based on understanding that this
14  is a rare complication.
15      Q.   And it's a complication that most typically
16  occurs about six years after the procedure has been
17  done?
18      A.   In the data that I have reviewed, the
19  earliest it's occurred is two days after the
20  procedure.  The mean is two days to two years, and the
21  latest is 27 years, so it's quite a wide spread, and
22  it being a rare event, it's difficult to comment

17 (Pages 62 to 65)

Page 66

1 beyond that.
2    Q.   But while it's a rare event, it's a life-
3 threatening event?
4    A.   Is an aortoenteric fistula a life-
5 threatening event?  Yes.
6    Q.   And so that would be something that you, as
7 an emergency room physician, had it been in your
8 differential, would be something you would want to
9 rule out before you discharge the patient?
10       MR. MEDINGER:  Objection.  You can answer.
11   A.   The rare, life-threatening events are
12 important to consider when evaluating patients.  The
13 patient who presents to the emergency room with back
14 pain and vomiting, and back pain that was resolved to
15 a one out of ten after a single dose of non-narcotic
16 medication is probably not the highest on my list for
17 considering this rare complication.  It is true that
18 the role of emergency rooms is to establish that the
19 patients are stable and hook them into the right care
20 for a definitive diagnosis.
21   Q.   So my question is:  If a life-threatening
22 event is within your differential, you want to rule it

Page 67

1 out before disposition of a patient?
2       MR. MEDINGER:  Objection.  Asked and
3 answered.  You can go again.
4       MR. SMITH:  Well, it wasn't answered.  It
5 was just a self-serving statement.
6 BY MR. SMITH:
7    Q.   So I'm trying to find out whether, if a
8 life-threatening event is within your differential,
9 you'll want to rule it out before discharging the
10 patient.
11       MR. MEDINGER:  Same objection.
12   A.   Ruling out all life-threatening and rare
13 complications in one emergency room visit is
14 impossible.  So it would be possible to pan scan a
15 patient from head to toe, which I would argue is not
16 correct care because that overdiagnosticates.  You
17 have to work appropriately within the limits of your
18 skilled evaluation, history, physical exam, and the
19 data you have available to you to understand the
20 likelihood of various items on your differential
21 diagnosis, and then you rule them out or arrange
22 appropriate follow-up accordingly.

Page 68

1    Q.   So it's my understand — back up for a
2 minute.
3       Did you have aortoenteric fistula within
4 your differential with this patient?
5    A.   I'm not remembering the day of seeing that
6 patient.  I don't know the answer to that.
7    Q.   Would you agree with me that if it was
8 within your differential, it would be something that
9 you would want to rule out before discharging the
10 patient?
11       MR. MEDINGER:  Same objection.  You can
12 answer again.
13   A.   Generally, that complication is something
14 you could evaluate with imaging, but you could also
15 evaluate with endoscopy set up through a GI physician,
16 which has follow-up that I arranged.
17   Q.   Assuming the person gets to the GI
18 physician prior to the sentinel event, or the herald
19 event, should I say?
20   A.   Yes.
21   Q.   Do you know, by looking at the records
22 today, whether you gave any consideration to the

Page 69

1 symptoms that he had on the fifth, which you note are
2 knee pain and numbness below the knees?
3    A.   From looking at my note on Page 53, I did
4 not mention his knee pain when he saw Comfort on the
5 fifth.
6    Q.   Can we agree that Mr. Johnson, on the 9th,
7 had back pain and abdominal pain?
8    A.   Yes.
9    Q.   Can we agree that his hematocrit was lower
10 than it was in 2006?
11   A.   Yes.
12   Q.   And it was lower than it was four days
13 earlier, but it's one that you don't think is a
14 substantial drop?
15   A.   We cannot agree that this is a significant
16 drop.
17   Q.   Well, I said it's lower, but you don't
18 agree that it's a significant drop.
19   A.   What I would say is that we actually have
20 evidence that there has not been acute bleeding in the
21 past five days because his hemoglobin is what I would
22 characterize as stable.

18 (Pages 66 to 69)

Page 70

1    Q.   Based on your history you took from him, he
2 had either blood in the stool or a blackened stool at
3 least once in the week prior?
4    A.   And normal stools since then.  Correct.
5    Q.   And he was anemic, and he was in pain?
6    A.   True.
7    Q.   Based on the stone survey, there was no
8 evidence of renal calculi.  We've already talked about
9 that.  No evidence of any abnormality of the
10 urogenital collection system?
11    A.   True.
12    Q.   He had a normal urinalysis?  That's in the
13 labs.
14    A.   What page?
15    Q.   The labs are like Pages 3 and 4.
16    A.   He had a completely -- let's see.
17 Urinalysis showing 1+ leuk esterase, which is a
18 measure, occasionally, of inflammation, but it's
19 fairly nonspecific.  He had one to two white blood
20 cells, no red blood cells, no bacteria.  So aside from
21 the mild inflammation in leukocyte esterase, his
22 urinalysis was normal, and there was no evidence of a

Page 71

1 urinary tract infection.
2    Q.   He was in persistent pain?
3    A.   He was not.  His pain resolved with one
4 dose of Toradol.
5    Q.   Resolved?
6    A.   To one out of ten.  I have more pain than
7 that right now.
8    Q.   And a history of nausea with vomiting?
9    A.   Yes.
10    Q.   Now, your diagnosis was suspected
11 gastritis?
12    A.   Yes.
13    Q.   And what are the signs and symptoms of
14 gastritis?
15    A.   It can be nausea and vomiting.
16 Occasionally, you can have some GI irritation
17 resulting in hemoccult positive stools, and you can
18 have nonspecific epigastric pain, occasionally
19 radiating to back.  It really varies based on the
20 patient.
21    Q.   Sometimes people with gastritis have no
22 symptoms?

Page 72

1    A.   If you are asking whether endoscopies of
2 people who are asymptomatic occasionally reveal
3 endoscopic evidence of gastritis, I think the answer
4 is yes.
5    Q.   If they were nonsymptomatic, they probably
6 wouldn't be coming to the emergency room for problems.
7    A.   You would be surprised though.  There is
8 lots of overdiagnosticating in terms of doing
9 endoscopies and doing diagnostic tests.
10    Q.   Now, you prescribed the Tylenol for pain?
11    A.   Yes.
12    Q.   And the omeprazole?
13    A.   Omeprazole.
14    Q.   That was for the gastritis?
15    A.   Yes.
16    Q.   Normally for gastric reflux?  It's one of
17 the primary things it's good for?
18    A.   Yeah.  It's basically stomach protecting
19 and decreasing of acid secretion, which irritates
20 preexisting gastritis that can be brought on by
21 alcohol, aspirin use.
22    Q.   Now, if you look at your note on Page 54 --

Page 73

1 actually, I haven't gone far enough, Page 55.  At the
2 very -- near the very bottom it says, "I," and it puts
3 your name in, so I am assuming that this comes up
4 automatically, and then you input your name?
5    A.   Yes.
6    Q.   And who inputs the name of the attending?
7    A.   Me.
8    Q.   This is not timed.  Do you know when you
9 discussed the treatment plan and diagnosis with
10 Dr. Flanigan?
11    A.   I don't know.
12    Q.   Is Dr. Flanigan still at Maryland?
13    A.   I don't know the answer to that.
14    Q.   When is the last time you saw him?
15    A.   It would have been 2008.
16    Q.   And you signed your note shortly before
17 midnight that night?
18    A.   Yes.
19    Q.   And it shows here that Dr. Flanigan
20 co-signed this note nine days later?
21    A.   It does seem to show that.
22    Q.   Do you know whether, sitting here today,

19 (Pages 70 to 73)

Page 74

1  you had your discussion with Dr. Flanigan before or
2  after Mr. Johnson left?
3      A.  I would have had it before he left.
4      Q.  Do you know what, if anything, you told
5  Dr. Flanigan?
6      A.  During our discussion about the patient?
7      Q.  Yes.
8      A.  Are you are talking about the day the
9  patient came in?
10     Q.  Well, I'm talking about, "I have discussed
11 the treatment plan and diagnosis with the attending,
12 Dr. Flanigan." So I'm trying to find out if you
13 recall anything about your discussion with him.
14     A.  Yes. So I would have presented to him.
15     Q.  Do you recall anything about your
16 discussion?
17     A.  No. Again, I don't remember this day or
18 this patient, but I would have discussed with him and
19 presented to him my clinical findings, the data at
20 hand, and my plan. He would have had the opportunity
21 to ask any questions of clarification, and we would
22 have come up with a plan together.

Page 75

1      Q.  Knowing how things work at the V.A., do you
2  have any understanding as to why it took him nine days
3  to co-sign?
4          MR. MEDINGER: Objection. You can answer
5  if you know.
6      A.  I don't know, but this would be an
7  electronic co-signature. It's simply a form that he
8  signs in the computer, not necessarily representing
9  when we had the discussion.
10     Q.  Do you recall hearing at all about
11 Mr. Johnson's death?
12     A.  When I was told by the risk management
13 people at the V.A. that this case was happening, but
14 that's the only time.
15     Q.  This is the first time you heard about it?
16     A.  True.
17     Q.  There is a section in here called Consults,
18 which is -- turn to Page -- I believe it's 33.
19     A.  Thirty-three?
20     Q.  Actually, it's Page 32.
21         I take it that you had to fill out a form
22 for the GI consult?

Page 76

1      A.  Yes. I believe that's how it's done. You
2  put in a computer order for a consult.
3      Q.  Let me just go through this, because I just
4  want to get an idea. You are listed as the requesting
5  provider, and it says, "Services to be rendered on an
6  outpatient basis." Is that something you decide or
7  someone else decides?
8      A.  So that's part of the disposition plan, so
9  it's part of my discussion with Dr. Flanigan: Does he
10 need an inpatient scope or an outpatient scope? After
11 our discussion, I would have put in an outpatient
12 service or an inpatient service. Actually, if it's an
13 inpatient scope, I wouldn't order it. The patient
14 would be admitted, and GI would be called.
15     Q.  So essentially, Mr. Johnson would have to
16 go to the GI clinic to get this done?
17     A.  Yes.
18     Q.  Down below that it has collection data. It
19 has the blood down there. Did you input this
20 information, or does the computer input this
21 information?
22     A.  I would have selected which labs I would

Page 77

1  like to have input, and I believe that they are
2  populated by the computer. You know what, "I don't
3  know the answer," is the truth. I don't know whether
4  it automatically populates with iron values, ferritin,
5  pro time, PTT, and hematocrit when you order a GI
6  consult. I don't know the answer to that.
7      Q.  It has no data available for certain
8  things, so that's what's leading you to think that
9  maybe the computer automatically searches for it?
10     A.  Maybe.
11     Q.  Probably when anybody gets a GI consult, it
12 may try to grab a whole bunch of different type of
13 information and try to put it in?
14     A.  That could be, and it also could be the
15 case that I had to select which labs should be input.
16 I frankly don't know the answer.
17     Q.  And the section at the very bottom, it
18 says, "Abdominal pain," and then, "Describe reasons
19 for referral." That's information that you input?
20     A.  Yes.
21     Q.  So epigastric abdominal pain, vomiting,
22 hemoccult positive stool, and melena times one?

Page 78

1   A.   True.

2   Q.   Carrying over to the next page, do you know

3   if this is information that you do, or this is

4   information ultimately the computer does itself, where

5   it has -- it appears to have -- when the order was

6   done, which is 2135?  Then underneath it has,

7   "Scheduled."  Do you know how all that works?

8   A.   I don't know how that works.

9   Q.   Do you know if, at the time Mr. Johnson was

10  leaving, he knew that a GI consult was scheduled for

11  the afternoon of October the 12th?

12  A.   So what I would have said to him when

13  discharging him is:  You need to follow up with the

14  GI; I have made the consult.  Then I'd let it

15  administratively unfold from there and specify that it

16  needs to happen within a week.

17  Q.   I'm looking here.  It says, "Scheduled

18  10-12-07, 1613: Lloyd, Ralph H."  Do you know what

19  that relates to?

20  A.   No.  I don't know how these things are

21  scheduled in the V.A.

22  Q.   It says, "Offer letter sent to GI New

Page 79

1   Fellows clinic."  Do you know what that means?

2   A.   I assume it means that they sent him a

3   letter to set up an appointment for the GI clinic.

4   Q.   So it's your understanding that,

5   essentially, you are saying, "You need to schedule a

6   GI.  I'll let them know, but you are the one who has

7   to call up and get the appointment"?

8   MR. MEDINGER:  Objection.  You can answer.

9   A.   Let's see.  In my note, "D.C. home with GI

10  outpatient follow-up.  Given telephone number of GI

11  clinic."  So I think that implies that I would have

12  told him to call the next day, let them know that you

13  were seen in the emergency room and that outpatient

14  endoscopy is indicated and that you need to be seen

15  with GI clinic.

16      In terms of the scheduling, the residents

17  are not really the ones who deal with the scheduling.

18  It's more of the administrative people at the V.A., so

19  I don't know how that works.

20  Q.   Based on everything you see, it's your'

21  understanding that you are telling him, "I'm going to

22  refer you to this.  The computer knows I'm referring

Page 80

1   you to this, but you are the one that has to call to

2   make the appointment"?

3   A.   Yeah, and I think that at the V.A., you

4   don't really -- I mean, everything needs to go through

5   the computer.  So I don't know that it goes through

6   the computer, and then Lloyd Ralph sees it and then

7   contacts the patient, in addition to the patient

8   calling the clinic.  I just always, to be extra sure,

9   give the patient the number of the clinic so they can

10  make contact on their end.

11      MR. MEDINGER:  I think that's it.

12      MR. SMITH:  No questions from the

13  government, and we'll read and sign.

14      (Signature having not been waived, the

15  deposition of ETHYL D. WELD, M.D. was concluded at

16  3:37 p.m.)

17

18

19

20

21

22

Page 81

1      ACKNOWLEDGEMENT OF DEPONENT

2   I, ETHYL D. WELD, M.D., do hereby acknowledge that I

3   have read and examined the foregoing testimony, and

4   the same is a true, correct, and complete

5   transcription of the testimony given by me, and any

6   corrections appear on the attached Errata sheet signed

7   by me.

8

9   _____

10  (DATE)          (SIGNATURE)

11

12

13

14

15

16

17

18

19

20

21

22

21 (Pages 78 to 81)

ETHYL D. WELD, M.D. - 9/30/2011

Page 82

1  CERTIFICATE OF SHORTHAND REPORTER - NOTARY PUBLIC
2       I, Rachel R. Hilker, commissioned as Rachel R.
3  Hilker, the officer before whom the foregoing
4  proceedings were taken, do hereby certify that the
5  foregoing transcript is a true and correct record of
6  the proceedings; that said proceedings were taken by
7  me stenographically and thereafter reduced to
8  typewriting under my supervision; and that I am
9  neither counsel for, related to, nor employed by any
10  of the parties to this case and have no interest,
11  financial or otherwise, in its outcome.
12       IN WITNESS WHEREOF, I have hereunto set my
13  hand and affixed my notarial seal this 7th day of
14  October 2011.
15
16  My commission expires:
17  September 20, 2013
18
19  _____
20  NOTARY PUBLIC IN AND FOR THE
21  STATE OF MARYLAND
22

Page 83

1       E R R A T A   S H E E T
2       IN RE: Goodie v. The United States of America
3  RETURN BY:_____
4  PAGE    LINE    CORRECTION AND REASON
5    ___    ___    _____
6    ___    ___    _____
7    ___    ___    _____
8    ___    ___    _____
9    ___    ___    _____
10   ___    ___    _____
11   ___    ___    _____
12   ___    ___    _____
13   ___    ___    _____
14   ___    ___    _____
15   ___    ___    _____
16   ___    ___    _____
17   ___    ___    _____
18   ___    ___    _____
19   ___    ___    _____
20
21  _____    _____
22  (DATE)          (SIGNATURE)

Page 84

1       E R R A T A   S H E E T   C O N T I N U E D
2       IN RE: Goodie v. The United States of America
3  RETURN BY:_____
4  PAGE    LINE    CORRECTION AND REASON
5    ___    ___    _____
6    ___    ___    _____
7    ___    ___    _____
8    ___    ___    _____
9    ___    ___    _____
10   ___    ___    _____
11   ___    ___    _____
12   ___    ___    _____
13   ___    ___    _____
14   ___    ___    _____
15   ___    ___    _____
16   ___    ___    _____
17   ___    ___    _____
18   ___    ___    _____
19
20  _____    _____
21  (DATE)          (SIGNATURE)
22

Merrill LAD
800-292-4789                                          www.merrillcorp.com/law