GOODIE VS. USA

DEPOSITION OF KENNETH LARSEN, M.D.

MARCH 22, 2012

ART MILLER & ASSOCIATES
PHONE  410-494-8300
FAX  410-385-1883
www.artmiller.com

PLAINTIFF'S
EXHIBIT
tabbies
1 0

**Page 1**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

- - - - - - - - - - - - - - -

FAYE GOODIE, et al.,          :
                              :
                              :
          Plaintiffs,  :   CASE NO.:
     vs.              :   RDB-10-3478
                      :
UNITED STATES OF AMERICA,    :
                      :
                      :
          Defendant. :

- - - - - - - - - - - - - - -

Greenbelt, Maryland
Thursday, March 22, 2012

Deposition of:
          KENNETH LARSEN, M.D.

called for oral examination by counsel for
Defendant, pursuant to notice, at the offices of
Department of Justice, 6500 Cherrywood Lane,
Greenbelt, Maryland, before Sylvia L. Jacobs,
Court Reporter, of Art Miller and Associates, a
Notary Public in and for the State of Maryland,
beginning at 9:46 a.m., when were present on
behalf of the respective parties:

**Page 2**

1    On behalf of Defendant:
2         JASON DANIEL MEDINGER, ESQUIRE
3         United States Department of Justice
4         Office of the United States Attorney
5         for the District of Maryland
6         36 South Charles Street, 4th Floor
7         Baltimore, Maryland  21201
8         (410) 209-4800
9
10   On behalf of Plaintiff:
11        MICHAEL P. SMITH, ESQUIRE
12        Salsbury Clements Bekman Marder and
13            Adkins, L.L.C.
14        300 W. Pratt Street, Suite 450
15        Baltimore, Maryland  21201
16        (410) 539-6633
17
18
19
20
21
22
23
24
25

**Page 3**

1              * * * * *
2
3              C O N T E N T S
4
5    EXAMINATION BY:                    PAGE
6      Counsel for Defendant             4
7
8
9
10
11   LARSEN DEPOSITION EXHIBITS: *     PAGE
12   1  Subpoena                    7
13   2  Curriculum Vitae              10
14   3  Report                57
15   4  Medical records          60
16   5  Photographs            116
17
18
19
20
21
22
23   (* Exhibits attached to transcript.)
24
25

**Page 4**

1              P R O C E E D I N G S
2    WHEREUPON,
3           KENNETH LARSEN, M.D.
4    called as a witness, and having been first duly
5    sworn, was examined and testified as follows:
6         EXAMINATION BY COUNSEL FOR DEFENDANT
7    BY MR. MEDINGER:
8      Q    Good morning.
9      A    Good morning.
10     Q    My name is Jason Medinger.  I represent
11   the United States of America.  This is a case
12   brought by Ms. Faye Goodie and her family and the
13   estate of Mr. Maurice Johnson against the United
14   States.
15           You've been retained as an expert for
16   the plaintiff.  We're here today to take your
17   deposition.  I'm sure you've been deposed many
18   times; is that correct?
19     A    Yes.
20     Q    Okay.  So I'm sure you know all these
21   ground rules, but I'll just go over them very
22   quickly so we have them in the transcript.  First
23   and foremost, as you know, our court reporter is
24   taking down everything we say here verbatim, so
25   please, to the extent possible, give verbal

**Page 5**

1 answers. She can't pick up head shakes and nods
2 all that well.
3 Secondly, I'm going to ask you a bunch
4 of questions. It's your job to answer those. If
5 you have any questions about the questions I ask
6 just stop me. Let me know, particularly, if I've
7 used a term incorrectly feel free to correct me
8 and we'll talk about the term and how you would
9 understand it, specifically medical terms and
10 things of that nature. If you don't stop me, I'll
11 just assume that what I said was intelligible and
12 that the answer that you are giving is responsive
13 to it.
14 We can take breaks at anytime, so just
15 let me know if you want to take a break and we can
16 do that. I'll try to be as expeditious as I can.
17 Throughout the deposition, Mr. Smith
18 might lodge some objections. That's no problem.
19 So just give him a little chance to jump in if he
20 wants to after I ask my question if you would just
21 pause for a moment in case he needs to say
22 something so we have a good, clean transcript.
23 Any questions before we get started?
24 A No.
25 Q Any reason why you can't give full and

**Page 6**

1 truthful testimony here this morning?
2 A No.
3 Q Could you state your full name for the
4 record, sir?
5 A Kenneth T. Larsen, Jr.
6 Q Okay. And can you tell us the address
7 where you currently reside?
8 A Where I live?
9 Q Yes, sir.
10 A 10599 Warland, spelled W-a-r-l-a-n-d,
11 Road, Marshall, Virginia.
12 Q Okay.
13 MR. MEDINGER: Let's go off the record
14 for just one second.
15 (Discussion held off the record.)
16 BY MR. MEDINGER:
17 Q Okay. Doctor, we'll mark this as
18 Exhibit 1.
19 (Deposition Exhibit No. 1 marked for
20 identification and attached to the
21 deposition transcript.)
22 Q Doctor, I'm just handing you what I've
23 marked as Exhibit 1. I gather you've seen this
24 document before, correct?
25 A Yes. I have a copy of it.

**Page 7**

1 Q Exactly. You have a copy sitting right
2 here in front of you. I'm sure you've seen a lot
3 of these before. This is just a subpoena for each
4 of these here today. It asks you to bring
5 certain documents with you, and I just want to ask
6 you what documents have you brought here before
7 you to this deposition?
8 A I've got the depositions of Dr. Weld,
9 W-e-l-d, Dr. Haider, H-a-i-d-e-r, and Dr. Onyiah,
10 O-n-y-i-a-h. I've got medical records from Johns
11 Hopkins, dated 10/10/2007 or October 10, 2007.
12 I've got an autopsy report from October 12, 2007,
13 and I've got the Baltimore, Maryland VAMC records
14 for Mr. Johnson.
15 Q Okay. Other than these documents which
16 you have brought with you here today, have you
17 been given any other documents in the -- for the
18 purpose of forming any opinions that you have in
19 this case?
20 A No.
21 Q Okay. Other than these documents which
22 you've just brought with you and described, did
23 you consult any other materials in forming any of
24 your opinions in this case?
25 A No.

**Page 8**

1 Q Specifically, did you review any
2 medical literature or any studies --
3 A No.
4 Q -- in forming any of your opinions in
5 this case?
6 A No.
7 Q Okay. Did you review any medical
8 treatises or textbooks?
9 A No.
10 Q Did you observe any imaging studies,
11 particularly CT scans, in forming any opinions in
12 this case?
13 A No.
14 Q Did you consult with any other persons
15 in forming any of your opinions in this case?
16 A No.
17 Q Okay. You mentioned how you have in
18 your possession the deposition testimony of
19 Dr. Weld and Dr. Onyiah, correct?
20 A Yes.
21 Q As well as Dr. Haider. You actually
22 wrote your opinion in this case before receiving
23 those deposition materials, correct?
24 A Correct.
25 Q Okay. After reading any of those

2

**Page 9**

1  materials, did any of those materials, i.e. the
2  deposition of Dr. Weld, Dr. Haider or Dr. Onyiah,
3  did they change any of the opinions that you have
4  in your report?
5    A   No.  Actually, Dr. Weld's deposition
6  strengthened my opinions about her thought
7  processes in particular.
8    Q   Okay.  So regardless of what was in the
9  transcripts, your opinion as you've stated in your
10  expert report is still the same?
11    A   Correct.
12    Q   Sir, we'll mark this as No. 2.
13       (Deposition Exhibit No. 2 marked for
14        identification and attached to the
15        deposition transcript.)
16    Q   Okay.  Sir, in looking at Exhibit 2,
17  you recognize that document obviously, right?
18    A   Yes.
19    Q   Okay.  And this is a copy of your CV?
20    A   Yes.
21    Q   Okay.  And flip through it.  Is this an
22  accurate copy of your current CV?
23    A   It is after I put this addition.  It
24  shows my recertification in emergency medicine.  I
25  recertified in 2010.  It's on the second page.

**Page 10**

1    Q   So on the second page where it says --
2  under Certifications --
3    A   Right there.  2010.
4    Q   So where it says Recertified 1990 and
5  2000, you need to add you were also recertified in
6  2010?
7    A   Correct.
8    Q   Okay.  Any other changes to your CV to
9  make it current?
10    A   No.
11    Q   Okay.  So, sir, I'd like just to talk
12  very briefly about your background and your
13  experience.  You graduated medical school from
14  Georgetown, right?
15    A   Correct.
16    Q   And then after that you did an
17  internship?
18    A   Correct.
19    Q   And where was that internship?
20    A   Georgetown.
21    Q   And did that internship have a specific
22  focus?
23    A   It was a straight medical internship.
24    Q   Meaning you were just doing general
25  practice?

**Page 11**

1    A   Internal medicine.
2    Q   Okay.  And how long did that last?
3    A   A year.
4    Q   And then where did you go after that
5  internship completed?
6    A   I got drafted into the United States
7  Army.
8    Q   And what roles and duties did you have
9  when you were in the Army?
10    A   I served from 1971 through 1973.  I was
11  stationed at Fort Belvoir at Dewitt Army Hospital,
12  and I worked -- actually both under the hospital
13  command, and eventually for the Surgeon General's
14  Office.  I did various unsundry things.  I was the
15  chief of clinics for a while.  Then I was doing
16  some of the early work on the electronic medical
17  record and also working with physician assistants.
18    Q   Okay.  Was that a clinical practice?
19    A   Yes.
20    Q   Even the time where you were doing the
21  electronic medical records work?
22    A   Yes.
23    Q   In other words, you're seeing patients
24  during that time?
25    A   Correct.

**Page 12**

1    Q   And then you became staff at Alexandria
2  Hospital?
3    A   Correct.  I worked part-time in the
4  emergency department at Alexandria Hospital from
5  the time I started in the service.  Actually,
6  before I started in the service, and when I got
7  out of the service, I joined the group full-time.
8    Q   And when you got to Alexandria, you're
9  practicing emergency medicine there?
10    A   Correct.
11    Q   And since that time, obviously, we can
12  see on your CV that you've had subsequent
13  appointments to various hospitals: Shady Grove,
14  Adventist, Fair Oaks and --
15    A   Fauquier.
16    Q   -- Fauquier.
17    A   Yes.  Actually, there's more than that.
18  When I first started, I was exclusively at
19  Alexandria.  The group that ran that picked up two
20  contracts subsequently, Arlington Hospital
21  Emergency Department and then the Mount Vernon
22  Hospital Emergency Department when Mount Vernon
23  Hospital was built, so we opened it basically.
24  And I was with those three hospitals although
25  really primarily at Alexandria until 1982, I

Page 13

1    think. '82 or '83, something like that.
2         I chaired the Alexandria Hospital the
3    last two -- the emergency department the last two
4    years I was there.
5         I went to Greater Southeast in D.C.  I
6    was vice chair for a year, and then I chaired that
7    department until I left there in 1995.
8         Went to the Southern Maryland Hospital
9    in Clinton, Maryland and I chaired that for four
10   years.  And I was vice chairman, I think, in the
11   fifth year or something like that.
12        I went from there to Fauquier Hospital.
13   I worked about two or three shifts at Shady Grove
14   because when I left Southern Maryland, they
15   invited me to join their group.
16        I didn't know that I wanted to drive
17   from where I lived to there because driving from
18   where I live to Southern Maryland Hospital got
19   really old after a while, and I basically got
20   offered a job at Fauquier Hospital, 15 minutes
21   from my house, and I thought that the hour and a
22   half drive probably just wasn't worth it --
23        Q    Okay.
24        A    -- so I stayed at Fauquier, where I've
25   been ever since.

Page 14

1         I have privileges at Inova Fair Oaks
2    because the group that holds the contract at
3    Fauquier also holds the contract at Inova Fair
4    Oaks, so should they need me in some sort of
5    emergency capacity I'm able to go, but I don't
6    really work there.
7         Q    Okay.  So principally you've been
8    working at Fauquier from 1999 to the present?
9         A    Correct.
10        Q    And specifically can you talk about
11   what your day-to-day roles and responsibilities
12   are currently at Fauquier?
13        A    I'm an emergency physician.
14        Q    And is that in a staff --
15        A    Correct.
16        Q    -- position?
17        A    Correct.  I'm not doing any more
18   administrative work.
19        Q    Okay.  Does that mean you supervise
20   clinicians under you, or are you actually seeing
21   patients directly?
22        A    Oh, no.  I see patients.  That's really
23   all I've ever done.  I'd held title of chair, but
24   my administrative work has always been in addition
25   to my clinical responsibilities.

Page 15

1         Q    So you would say that in your current
2    duties you're seeing patients on a day-to-day
3    basis?
4         A    That's all I do.
5         Q    During your time at Fauquier you've
6    only practiced in emergency medicine, right?
7         A    That's all I've ever done.  Forty years
8    or pretty close to it at this point.
9         Q    So, obviously, you'd say that's your
10   specialty?
11        A    Yes.
12        Q    Can you just describe for us generally
13   what someone who is an emergency medicine
14   clinician does?  What is their role in the
15   hospital?
16        A    Well, you see patients who come into
17   the emergency department for any reason they come
18   in.  The federal government has seen to it that we
19   carry out that obligation.  We are, after all, the
20   safety net.  You walk in the door and say I want
21   to see a doctor, we see you.
22        Q    Uh-huh.  And that could be any range of
23   ailments?
24        A    You've got it.
25        Q    And ailments from, you know, people

Page 16

1    that might be underinsured that are just sick to
2    people that have gunshot wounds and things like
3    that?
4         A    Correct.  It's not just the
5    underinsured who come in who are just sick.  I
6    mean, folks with really good insurance come in
7    with hangnails too.
8         Q    Fair enough.  In that work as an
9    emergency medicine clinician do you work in
10   conjunction with other specialists in treating
11   patients?
12        A    Within the emergency department
13   probably not, but we certainly consult with other
14   physicians when we have patients to admit or to be
15   followed up closely as outpatients.
16        Q    Okay.  And do you then in your role as
17   an emergency physician refer patients to a
18   specialist for follow-up care?
19        A    Yes.
20        Q    And when you make such referrals, do
21   you sometimes do it on an inpatient basis and
22   sometimes on an outpatient basis?
23        A    As a general rule emergency physicians
24   cannot admit patients.  You don't have admission
25   privileges, so if a patient requires admission,

Page 17

1    you have to find a physician to admit them to the
2    hospital.
3        Q    Uh-huh.
4        A    If it's a specialty case, say there's a
5    patient who has a gallbladder that needs to be
6    removed, you know, it's a general surgical case.
7    You would talk to a general surgeon.
8            If it's a medical case, you would talk
9    to usually the patient's primary physician or a
10   hospitalist in the hospital. The hospitalist or
11   internal medical specialist admit patients. If
12   it's a kid, it would be a pediatrician or an
13   OB/GYN doctor.
14       Q    Okay. In a situation where you are not
15   referring them to somebody who can admit them, do
16   you at times refer them to a specialist for
17   follow-up care on an outpatient basis?
18       A    Yes.
19       Q    What determines whether you are going
20   to refer someone to a specialist for the
21   possibility of admission versus referring them to
22   someone to follow up on an outpatient basis?
23       A    How sick the patient is generally.
24       Q    And how do you mean how sick?
25       A    Well, when I first started doing this

Page 18

1    if you came in the hospital and said -- I mean, if
2    you were 60 years old and you came in the hospital
3    and you said, "I'm just so tired I can't go on,"
4    we would admit you and try and figure out what was
5    wrong with you. You can't do that today. You
6    have to have a diagnosis that requires
7    hospitalization, or no insurance company will pay
8    your bill, that includes the federal government,
9    you know, Medicare and Medicaid. None of these
10   insurance carriers will pay for something that
11   doesn't actually require skilled hospitalization.
12   So our job is to find out whether you meet those
13   criteria, and if you do put them in the hospital.
14       Q    And when you say "our job" you're not
15   referring necessarily to the emergency physician.
16   You're referring to someone else who could make an
17   admission decision or not?
18       A    I'm actually referring to the emergency
19   physician because we're the ones who pull the
20   trigger. I mean, if I see you and decide to send
21   you home, I probably don't talk to anybody else
22   about it, unless I think you need very close
23   follow-up.
24           If I think you need to be seen the next
25   day, for instance, I'll call someone and ensure

Page 19

1    that that happens. If I admit you, obviously,
2    I've called a physician to do that.
3        Q    And I just want to make sure I
4    understood your previous testimony. Maybe I
5    missed it, but I thought you said that emergency
6    physicians don't have admission privileges.
7    Normally that falls under general surgery or some
8    other specialty; is that right?
9        A    Correct.
10       Q    Okay. And so when you're saying,
11 ·  quote/unquote "we admit them," what you're really
12   saying is I would refer them to someone in general
13   surgery who I would anticipate would admit them?
14       A    Correct.
15       Q    Okay. When you have a situation where
16   you as an emergency physician are referring
17   someone to general surgery or some other
18   specialist, is it fair to say that the basis of
19   that referral is some sort of working diagnosis
20   that you have come up with?
21       A    Yes.
22       Q    Okay. Would you say that that is a
23   final diagnosis of what is wrong with the patient?
24       A    Maybe. Maybe not.
25       Q    Okay. Can you expound on that answer a

Page 20

1    little bit?
2        A    Well, I mean, if you have an acute
3    myocardial infraction and I make that diagnosis,
4    you're going to get admitted and I know what's
5    wrong with you, and that will be a final diagnosis
6    because I've made the diagnosis. If you have
7    something which I suspect is a life-threatening
8    problem that I can't identify the cause, I mean,
9    you may be a admitted for further testing to
10   figure that out.
11       Q    Okay.
12       A    The vast majority of times I think we
13   have a working diagnosis that's probably close to
14   a final diagnosis when we admit patients.
15       Q    In instances were you are, again,
16   referring someone to another specialist and you
17   don't have what you consider to be a final
18   diagnosis -- we'll take not the infarction example
19   but something where you're unsure of what it is,
20   at that point you forward that working diagnosis
21   to the specialist, right?
22       A    Correct.
23       Q    And sort of say I think it might be
24   this?
25       A    Yeah. You may, for instance, have

Page 21

1  someone in shock and you think that this is septic
2  shock and, in fact, you're pretty sure that that's
3  what it is but can't find the source of the
4  infection. I mean, that would be a fairly typical
5  example of that sort of thing, I think. You've
6  got the shock right and you're sure it's septic
7  shock, but you can't find the source of that
8  infection. So that patient gets admitted, and the
9  search for the source goes on.
10      Q   Okay. As an emergency room physician,
11 obviously we talked about how you see patients
12 that come into the ER in acute stress and pain,
13 right?
14      A   Yes.
15      Q   At times -- and sometimes they have a
16 minor complaint?
17      A   Correct.
18      Q   Is it fair to say that the primary
19 responsibility of an emergency room physician is
20 to stabilize patients who come into the ER?
21      A   Yes. That's one of your primary
22 responsibilities.
23      Q   Okay. And what are the others?
24      A   I think your job is to determine the
25 cause of the patient's complaint to the best you

Page 22

1  can as best you can. Sometimes you can't, and if
2  you can't determine the cause of their complaint,
3  your job is then to decide whether what they're
4  complaining about has a possible really serious
5  cause, and if it does, to eliminate that as a
6  possibility to the best of your ability to do so.
7       Q   And what about in that situation where
8  you don't think that person has a very serious
9  ailment but you can't quite figure it out?
10      A   If there's somebody you think needs
11 further work-up, they can be worked up as an
12 outpatient. The patient gets discharged to
13 follow-up.
14      Q   Okay. We talked a couple seconds --
15 well, strike that.
16          At your hospital in Fauquier how many
17 beds are there in the emergency department?
18      A   Twenty-two.
19      Q   And give me a sense for the number of
20 people that are coming into the ER on a daily
21 basis.
22      A   We see probably 36,000 patients.
23      Q   Over a year?
24      A   Yes.
25      Q   And can you break that down on any

Page 23

1  given day?
2       A   Roughly 100.
3       Q   Okay. Obviously, given those numbers,
4  it's not possible to retain all of those people in
5  the hospital, right?
6       A   Correct. Sure. I think our admission
7  rate is probably about 15 percent.
8       Q   Okay. In your role as an emergency
9  physician do you have any responsibilities to read
10 and interpret imaging studies?
11      A   Plane films, yes. Special studies, no.
12      Q   What do you mean by plane films?
13      A   That's p-l-a-n-e, by the way. X-rays
14 done in a single plane.
15      Q   Okay. And when you refer to special
16 films what do you mean?
17      A   CAT scans, ultrasounds, MRIs.
18      Q   Okay. So if you're not the one reading
19 those who, if anybody, do you rely on to read and
20 interpret those?
21      A   Radiologist.
22      Q   Okay. Anyone else?
23      A   No.
24      Q   Okay. You don't consult with any other
25 specialist for the reading and interpretation of

Page 24

1  special films?
2       A   Correct.
3       Q   Notwithstanding the fact that you rely
4  on others, have you independently had any training
5  in how to read special films like CT scans?
6       A   All that stuff was invented after I
7  went to medical school. I mean, literally every
8  one of those modalities that I just talked about
9  was put into play after I graduated, so the answer
10 is no.
11      Q   Okay. And, obviously, since that time
12 you've not had any continuing medical education
13 about reading such studies?
14      A   Some, but not to the point that I
15 actually feel capable, you know, of doing that.
16      Q   Okay. So this is probably obvious
17 then, but I'll just ask it so we have it on the
18 record. You're not holding yourself out in terms
19 of being an expert in the reading of CT films?
20      A   Generally, when I'm reviewing one of
21 these cases, I ask them not to send me that stuff
22 because I can't. It's not something that I can
23 do. I may be able to look through them and say
24 this looks funny, but I have no faith in my own
25 ability to do that accurately.

Page 25

1    Q   Doctor, I'd like to switch gears a
2  little bit and talk about your experience with
3  diagnosing renal stones.  As you know, that's one
4  issue that's in this case.
5    A   Correct.
6    Q   So I'd just like to talk with you about
7  whether in your role as an emergency physician you
8  have ever formed a final diagnosis or even a
9  working diagnosis that somebody who came to you
10 might have renal stones.
11   A   Oh, sure.  I mean, frankly I think in
12 most cases it's very apparent before you ever do
13 the study.
14   Q   Okay.  And is that --
15   A   It's not 100 percent true.  Probably 99
16 percent true.
17   Q   Just so I understand:  Is that
18 something that you yourself have made a,
19 quote/unquote "final diagnosis" to say I've seen
20 that patient and I think this patient has renal
21 stones, or do you always rely on some imaging
22 study to confirm that before saying this is the
23 final diagnosis?
24   A   Invariably these days -- invariably
25 those patients get imaging studies.  You know,

Page 26

1  before CT scans we used to do IVPs.  If patients
2  had allergy to IVP dye that, in fact, was a
3  clinical diagnosis.  You know, you can accurately
4  diagnose these things without having confirmation,
5  without having radiologic confirmation, although
6  generally that's what's done.
7    Q   Tell me then what sort of symptoms do
8  you see in a patient that sort of gives you an
9  inkling that this person might have renal stones?
10   A   The classic history is the abrupt onset
11 of severe flank pain radiating the front to
12 the groin, sometimes to the testicle.  It starts
13 suddenly and stops suddenly, if it does stop.
14 I've seen patients who describe this pain that
15 went away in the lobby while getting registered
16 and, in fact, did pass a kidney stone.  Not that
17 we could confirm that radiologically, because once
18 it's gone it's gone, but may have some blood cells
19 in their urine, for instance, confirming that
20 that's probably the cause of the pain.
21   Q   Okay.  Any other symptoms other than
22 this onset of flank pain that you just described?
23   A   This can be associated with a feeling
24 of urinary frequency.  You have to void very
25 constantly despite the fact that you're really not

Page 27

1  passing much urine.  If the pain is bad enough
2  you'll could get nausea, vomiting and sometimes
3  even the term diaphoresis.  That really is more a
4  matter of the severity of the pain than anything.
5    Q   Okay.  You mentioned that typically
6  most patients to confirm whether they have renal
7  stones or not do get imaging studies these days.
8    A   Invariably.
9    Q   What imaging study, if you're aware, do
10 they normally get?
11   A   Non-contrast CT.
12   Q   Do you know why it is they get a
13 non-contrast CT?
14   A   Well, because the stone has the same
15 opacity as the IVP dye.  It is possible to see
16 stones if you give contrast because what
17 happens -- what causes pain with a kidney stone --
18 the kidney stones in your kidney don't cause you
19 any pain at all.  You don't even know it's there.
20 That stone may pass into the ureter, which is much
21 thinner than the kidney is.  Typically, it will go
22 all the way down the ureter and hang up in the
23 distal portion of the ureter just before you get
24 to the bladder, which is -- that's the narrowest
25 part of the ureter.  This is where these stones

Page 28

1  usually hang up.  When they do, they block the
2  flow of urine down.  The kidney is trying to
3  squeeze it out, but it's not going anywhere.
4          As a result, the ureter dilates and the
5  kidney dilates.  It's the dilatation -- the
6  space-occupying dilatation of the kidney and the
7  ureter that causes pain.  Once that stone cuts
8  loose and gets into your bladder the pain goes
9  away instantly, as quick as it came.  That's the
10 typical history of this thing.
11         So if you give contrast dye, the
12 contrast will fill the ureter down to the point of
13 the stone or it won't fill the ureter at all.
14 You'll see minimal function of the kidney.  If
15 it's highly obstructed, you'll see minimal
16 contrast in that kidney, minimal contrast in the
17 ureters because it's not going down there because
18 the kidney is essentially nonfunctioning because
19 of the blockage.
20         If there is some urine passing that
21 stone, the dye will come down to the stone and
22 stop.  You may not be able to tell that there's a
23 stone there at the end of the column of dye, but
24 you know there's an obstruction there, which
25 essentially proves the case.

7

Page 29

1     Q   Okay.  You mentioned that sometimes
2  there is found blood cells in the urine with folks
3  that have renal stones?
4     A   Yes.
5     Q   Can you just describe physiologically
6  how that blood gets there?
7     A   The stone jams in the ureter and causes
8  some abrasion.  This is what we think.  Okay.  It
9  causes some abrasion to the side of the ureter and
10  some bleeding.
11     Q   Okay.  Can it ever cause blood in
12  stools?
13     A   No.
14     Q   Because it goes to the ureter?
15     A   It's a different system.  They're not
16  hooked up.  I mean, normally they're not hooked
17  up.
18     Q   Once a diagnosis is made with respect
19  to kidney stones what, if anything, is done on a
20  treatment basis?
21     A   Generally it's a matter of pain control
22  until the stone passes.  This depends upon the
23  size of the stone.  If the stone is 4 millimeters
24  or smaller, 95 percent or more of them pass by
25  themselves with no help.  Once you get to 5

Page 30

1  millimeters, that drops to, like, 75 percent.  As
2  they get bigger, none of them will pass when you
3  get to a certain size, and we have other ways to
4  break that stone up to get it to move.
5     Q   And assuming it's just a smaller stone
6  that can pass, the patient that has that kind of
7  stone isn't admitted to the hospital, right?
8     A   Correct.  Not unless there's some
9  secondary problem like infection.
10     Q   Essentially they're discharged with
11  pain control medicine and told come back to us if
12  there's other problems?
13     A   Generally medicine to control pain and,
14  medicine to help dilate your ureters so the stone
15  will pass easier.
16     Q   Doctor, I'd next like to talk just
17  generally about your knowledge of gastritis.  As
18  you know, that's another issue in this case.  Can
19  you tell me just generally for the record what
20  gastritis is?
21     A   It's an inflammation of the stomach.
22  Of the inner lining of your stomach.
23     Q   Can you tell me what causes it?
24     A   Oversecretion.  Your own oversecretion
25  of the acid or your own inability of cells in your

Page 31

1  stomach to produce substances which protect the
2  stomach lining from the acidity that's normally in
3  it, so one of those two mechanisms or outside
4  agents like aspirin or alcohol.
5     Q   You mentioned alcohol.  Is there a
6  certain quantity of alcohol that needs to be taken
7  before one would start to expect gastritis to
8  occur?
9     A   I'm reviewing my own mind for my own
10  experience with this, but I would say no.  I mean,
11  I don't think anybody can quantitate that, but I
12  don't know.
13     Q   Okay.
14     A   I've never seen a study where they got
15  a bunch of fraternity guys together to see who
16  developed gastritis at what point.  I've just
17  never seen anything like that.
18     Q   Fair enough.
19     A   It's interesting.  It would be an
20  interesting study to do.
21     Q   What about drug use?  Can drug use also
22  cause gastritis?
23     A   Any drug which causes irritation like
24  aspirin, like Motrin, like any of the nonsteroidal
25  antiinflammatories, Prednisone, all of those drugs

Page 32

1  can cause irritation of the stomach lining.
2     Q   I know some studies have linked cocaine
3  use with development of gastritis.
4     A   It can.  I mean, assuming you swallow
5  it.
6     Q   Yes.  So if one has gastritis, how does
7  it manifest?  What symptoms are telltale signs for
8  gastritis?
9     A   Typically burning epigastric pain
10  that's made worse depending upon exactly where it
11  is that may be made worse be swallowing food.  You
12  may actually sort of feel it in your stomach.
13  Made worse by things that would typically irritate
14  your stomach in the first place, alcohol, for
15  instance, or taking aspirin or Motrin.  And
16  typically if those things are causing it and you
17  add them into an already inflamed stomach, it may
18  make the pain worse.
19     Q   Okay.  Is nausea associated with
20  gastritis?
21     A   Can be.
22     Q   How about vomiting?
23     A   Can be.
24     Q   How about -- I guess you already
25  mentioned it, but essentially pain in the abdomen.

Page 33

1   That could be a symptom of gastritis?
2     A   Yes. It's burning epigastric pain.
3     Q   Okay. What about blood in the stool?
4     A   No.
5     Q   Okay. You're not familiar with any
6 studies showing that gastritis is associated with
7 melena?
8     A   Let's divide that out. If we're
9 talking about red blood, no. If you're talking
10 about melena, digested blood, possibly.
11     Q   Okay. And can you describe for us
12 physically how melena would occur as a symptom of
13 someone that has gastritis?
14     A   You can obviously have some bleeding in
15 your stomach. Blood passes down to the duodenum
16 where it's digested. When it's digested, it
17 discolors and turns black further down the --
18 downstream in your bowel. It is black color, and
19 it will discolor your stool because it's digested.
20     Q   So in your practice as an emergency
21 medicine physician, have you ever diagnosed
22 someone as having gastritis?
23     A   Sure.
24     Q   Is that something that's common?
25     A   It's certainly not uncommon.

Page 34

1     Q   Okay.
2     A   I think I probably see somebody with
3 that probably every other time I work, at least.
4     Q   Okay. And how was it that you came to
5 make that diagnosis? Was it just based on your
6 taking a history and physical of the patient, or
7 were there any kind of imaging studies done?
8     A   Generally it's history and physical and
9 response to treatment.
10     Q   Okay.
11     A   Not uncommonly we give these people --
12 we term them "GI cocktails." You know, Maalox and
13 that sort of thing but mixed with viscous
14 Xylocaine, which is a local anesthetic. They
15 drink it and the pain goes away, or we may give
16 them intravenous acid-blocking agents and there
17 are different kinds of those because they work
18 very quickly given intravenously, and not
19 uncommonly will make the pain completely go away
20 in a matter of 10 or 15 minutes.
21     Q   You said before you look at,
22 quote/unquote, "response to treatment." Are the
23 treatments that you're talking about this Maalox
24 cocktail and these acid-blocking agents?
25     A   Yes.

Page 35

1     Q   Any other treatments that you would
2 give to sort of see and confirm that gastritis is,
3 in fact, what this person has?
4     A   Not typically.
5     Q   For those folks that you have diagnosed
6 as having gastritis, do you recall any of them
7 being admitted to the hospital for that treatment?
8     A   No. I mean, what I'm running through
9 in my mind is if I remember anybody who's bleeding
10 enough from gastritis to be vomiting enough blood
11 to have gotten themselves admitted. Typically if
12 people are bleeding that much, they have other
13 sources of bleeding like a gastric ulcer.
14     Q   Okay. I'll change gears just a little
15 bit and ask you a couple of quick questions about
16 melena. You already addressed most of them. Can
17 you just give us the clinical definition for what
18 melena is?
19     A   Black stool. Black stool which is
20 positive for containing hem or iron.
21     Q   And you talked about some of the causes
22 of melena, but can you describe any other causes
23 of what a person has that subsequently results in
24 them having melena?
25     A   Anything that causes bleeding in the GI

Page 36

1 tract above about -- above about the duodenum, the
2 end of the duodenum will cause melena. Anything.
3     Q   Okay. The last sort of general medical
4 topic I want to talk to you about, Doctor, is an
5 aortic -- aortoenteric fistula, which because I
6 always trip over it. Can we say that we'll call
7 it an AEF?
8     A   Yes. Okay.
9     Q   It's easier for us and probably for our
10 court reporter.
11     A   And me too.
12     Q   Good. So, Doctor, obviously you know
13 this case involves a secondary AEF in a patient,
14 correct?
15     A   Yes.
16     Q   Can you tell us for the record what an
17 AEF is? What your understanding of it is.
18     A   It's a fistulous tract that establishes
19 itself between the aorta and a segment of your
20 bowel. I mean, typically the lowest portion of
21 the duodenum.
22     Q   And for purposes of this case, in your
23 role as an emergency medicine physician are you
24 holding yourself out as an expert in AEFs?
25     A   What do you mean by an expert in AEF?

Page 37

1     MR. SMITH: I'm going to object to the
2  question.
3     Q   In terms of having knowledge about its
4  causes, diagnosing it, things of that nature.
5     A   Well, I would say that I know what it
6  is and I generally know how it's formed and how it
7  occurs and I'm an expert in recognizing when you
8  ought to be concerned about it and do whatever is
9  necessary to find out whether a patient has one or
10  not.
11     Q   Okay.  So then sticking with that, can
12  you just describe for us generally what happens
13  when someone has an AEF?  What is actually going
14  on physiologically?
15     A   For one reason or another bleeding
16  occurs from the end -- from the Dacron patch that
17  replaces a piece of the aorta and the two big
18  arteries that divide off the end of it.  Usually
19  in the proximal portion of that where it's
20  attached to the aorta itself as opposed to down
21  where it attaches into the iliac vessels.  And as
22  a consequence of that bleeding, a blood clot may
23  be formed, which then as a consequence a pulsation
24  may eat into the lining of the bowel and open up a
25  fistula, if you will.  An open space through the

Page 38

1  clot and into the bowel.
2     Q   And how does an AEF manifest itself?
3     A   What do you mean?  What are the
4  symptoms of it?
5     Q   Uh-huh.
6     A   In the early part of the process
7  typically severe flank pain which may or may not
8  radiate toward your groin.  The reason for that is
9  that hematoma formation is retroperitoneal.  The
10  aorta is a retroperitoneal vessel, and as it's --
11  and the kidney is a retroperitoneal organ.  And
12  these things lay in fairly close proximity to one
13  another.  So in the same way that when the kidney
14  dilates it causes pain by occupying space where it
15  doesn't belong, in the retroperitoneum the aorta,
16  if it starts to bleed for any reason, and the AEF
17  is one of the things that can cause accumulation
18  of blood around the aorta as is a leaking
19  abdominal aortic aneurysm or expanding abdominal
20  aortic aneurysm will give you that same kind of
21  pain because it's expanding in the retroperitoneal
22  space and occupying places where it doesn't
23  belong.
24     Q   Okay.  We were talking about symptoms
25  and I think you mentioned this flank pain.  Any

Page 39

1  other symptoms that you associate with AEFs?
2     A   Eventually you will bleed into your GI
3  tract.  When you bleed into your GI tract directly
4  from your aorta, you will exsanguinate shortly.
5     Q   Okay.  Can you just put that in
6  layperson's terms what that means?
7     A   Bleed to death.
8     Q   And when you say shortly, why do you
9  say that?
10     A   Because the aorta carries the -- I
11  mean, it's the main blood vessel in your body.  It
12  carries -- I don't know exactly what percentage of
13  the blood that comes out of your heart, but a fair
14  portion of it, and if your heart is squeezing that
15  out into an open space, there isn't going to be
16  any blood left in circulation.
17     Q   Do you have any sense for how fast
18  shortly is?
19     A   It depends on the size of the hole,
20  obviously.  It can be -- you know, we can be
21  talking about 15 or 20 minutes or we can be
22  talking about a couple hours.
23     Q   I've read some literature suggesting
24  that folks describe an AEF where a patch or a
25  suture area essentially ruptures, and then at that

Page 40

1  point the aorta is like a firehose spitting out
2  blood into an area.  Is that somewhat accurate in
3  terms of what physiologically is happening?
4     A   I think that's what I just described,
5  actually.  You put a different moniker on it, but
6  I think we're describing the same thing.  It's
7  also fair to say that not uncommonly these things
8  have a little bit of bleeding when they first
9  start.  Then some time passes between this little
10  bit of bleeding when they first start and when
11  they really blow.  That time frame is probably
12  pretty variable.  We don't really know what it is.
13     Q   Okay.  Do you know what the medical
14  literature says in terms of the incident rate of
15  secondary AEFs after someone has had a bifemoral
16  bypass?
17     A   I think it's relatively uncommon,
18  probably a couple percent.
19     Q   Okay.  If I told you it's as low as a
20  half of 1 percent would you quibble with that?
21     A   No.  I'm sure you could find something
22  that says that.  I wouldn't argue.
23     Q   Okay.  But a decently rare phenomenon
24  is what you would say?
25     A   Correct.

Page 41

1    Q   We were talking about the time frame at
2  which you would have some sort of rupture in a
3  suture and then subsequently some sort of symptoms
4  of that happening.  Are you familiar with what the
5  medical literature says in terms of the period of
6  time in which you could have that process play
7  out?
8    A   No.  I'm not sure anybody -- I don't
9  mean to detract from the medical literature,
10  believe me.  But I don't believe anybody can say
11  with a great degree of accuracy what that time
12  frame is because we only know when we make the
13  diagnosis.  We don't know when the problem started.
14  If someone, for instance, had -- the term "herald
15  bleed" has shown up in the discussions.  If
16  someone had a herald bleed and bled into the space
17  between the aorta and the valve, and that blood
18  slot sat there and sort of pounding away with the
19  aorta and eventually broke through the bowel wall
20  and caused this fistula to occur, I don't think
21  anybody knows how long that hematoma may have been
22  there because generally speaking these things
23  aren't figured out until the patient becomes
24  symptomatic minimally with pain.  And then not
25  uncommonly until the thing blows.  When it blows,

Page 42

1  you don't know how long that clot has been there.
2  There's no way to tell that.  It's just not
3  possible to do.
4    Q   Uh-huh.
5    A   It may have been hours.  It may have
6  been days.  It may have been a week or two.  It's
7  just not possible.
8    Q   Okay.  Assuming an AEF is found, are
9  you familiar with what kind of treatment options
10  are available?
11    A   Once they blow -- you know, operative
12  invention may be attempted, but it's generally
13  unsuccessful.  I mean it's in many ways pretty
14  similar to bleeding from an abdominal aortic
15  aneurysm.  If that thing leaks and it leaks into
16  the retroperitoneal space and it doesn't get
17  outside the retroperitoneal space, the operative
18  intervention will save the vast majority of
19  patients who have this if the diagnosis is made.
20          Once that thing ruptures through the
21  retroperitoneal space and gets to this whole
22  peritoneal cavity that is easily filled with
23  blood, it's all over.  The operative mortality
24  goes up, like, 90 percent.  So it's a matter of
25  making the diagnosis early before the horse gets

Page 43

1  out of the barn, if you will, before that thing
2  really blows and really starts to bleed.
3          If you can make this diagnosis prior to
4  the time that occurs, then you've got a reasonable
5  chance at salvaging the patient.  Unfortunately,
6  most of the time that doesn't happen.  A lot of
7  times you don't have the opportunity to do it.
8  Sometimes you do have the opportunity to do it.
9  Sometimes it is diagnosed.  Sometimes the patient
10  is salvaged.
11    Q   We talked about how AEFs are a decently
12  rare phenomenon.  Can we say in your career how
13  many times you've had to deal with a patient who
14  was suspected of having an AEF?
15    A   Once.
16    Q   Do you remember when that was?
17    A   It was when I was at Greater
18  Southeastern.  I couldn't tell you the exact year.
19    Q   Can you give us any ballpark?  Was this
20  in the '90s?  The '80s?
21    A   80s.
22    Q   Can you tell me just generally about
23  that patient's history, how that patient came to
24  you and what you decided?
25    A   The guy came in with a sudden onset of

Page 44

1  vomiting blood and essentially exsanguinated.
2    Q   Okay.  And so, obviously, that person
3  expired.
4    A   Yes.  He had a history of graft.
5    Q   What was the time frame at which you
6  were able to see and treat this patient before he
7  expired?
8    A   An hour.
9    Q   Other than this vomiting of blood, did
10  he have any other symptoms which led you to think
11  maybe there might be an AEF there?
12    A   You know, only huge volumes of blood
13  loss in a patient who had a graft.  That's what I
14  thought the most likely cause of this -- I mean,
15  the guy bled to death in front of me.
16    Q   Was any surgical invention attempted?
17    A   No.
18    Q   Okay.  I gather there just wasn't time
19  to do it?
20    A   Correct.
21    Q   Other than this one time where you were
22  involved in a patient's care -- strike that for a
23  second.
24          It was ultimately determined that an
25  AEF happened in this patient, right?

Page 45

1    A    Yes.
2    Q    Who determined that?
3    A    The coroner.
4    Q    Okay.
5    A    It's not really the coroner.  It's the
6  medical examiner.
7    Q    So you yourself didn't come to that
8  conclusion definitely.  You waited for an autopsy?
9    A    Well, I came to the conclusion
10  definitely, and the autopsy proved that I was
11  right.  Let's put it that way.
12    Q    Okay.  Other than the one time where
13  you were, I guess, directly involved in a patient
14  who had an AEF, had there been any other instances
15  in your career where you've had to consult on a
16  patient who it was suspected might have an AEF?
17    A    Where I had to -- did you say consult?
18    Q    Consult.
19    A    You mean that I saw?
20    Q    Either that you saw or, for example, if
21  there was a resident and you're a staff and they
22  come to you and say, "These are the some symptoms
23  I'm seeing.  What do you think?"  Is there any
24  other time at which you came into contact with any
25  case where AEF was even involved?

Page 46

1    A    I have seen patients who had grafts and
2  had pain that I was concerned about and I CT'd
3  looking for a problem with a graft.
4    Q    Okay.
5    A    I've seen probably half a dozen of
6  those.
7    Q    Okay.  So you said about six cases that
8  you've had where you've seen someone and thought
9  maybe they might be concerning for an AEF?
10    A    Correct.  Yes.  Or extravasation of
11  blood from the graft itself if not the presence of
12  a fistula because really that's when you want --
13  if you're going to make this diagnosis, you'd like
14  to make it when there's a hematoma there before
15  there's a fistula.  You want to -- when there's
16  extravasation of blood from that graft before that
17  fistula actually becomes a fistula and opens up
18  into the bowel.  You would like to make that
19  diagnosis or when the fistula is very small and
20  only a minimal amount of bleeding going on.
21  That's when you want to do it.
22    Q    With respect to these -- we'll just say
23  six patients, what are the steps that you took
24  after they came in and you thought there was
25  something concerning for AEF?

Page 47

1    A    Contrast CT.
2    Q    You did that for all of them?
3    A    Pardon?
4    Q    That was done for all of them?
5    A    Yes.
6    Q    And what were the results of these
7  diagnostic studies?
8    A    They all -- none of them indicated that
9  that was a problem.
10    Q    So they essentially all came back
11  clean?
12    A    Right.  Exactly.  I mean, or otherwise
13  I would have included them in the first question
14  we talked about AEF that I've dealt with.
15    Q    Okay.  And so what -- if you recall,
16  what was then the diagnosis?  What was wrong with
17  these folks?
18    A    One patient had a little
19  retroperitoneal bleeding from actually it turns
20  out probably trauma, and the others I was never
21  able to really pinpoint what their discomfort came
22  from.
23    Q    Okay.  After getting those imaging
24  studies, were these patients retained in the
25  hospital?

Page 48

1    A    No.
2    Q    And were all of these imaging studies
3  done while they were in the hospital, or did any
4  of them come through subsequent outpatient
5  follow-up care?
6    A    They all were referred for follow-up.
7    Q    While they were there in the hospital?
8    A    Well, yeah.  I mean, discharge from the
9  emergency department with --
10        MR. SMITH:  I think his question was
11  where did the CTs occur.
12    A    While they were in the emergency
13  department.
14    Q    I just want to make sure I'm clear in
15  my question.  So with respect to these six
16  patients, they come in complaining of pain and
17  then you subsequently say "You need to get a CT
18  with contrast."  Are those CTs with contrast done
19  while they're there at that visit --
20    A    Yes.
21    Q    -- or are they?
22    A    I apologize.  I mean, that's just so
23  standard that I couldn't imagine you asking.  It
24  didn't make any sense to me that I would send a
25  patient out to get a study.  You know, discharge

Page 49

1  them and say get the study as an outpatient. We
2  just don't do that.
3      Q   Uh-huh.
4      MR. SMITH:  Can we take a break?
5      MR. MEDINGER:  Yeah.  This is actually
6  a really good spot to take a break.
7      (Recess was taken.)
8      (Deposition Exhibit No. 3 marked for
9      identification and attached to the
10     deposition transcript.)
11 BY MR. MEDINGER:
12     Q   Doctor, we've given you what's been
13 marked as Exhibit 3.  You recognize that as the
14 expert report you wrote in this case, right?
15     A   Yes.
16     Q   Okay.  And first and foremost I'd just
17 like to ask you a couple of questions about the
18 information that you relied on in writing this
19 report.  If you look at paragraph 2, it talks
20 about the records that you were given and the
21 records that you evaluated.  Does that fairly and
22 accurately describe the records that you relied on
23 in forming your expert report in this case?
24     A   Yes.  Obviously, I saw the Hopkins
25 records and the autopsy as well.  I don't know if

Page 50

1  that's mentioned there.
2      Q   Yes.  I think it is, actually.
3      A   Yep, it is.
4      Q   And, again, this I think we talked
5  about this earlier in the deposition, but you
6  didn't rely on any other materials in forming your
7  expert report in this case?
8      A   Correct.
9      Q   Okay.  So if you look here, Doctor,
10 sticking with this second paragraph we know that
11 in January of 2006 there was a CT done of Mr.
12 Johnson, and at that point it didn't show any
13 problems with the bypass graft area, correct?
14     A   Yes.
15     Q   That's your understanding?
16     A   Yes.
17     Q   But as we talked about before, you
18 didn't specifically yourself review those CT
19 images?
20     A   Correct.
21     Q   Okay.  Other than, you know, what's
22 listed in the radiology report about what the
23 findings were, is there anything else in Mr.
24 Johnson's presentation which suggests to you that
25 as of January 2006 he wasn't having any problems

Page 51

1  with that graft area?
2      A   I have not seen anything else in the
3  records up until, you know, his October visits in
4  2007 that suggested to me that there was problem.
5      Q   And just so --
6      A   There isn't much in the records in
7  between.
8      Q   That's correct.
9      A   Yes.
10     Q   Just to be completely fair to you, let
11 me mark as the next exhibit the relevant medical
12 records, and we'll just dwell a little bit on
13 January 1st --
14     A   Okay.
15     Q   -- and see what your responses are
16 going to be.
17     (Deposition Exhibit No. 4 marked for
18     identification and attached to the
19     deposition transcript.)
20     Q   First, Doctor, let's look in Exhibit 4,
21 which I'll proffer to you are various pages from
22 Mr. Johnson's medical records.
23     A   Yes.  I recognize them, actually.
24     Q   And so if we look at page 4, there is a
25 column in there talking about the blood work that

Page 52

1  was done on Mr. Johnson in January of 2006.  Do
2  you see that column there?
3      A   Okay.
4      MR. SMITH:  There's two pages, two
5  markings on these pages.  There's your marking,
6  and there's the VA marking, so when you say page 4
7  are you referring to the VA marking or are you
8  referring to your marking?  They're two different
9  pages.
10     MR. MEDINGER:  Thanks for the
11 clarification.
12 BY MR. MEDINGER:
13     Q   I'm referring to our markings, and our
14 markings refer to the ones if you look, Doctor --
15     A   I've got it.
16     Q   -- D004.
17     A   I hate to use the phrase, but I think
18 we're on the same page.
19     Q   That's good.
20     Okay.  So if you look at D004, there's
21 that column for blood work that was done in
22 January of 2006.  Are you familiar with what the
23 acronyms and abbreviations are for what is listed
24 there?
25     A   Yeah.  Yes, I am.

Page 53

1    Q   Okay.  Looking at those from the
2  January 2006 time frame, is there anything that
3  looks to you to be abnormal in his blood work?
4    A   No.
5    Q   Okay.  Doctor, next I'd like you just
6  to scan very quickly to page D0082.
7    A   Okay.
8    Q   And if you could just read silently to
9  yourself pages 82 through 86.  I'll proffer to you
10  these are the clinical notes presentation from
11  this January '06 visit.
12    A   Okay.
13    Q   And when you're done I'll ask you a
14  couple quick questions.
15    A   Okay.
16    Q   Okay.  Doctor, looking at that medical
17  note from January of 2006, would you agree that
18  Mr. Johnson at this point was hemodynamically
19  stable?
20    A   Yes.
21    Q   Okay.  And what would lead you to agree
22  to that statement?  What are the signs that you
23  look for to determine that?
24    A   Blood pressure and pulse rate are
25  normal.

Page 54

1    Q   Okay.  Is that how you define being
2  hemodynamically stable, looking at blood pressure
3  and heart rate?
4    A   I don't think that's necessarily how
5  you define it, but they're certainly indicators of
6  that.  I mean, typically you would define
7  hemodynamically stable as a series of blood
8  pressures and pulse rates which didn't change in a
9  matter of a relatively brief period of time.
10    So if you have a patient in your
11  emergency department that comes in with a blood
12  pressure of 120/80 and you take their blood
13  pressure four or five times over a period of three
14  hours and they're all 120/80 and the heart rate
15  stays 80 throughout, that's hemodynamically
16  stable.
17    Q   Okay.
18    A   Okay.
19    Q   Okay.  Does the fact that he was
20  hemodynamically stable throughout this
21  January 2006 visit, is that further evidence that
22  he wasn't having problems with the graft area at
23  this time?
24    A   I think hemodynamically stable means
25  that you're not acutely bleeding at the time that

Page 55

1  these parameters are measured, if that makes
2  sense.  We only have -- we have one blood pressure
3  and pulse to deal with in this record that I see,
4  so you don't know if there were changes that
5  occurred here.  My assumption is are there aren't
6  because nobody noted them and nobody did anything
7  about them, so likely he was hemodynamically
8  stable during this visit.
9    Q   Okay.  But you agree at the very least
10  if he was not hemodynamically stable, that would
11  be an additional factor concerning for problems
12  with that bypass pass area?
13    A   Yes.
14    Q   But then can we agree on the converse
15  though that if he is, further evidence that
16  there's no problems with the graft area?
17    MR. SMITH:  Objection.
18    A   Yes and no.  If the patient is
19  hemodynamically stable, I think it means that
20  they're not bleeding then.  It doesn't mean they
21  didn't bleed three days ago and stabilized their
22  hemodynamic system.  You can lose 25 percent of
23  your blood supply acutely.  While that's going on,
24  you will probably not be hemodynamically stable,
25  but over a period of hours to days you will regain

Page 56

1  stability as long as the bleeding stops.
2    Q   Okay.  And let's tease that out.  How
3  would the bleeding stop if there was a problem at
4  the graft area?
5    A   You could get a clot that overlies the
6  area that's bleeding.  If it's a small area, you
7  could get a clot that overlies that and stops the
8  bleeding.
9    Q   Uh-huh.
10    A   That is, after all, how bleeding
11  stops --
12    Q   Okay.
13    A   -- you know, usually.  We do have
14  things to help it along at times, but that's the
15  natural mechanism that your body uses to stop
16  bleeding.
17    Q   And my question really is:  Is it
18  additional evidence of, maybe not confirming that
19  hemodynamic stability evidence of stability of the
20  graft site?
21    A   I think it is evidence of not acutely
22  bleeding at the time things are measured.  I don't
23  think you can say more than that.
24    Q   Did you notice in this January 2006
25  visit they essentially allayed his pain, and he

Page 57

1 denied having any discomfort at that point, and
2 then they subsequently discharged him, right?
3     A   Yes.
4     Q   Okay.  Just going back to your report.
5 You don't contend there was any medical
6 malpractice on the part of the VA with respect to
7 this January 2006 visit, right?
8     A   Correct.
9     Q   Okay.  Let's move forward then to
10 October 5, 2007.  And we can start with your
11 report, and then we'll look at the medical records
12 themselves.  If you look at paragraph 3 of your
13 report, it says that Mr. Johnson arrived at the VA
14 medical center with complaints of bilateral knee
15 pain and numbness below the knees.  And then you
16 go on to talk about the findings of Dr. Onyiah.
17 Did you see anywhere in the medical records any
18 complaints of abdominal pain by Mr. Johnson at
19 this time in this October 5, 2007 visit?
20     A   I did not.
21     Q   Okay.
22     A   I mean, interestingly because on his
23 next visit, which is the 9th, they say that he has
24 had abdominal pain for five days.  I just find
25 that interesting.

Page 58

1     Q   Yeah.  In other words, we see no record
2 of it being reported on October 5th, but then on
3 the 9th he says he's had it --
4     A   -- for five days.
5     Q   Yes.  Okay.  Let's look at page D0057.
6 And just if you could read this interval history
7 section to yourself, and then I'll just ask you a
8 couple questions about it.
9     A   Okay.
10     Q   You notice in the notes where it says
11 his knee pain was somewhat improved by wearing
12 knee braces?
13     A   Yes.
14     Q   And then it subsequently says, and I'll
15 proffer to you what it says on page 59.  You can
16 look at it if you like.  That he was walking
17 significant amounts everyday.
18     A   I actually remember reading that.
19     Q   Okay.  So, obviously, Mr. Johnson as of
20 this date, October 5, 2007, was ambulatory, right?
21     A   Yes.
22     Q   Based on the findings that he was
23 ambulatory and that knee braces did sort of
24 alleviate some of his pain, does that suggest any
25 clinical finding to you about the cause of his

Page 59

1 knee pain?
2     A   It suggests it's musculoskeletal.  I
3 mean, actually that's my assumption.
4     Q   And by musculoskeletal you mean, you
5 know, sort of the pain that all of us experience
6 when our knees get to a certain point of use?
7     A   Yep.  When you get older, it gets
8 worse.
9     Q   I'm already there.  I've been running
10 too much.
11         Okay.  Doctor, looking at this
12 October 5, 2007, and particularly they did do some
13 vital signs, which are here on page 57, would you
14 agree that Mr. Johnson was hemodynamically stable
15 during this October 5th visit?
16     A   No.  Again, I think that blood pressure
17 and pulse are normal.  That's one record.  I mean,
18 with the same -- the same statement that I made
19 previously.  That's just one blood pressure and
20 pulse.  You really can't say he's hemodynamically
21 stable during the visit without other markers, but
22 my assumption is he was because nothing else was
23 done.
24     Q   And in terms of talking about what
25 impact that might have at all with respect to what

Page 60

1 we can say about the bypass graft area, the most
2 you would say that that says to us is he wasn't
3 actively bleeding at that point?
4     A   Correct.
5     Q   Okay.
6     A   But if you look at other parameters in
7 the chart, they certainly suggest that he had
8 blood.
9     Q   Okay.  What other parts of the chart
10 during this -- this is on the October 5th visit?
11     A   Right.
12     Q   -- talk about that?
13     A   Well, his lab values.  His hematocrit
14 is 34, and his previous hematocrit is, like, 42 or
15 43 something like that.
16     Q   Let's take a look at that.  And the
17 labs are back on page 4.
18     A   Okay.
19     Q   And you see the column there, Doctor,
20 where it says October 5, 2007?
21     A   Yes.
22     Q   You mentioned hematocrit, and that's
23 reflected by the HCT acronym, right?
24     A   Correct.
25     Q   Okay.

Page 61

1    A    There are hemoglobin guys, and there
2 are hematocrit guys. I'm a hematocrit guy.
3    Q    Okay.
4    A    I mean, when people look at parameters
5 for blood loss and that sort of thing, we really
6 have two tests that measure this in the CBC. One
7 is the hemoglobin content, and the other is the
8 hematocrit. People get to looking at -- you pick
9 one of those two things to watch as a matter of
10 habit. My habit is hematocrit.
11    Q    And forgive me for just being
12 academically curious, but what is really the
13 difference between the two measures?
14    A    Okay.
15    Q    What's different about them?
16    A    Your hematocrit is the percentage of
17 your blood volume, which is packed red blood
18 cells. In other words, if you want to
19 determine -- it's the way we used to do it in the
20 old days before you had machines that would do
21 everything for you. You would take a capillary
22 tube and you take your blood specimen and mix it
23 up well. You take a capillary tube, fill the
24 capillary tube with that blood and put it in the
25 spinner and spin that until it packed the cells

Page 62

1 down. Take the capillary tube out and literally
2 measure it. They had a little device that
3 measured it for you to tell you what percentage of
4 that blood is packed red blood cells.
5    Q    Okay. And why would one choose one
6 measure over the other?
7    A    I think it's just habit. Hemoglobin,
8 by the way, is actually a measurement of your
9 hemoglobin, which is a part of your red blood
10 cells. So it's a measurement of the total amount
11 of hemoglobin in your blood, which is a reflection
12 of your red blood cell mass.
13    Q    Okay. Looking at the labs from this
14 October 5th visit the line of questioning that we
15 were going down was whether Mr. Johnson was
16 hemodynamically stable at this point, and you
17 mentioned the hematocrit. I have some questions
18 about that in a second, but is there anything else
19 in this blood work that would give any suggestion
20 to you that Mr. Johnson was not hemodynamically
21 stable?
22    A    No. I don't think this does either.
23 It just -- what this reflects is he's lost 25
24 percent of his circulating blood volume between
25 January 31, 2006 and October 5, 2007.

Page 63

1    Q    Okay. So sticking then just with the
2 hematocrit level, it's obviously indicated on
3 here -- and there's an L next to it, which
4 suggests it's somewhat low. At your hospital do
5 they have similar values assigned to hematocrit
6 levels and when they reach certain thresholds?
7    A    Yes.
8    Q    What's the threshold at which your
9 hospital would say someone's hematocrit is low?
10    A    For males it's around 38.
11    Q    Okay. And what --
12    A    It's not nearly as important as the
13 comparative value, obviously.
14    Q    Certainly. Because one could have just
15 a low hematocrit level historically?
16    A    Exactly. You could suffer from chronic
17 anemia, for instance, and have a hematocrit of 32
18 or baseline normal and it's about in that range
19 every time you test it.
20    Q    Okay. And is there a level below low?
21 In other words, if someone is below even a certain
22 threshold, is there an additional signal, if you
23 will?
24    A    Certain labs have panic value kinds of
25 things, and they set those different for different

Page 64

1 tests. What that essentially means is the test is
2 so abnormal that they pick up the phone and call
3 you and tell you about it as opposed to just
4 printing it out on the sheet. I don't know if
5 this hospital does that or not.
6    Q    But in your hospital do you know what
7 the level is?
8    A    For hematocrit I don't know. I could
9 give you a reasonable estimate of probably 20.
10    Q    Okay. And I'm not going to hold you to
11 the exact number, but 20 is where red lights are
12 going off?
13    A    Yes.
14    Q    So someone with a 32 level of
15 hematocrit can still function?
16    A    Oh, sure.
17    Q    Okay.
18    A    Still function and probably not be very
19 symptomatic. I mean, if your hematocrit dropped
20 from 43 to 32 in a period of hours you would be
21 very symptomatic. You'd be tachycardic. You'd be
22 hypotensive. Your heart rate would be up. Your
23 blood pressure would be down. If your hematocrit
24 had dropped from 42 to 32 -- from 43 to 32, three
25 days ago, in a period of several hours you'd be

Page 65

1  hemodynamically stable on the third day if you had
2  no further blood loss because your volume would
3  have corrected itself. There's enough blood and
4  oxygen carrying capacity in those red cells with a
5  hematocrit of 32 to meet all your vital signs and
6  your vital functions, so your blood pressure and
7  heart rate would be expected to be normal.
8      Q    What are some of the reasons why a
9  hematocrit level would change within a person?
10     A    The first and most common reason I
11 would say is from bleeding someplace in your body,
12 someplace outside your body but from bleeding.
13 That's the most common way that it changes, and it
14 is the one to be concerned about when you look at
15 this phenomenon.
16     Q    Could there be any dietary impacts on
17 hematocrit levels?
18     A    You can become anemic for lots of
19 different reasons because of many disease
20 processes, because of vitamin deficiencies,
21 because of iron deficiencies on and on. I mean,
22 there are lots of reasons to become anemic, but
23 the one that is the most life threatening cause
24 and the one to be most concerned about, obviously,
25 is blood loss.

Page 66

1      Q    Okay. Are you familiar with medical
2  studies which show that the hematocrit level could
3  change whether the test is given of someone supine
4  versus somebody in a different setting?
5      A    The first time I ever heard about that
6  was when I read Dr. Weld's deposition. I found it
7  interesting.
8      Q    Do you agree with it or disagree with
9  it?
10     A    I really can't comment on it. I've
11 never read the study. I wouldn't be terribly
12 surprised.
13     Q    Okay.
14     A    But let me say right up front when you
15 have a patient with this kind of anemia that
16 obviously has lost a third or 25 percent of their
17 oxygen carrying capacity, you know, 25 percent of
18 their red cell mass in a matter of a year or
19 however long it was, and you're evaluating that
20 patient for an acute problem and two days later
21 that hematocrit has dropped another two points,
22 coming up with 100 reasons that are not life
23 threatening and considering those as possibly
24 being the cause is not what you need to do. You
25 need to decide and prove that this patient who has

Page 67

1  a possibility of a problem may cause this acute
2  blood loss doesn't have it. You need to rule out
3  significant life threatening process that may have
4  reflected itself in acute bleed.
5      Q    Sticking to sort of with hematocrit
6  levels, is it true -- you talked about people with
7  anemia that might have a lower level and that's
8  just what they have to live with. Is it true that
9  over the duration of one's life one's hematocrit
10 level is somewhat static?
11     A    Depending upon outside influences of
12 disease processes, your hematocrit probably stays
13 in a fairly similar range.
14     Q    And that's just based on genetics or
15 how one's system is?
16     A    Yes.
17     Q    Okay. So getting back to this
18 October 5th visit. We talked about the knee pain
19 and likely being musculoskeletal in origin.
20     A    I think so.
21     Q    Can we agree then that the knee pain
22 that he was complaining about wasn't related to
23 the bypass graft area?
24     A    I don't think it was.
25     Q    Okay. So we know that Dr. Onyiah is a

Page 68

1  primary care physician. Do you contend that she
2  had any independent duty to evaluate whether Mr.
3  Johnson was having a problem with his graft area?
4      A    I think she had an independent duty to
5  understand that he lost 25 percent of his
6  circulating blood volume, and I think she had an
7  independent duty to be sure that he didn't have an
8  active bleeding problem when he left the clinic.
9      Q    And that -- so she -- that opinion,
10 that contention is based on her knowing that he
11 has lost that hematocrit level?
12     A    Correct.
13     Q    Did you read the portion of Dr.
14 Onyiah's deposition where she indicated that she
15 gave the care she gave and the lab work was
16 actually done after he had left her care?
17     A    That the results came back after he
18 left the clinic? I don't remember that from her
19 deposition.
20     Q    Let's just --
21     A    She may very well have said that. I
22 just don't remember it.
23     Q    If that actually is the case and the
24 results came back after he was outside of her
25 care, would it change your opinion at all about

Page 69

1   any duty that Dr. Onyiah might have owed?
2       A   If she were practicing in an emergency
3   department as an emergency physician, I would say
4   that that in and of itself is a deviation of the
5   standard of care. You don't order lab tests like
6   that and then send the patient home before you
7   know the results. I don't know the VA system well
8   enough to say that that in and of itself is a
9   deviation of the standard of care, given her
10  setting.
11      Q   Okay.
12      A   I mean, if that's typically the way
13  things are done there and this wasn't followed up
14  on, she can't be held responsible for it if she
15  didn't know. You know, in emergency medicine you
16  can't not know. You order a lab test for a
17  reason. You need to know the results before you
18  make decisions on whether you're going to
19  discharge the patient.
20          If she ordered these test results and
21  the test results didn't come back until after the
22  patient was gone and she had no knowledge of them
23  and that's typically the way they do things there,
24  then I really can't say that she has breached the
25  standard of care if that's the routine way things

Page 70

1   are done. Since I don't practice in a primary
2   care setting, I can't criticize that.
3       Q   Okay.
4       A   I clearly think she needed to be very
5   concerned about the drop in that hematocrit.
6       Q   Let's take it outside of the context of
7   just the VA, and you can tell me whether you can
8   opine way or the other at this point. Let's talk
9   just about generally any primary care physician
10  that may have privileges at Fauquier but they have
11  their little primary care spot which people go to
12  in some sort of community and Dr. Onyiah is giving
13  care in that kind of a setting. Would you say at
14  that point that there's any responsibility of the
15  primary care physician to know about the lab work
16  before someone is discharged?
17      A   Again, I don't practice in the primary
18  care setting. I can certainly see a way in which
19  those things are done that way, I mean, if that's
20  routine practice, that's routine. I just can't --
21  I really can't opine.
22      Q   Okay. And then if the case really is
23  that Dr. Onyiah is in the role of a primary care
24  physician, would you say at that point then that
25  you would not be able to opine as to the standard

Page 71

1   of care that would be applicable to her?
2       A   Well, yes and no. I mean, there are
3   things that I think every physician should know
4   and it doesn't really matter what your specialty
5   is. There isn't a physician practicing who
6   shouldn't recognize that this man's blood volume
7   dropped at some point by 25 percent and shouldn't
8   be concerned about that. We all should. If the
9   practice in her practice setting is that lab
10  results get sent out and they come back to the
11  chart at some later date and somebody checks on
12  them and follows up or whatever that is, then I
13  can't -- and I don't know what that circumstance
14  is here, but if that's the case, I can't be
15  critical because she is following the standard
16  routine.
17      Q   Okay. Sir, now I'd like to turn to
18  this October 9th visit with Dr. Weld.
19  Specifically I want to look at Mr. Johnson's
20  initial presentation. So if you look to pages D55
21  in that packet, and if you don't mind, Doctor, if
22  you could just read from D55 through D57, and just
23  sort of familiarize yourself with that initial
24  presentation of Mr. Johnson. This is the nursing
25  note.

Page 72

1       A   Okay.
2       Q   Okay. Doctor, I'm looking at this
3   initial nursing note, which it looks like the date
4   of the note it was started at 3:50 in the
5   afternoon on October 9, 2007. At this point it
6   looks like the chief complaint is pain in lower
7   back, mid-epigastrium chest pain and vomiting.
8       A   Epigastrium is really not in the chest,
9   but that's neither here nor there.
10      Q   I was going to ask you about that.
11  Where is the mid-epigastrum?
12      A   Where your ribs come up and meet the
13  point of your sternum, the epigastrium sits right
14  below that.
15      Q   Uh-huh. Okay.
16          So there's vomiting but there's no
17  express indication of abdominal pain at that
18  point, right?
19      A   Correct.
20      Q   If you look at D56, they do take a
21  pulse and a blood pressure.
22      A   Yeah. They do it twice this time.
23      Q   Uh-huh. So looking at just the one
24  from October 9th, that pressure and pulse rate, is
25  that consistent in your opinion with someone who

Page 73

1   is hemodynamically stable?
2       A   Yeah.  Now we have two points so, yes.
3       Q   And when you say two points, what's the
4   other point?
5       A   We have one at 15:43 and one at 14:39.
6       MR. SMITH:  They're different dates.
7       Q   They're actually from different dates.
8       A   Oh.  Oh.  I'm sorry.
9       Q   No problem.  The bottom one is from
10  October 5th.
11      A   I didn't even look the date.  I just
12  assumed they were done on the same visit.
13      Q   Okay.
14      A   It's the same comment I made the other
15  two times we discussed this.
16      Q   That essentially this is consistent --
17      A   I mean, they're normal vital signs at
18  the time they were taken.
19      Q   So let's then look at Dr. Weld's note,
20  which starts at D0053.  Forgive me.  These are
21  done in reverse chronological order, so it is what
22  it is.  But if you look at that note, it looks
23  like she started it at 6:59 p.m. on October 9th.
24  Actually, how about this, sir, if you don't mind
25  just reading through pages D53, 54 and then on to

Page 74

1   55 just so you can familiarize yourself --
2       A   Okay.
3       Q   -- with what she says there.
4       A   Okay.
5       Q   So, Doctor, what I want to talk to you
6   about is sort of the material from page 53 sort of
7   down to midway through 594 where it says ECG.
8       A   Okay.
9       Q   Take all that information from the
10  initial history and physical all the way down to
11  that ECG.  If that is the clinical presentation of
12  a patient that you've seen in the emergency room
13  what would be in your differential in terms of
14  what's wrong with that patient based on that
15  presentation?
16      A   Certainly her concern about ureteral
17  colic or kidney stone would be high on the list
18  and right behind it would be some problem with
19  that graft.
20      Q   Okay.  Anything else?
21      A   Those would be the two major
22  considerations.
23      Q   Is it fair to say this acute onset of
24  flank pain would have put renal stones first on
25  the list of what your differential would be?

Page 75

1       A   Yeah.  Because it's the most common.
2       Q   And I think we talked about this
3   earlier, and the proper protocol for when you
4   think someone has renal stones is to give a
5   non-contrast CT?
6       A   Correct.
7       Q   And we obviously know that Dr. Weld
8   gave Mr. Johnson a non-contrast CT in this case,
9   right?
10      A   Correct.
11      Q   So at least up to that point would you
12  say that she was providing the standard of care to
13  Mr. Johnson?
14      A   Yes.
15      MR. SMITH:  Objection.
16      Q   Okay.  Based on this patient's history
17  of drug and alcohol abuse, would gastritis have
18  been in your differential of possible causes for
19  his presentation?
20      A   No.
21      Q   Okay.  Why is that?
22      A   It doesn't cause flank pain.  He had --
23  it seems to me like he had two different pains.
24  One is described as epigastric discomfort, and the
25  other described as flank pain and gastritis

Page 76

1   doesn't cause flank pain.
2       Q   But it can be associated with
3   epigastric pain?
4       A   Sure.
5       Q   Okay.
6       A   It typically is.
7       Q   So I'm trying to understand then why
8   would gastritis not be in your differential.
9       A   Well, I thought you were talking about
10  the differential of his left flank pain.
11      Q   Okay.  No.  No.  Sorry, Doctor.  I'm
12  talking about --
13      A   Oh.  The entirety?
14      Q   Yeah.
15      A   I think that's a consideration as a
16  cause of his epigastric discomfort.
17      Q   Does the fact that Mr. Johnson was
18  intermittently homeless, would that have increased
19  the likelihood that gastritis would have been in
20  your differential?
21      A   No.
22      MR. SMITH:  Objection.  I know you
23  don't want speaking objections, but I'm looking at
24  pages 53, 54 and 55.  If Dr. Weld is limiting her
25  considerations to what's on there, I think your

Page 77

1   questions should limit that. I don't see anything
2   about being intermittently homeless on this page.
3        MR. MEDINGER: Okay. I'll take your
4   speaking objection and say --
5        MR. SMITH: I usually don't like --
6   you're asking him questions based on what she's
7   doing. I think we need to limit ourselves to the
8   pages that indicate what she was considering.
9        MR. MEDINGER: Okay.
10  BY MR. MEDINGER:
11       Q   Doctor, I'll be clear --
12       A   She didn't use the descriptor
13  intermittently.
14       Q   Doctor, I'll be clear about the
15  questions that I'm asking you. I'm trying to sort
16  of have you place yourself in the role of Dr. Weld
17  and things that would be considerations of yours
18  and getting at what your differential would be.
19       So assuming you yourself knew that
20  someone was intermittently homeless and the same
21  presentation, would that factor of intermittent
22  homelessness somehow affect what would be in your
23  differential?
24       A   No. Well, I mean for certain kinds of
25  problems, yes. Gastritis isn't one of them.

Page 78

1        Q   What about somebody that has a history
2   of alcohol abuse? Does that put gastritis higher
3   on your list in your differential?
4        A   I think as a cause of epigastric
5   discomfort, yes.
6        Q   Okay. If you had suspected that a
7   patient with this presentation had gastritis what,
8   if anything, would do you to sort of rule out
9   whether that, in fact, was the case and the cause
10  of the pain?
11       A   Typically patients in whom I think have
12  gastritis I give the GI cocktails we talked about
13  earlier, and I also give them intravenous
14  medications of one sort or another.
15       Q   Okay.
16       A   There are two different kinds of
17  medications we use for gastritis. One or the
18  other.
19       Q   And as we talked about before, after
20  you give them that they're not admitted to the
21  hospital subsequently if their symptoms resolve;
22  is that right?
23       A   Certainly if their symptoms resolve
24  they aren't.
25       Q   In addition to getting this

Page 79

1   non-contrast CT -- strike that for a second.
2        Just to be ultra clear, you said before
3   you didn't look at the non-contrast CT that was
4   done?
5        A   I did not.
6        Q   Okay.
7        A   Let me clarify something on the last
8   point we talked about patients with gastritis and
9   that sort of thing. I think this patient has two
10  different complaints, his complaints about the
11  gastric pain and his complaints of left flank
12  pain. I don't think the epigastric pain -- the
13  things I considered to be causes of the epigastric
14  pain I do not think to be causes of his left flank
15  pain. I think you have to deal with both of
16  those.
17       Q   Okay.
18       A   Okay.
19       Q   So in addition to this non-contrast CT
20  we do know that Mr. Johnson was given a dose of
21  Toradol.
22       A   Yes.
23       Q   And can you tell us just for the record
24  what Toradol is?
25       A   It's Ketorolac. It's a nonsteroidal

Page 80

1   antiinflammatory drug which can be given
2   intravenously.
3        Q   And what is it supposed to do?
4        A   Basically a pain reliever.
5        Q   Okay.
6        A   It is like Motrin.
7        Q   It looks like he was also given a dose
8   of Zantac.
9        A   Yes.
10       Q   And can you just explain what that is?
11       A   That is one of the drugs that I talked
12  about that you usually give intravenously if you
13  think somebody has gastritis.
14       Q   Okay.
15       A   It's a histamine blocker, presumably
16  decreases the acid output in your stomach. It's
17  actually pretty interesting because when you give
18  it IV, if you have patients that have gastritis or
19  duodenal ulcer it not uncommonly will relieve all
20  their discomfort in 10 or 15 minutes. It's pretty
21  remarkable.
22       Q   Doctor, if you look at page D0053, this
23  is the nursing note right above Dr. Weld where it
24  talks about these drugs that he was given, and
25  there's an entry from 21:00 indicating that he did

Page 81

1   get relief from the Toradol, and that his pain
2   level was -- I think it should be now 1 out of 10.
3       A    Yeah.  It went from a 4 to a 1.
4       Q    Okay.  So are you of the opinion that
5   this Toradol did relieve his pain, at least
6   according to his report?
7       A    Well, I'm of the opinion that his pain
8   decreased.
9       Q    Okay.
10      A    There are a number of explanations for
11  that, I suppose.
12      Q    Okay.  Do you have any opinions as to
13  what the explanations are?
14      A    Well, it could be a consequence of the
15  intravenous medications he was given or simply a
16  consequence of whatever was causing his pain in
17  the first place just settling down a little bit.
18      Q    Okay.  Would you agree that these
19  records show that after being given this Toradol
20  he's no longer complaining of that epigastric
21  pain?
22      A    Yes.  Where did you --
23      Q    Well, I'm asking you.  I don't see
24  anything in the record to show that he still had
25  epigastric pain after being given the Toradol.

Page 82

1   And you were talking about how there was two pains
2   that he had --
3       A    Right.
4       Q    -- when he came in.  And I think the
5   records show that at discharge he wasn't
6   complaining of either of those pains.
7       A    Well --
8       Q    My question is:  Looking at these
9   records would you agree with that?  Is there any
10  basis to say he still had that epigastric pain?
11      A    He has 1 over 10 pain and,
12  unfortunately, the records I don't think reflect
13  which of those pains or both are now 1 over 10 as
14  opposed to 4 over 10.
15      Q    Okay.
16      A    It's just not separated out.
17      Q    But certainly you saw nothing in the
18  record to suggest he still had epigastric pain
19  specifically at discharge?
20      A    Right.  Nor did I see anything to
21  suggest that he didn't.
22      Q    Uh-huh.
23      A    I don't think the report speaks to it.
24      Q    They say at discharge that he was able
25  to ambulate from the emergency department.

Page 83

1       A    Correct.
2       Q    Is that an indication that his pain was
3   controlled at that point in your opinion?
4       A    No.
5       Q    Why not?
6       A    Well, we know he had 1 over 10 pain.
7   He walked in and he had 4 over 10 pain.
8       Q    Uh-huh.
9       A    So the fact that he can walk doesn't
10  mean he doesn't have pain.  They're independent
11  functions.
12      Q    Okay.  If someone was in acute pain,
13  you would expect that they couldn't ambulate,
14  right?
15      A    Well, it depends on how much pain they
16  have.
17      Q    If someone had 5 out of 10, 6 out of
18  10?
19      A    Most people walk around with moderate
20  pain --
21      Q    Uh-huh.
22      A    -- and even walk around with severe
23  pain.  I mean, people walk in that have myocardial
24  infarctions.  I walked when I had a kidney stone,
25  you know.  That was, like, 8 or 9, I suppose, over

Page 84

1   10 pain.  People walk with pain all the time
2   unless we're talking about a broken ankle.  If
3   we're talking about pain from a broken ankle, that
4   would explain you not being able to walk.  The
5   fact that you could walk pretty well means you
6   don't have a big displaced fracture most of the
7   time.
8       Q    Okay.  On page 595, Dr. Weld makes the
9   assessment that the patient is completely
10  hemodynamically stable.  Do you have any reason to
11  quibble with that assessment based on the
12  information we have?
13      A    No.
14      Q    If he was not hemodynamically stable,
15  would that impact his ability to walk?
16      A    It could.
17      Q    We talked earlier about referrals and
18  whether they're done on an inpatient or outpatient
19  basis.  Given the clinical presentation of a
20  patient like this and given that he's
21  hemodynamically stable and the pain is now at a 1
22  out of 10 intensity, at that point is there any
23  duty to retain that person in the hospital?
24      A    You're talking about the specific
25  circumstances that this patient --

Page 85

1     Q    Sure.  With someone that presents with
2  this same history and physical.
3     A    Without --
4     Q    I'm sorry.  Let me add one more fact.
5  And that there is a vascular follow-up appointment
6  in a couple weeks.
7     A    Without looking at their lab work?  I
8  mean, this is your --
9     Q    It's my hypothetical.
10    A    Exactly.
11    Q    I'll give you one more fact.  Someone
12  has looked at the lab work.
13    A    Okay.  Then I think that you have an
14  absolute duty given this patient's presentation to
15  be sure that they've not bled from that graft.  I
16  mean, the presentation with flank pain radiating
17  to the groin is, I mean, the classic differential
18  in patients in this age bracket, particularly
19  those who we know have vascular disease.  The
20  classic differential is to be sure there's not a
21  problem with the aorta, be that an aortic
22  aneurysm, a leaking abdominal aortic aneurysm or a
23  problem with the graft similar to what, in fact,
24  that it turns out that Mr. Johnson had.
25        It presents in exactly the same way a

Page 86

1  kidney stone does.  I think given that you've got
2  proof that that patient lost 25 percent of his red
3  blood cells in about a year and half period of
4  time and then dropped his hematocrit another two
5  points in about a five day period of time, you
6  have an absolute obligation to be sure that that
7  is not -- that this vascular problem that we've
8  been considering may be possible is not.
9        To make a long story short, he had to
10  have a contrast CT.  Bottom line.
11    Q    So we know in this case that he did get
12  a non-contrast CT.  Are you familiar with what the
13  differences would be in what one could see in
14  terms of the graft area using contrast, or is that
15  something you would defer to a radiologist about
16  what could or couldn't be seen?
17    A    I think a radiologist will give you a
18  better opinion, but my opinion is and what I would
19  be looking for and the reason I would do the study
20  is to look for some evidence of hematoma around
21  the graft site and some evidence of leak from the
22  graft.
23    Q    Are you familiar with -- strike that.
24        Are you aware of any studies which show
25  the ability of a contrast CT to pick up signs of

Page 87

1  AEF better than a non-contrast?
2     A    I am not.
3     Q    Okay.
4     A    I'm not sure that really identifying
5  the fistula is the object of the study.  What I
6  would be looking for is some evidence that there
7  had been some bleeding around the graft, which I
8  think would be better -- again, I'm not a
9  radiologist, but I think it would be better seen
10  if you could actually see the contrast in the
11  artery itself or some evidence of leak without
12  fistula.
13        If you've got a fistula running all the
14  way through the bowel that's one thing.  Some
15  leak -- some small leak out of that graft into the
16  retroperitoneal space in the area of the hematoma
17  that point in time would have been diagnostic.
18  Don't mistake me, I don't really think he had a
19  large fistula at the time he was seen.  I think he
20  had a clot, and he probably had some small area
21  which may have eroded through where he got some
22  blood up into his GI tract, which is why he had
23  hemoccult positive stool.
24    Q    Let's talk about that positive stool
25  and melena.  The records indicate that he had that

Page 88

1  seven days prior to presentation.
2     A    Yes.
3     Q    And he had it --
4     A    Black stool, correct.
5     Q    You're familiar with -- well, let me
6  ask you.  Is it your opinion that when one has
7  melena secondary to an AEF that you have melena
8  that is brisk in onset and multiple?
9     A    It depends upon -- again, it depends on
10  the size of the fistula and the amount of bleeding
11  whether this is one of these things they term a
12  herald bleed with just a bit of blood because it's
13  a little bit of fistula that clots off or whether
14  this is, in fact, the real deal with the firehose
15  that you were talking about earlier.
16    Q    Uh-huh.
17    A    I mean, obviously, if it's a firehose
18  fistula you're going to exsanguinate, you know.
19  Obviously, that's not a consideration here.
20  What's a consideration is a patient whom
21  demonstrably has lost, like, 25 percent of his
22  blood supply in a year and eight months or
23  something like that.  A patient whom in a period
24  of five days whose hematocrit has dropped another
25  two points, a patient who has a positive hem stool

Page 89

1  and a patient who presents with classic kidney
2  stone kind of pain which can, in fact, be caused
3  by an abdominal aortic problem. I mean, in my
4  opinion you need to rule that out.
5       I mean the only real criticism that I
6  have of Dr. Weld's work-up in this evaluation -- I
7  mean, I fault her for not knowing that an
8  abdominal aortic aneurysm or an abdominal aortic
9  problem can present like a kidney stone does in
10  this age bracket. She should know that, but I
11  also -- my primary consideration in terms of her
12  not meeting the standard of care is by not doing a
13  contrast CT. If she had done a contrast CT, I
14  wouldn't be here.
15     Q   Okay. Let's just stick with the melena
16  point very quickly before we move on to the
17  contrast CT or not. In your opinion, Doctor, how
18  far in the past could an incidence of melena be
19  before it's no longer concerning for a possible
20  AEF? Does that make sense?
21     A   Yes.
22     Q   Okay.
23     A   I would think maybe two weeks, three
24  weeks, something like that. Again, this is kind
25  of put together on the spot. I don't think that a

Page 90

1  significant AEF that's really bleeding rapidly is
2  a consideration here because that's not happening.
3  Otherwise, the patient would be looking like the
4  fountain that we talked about before. What's a
5  consideration is is there's a problem with a graft
6  that's caused bleeding significant enough that the
7  man's hematocrit has dropped but not significant
8  enough to cause him to firehose. There's really
9  one way that you can make that determination, I
10  think, adequately without opening his belly and
11  looking, and that's to do a contrast CT.
12     Q   Okay. In terms of signs of looking for
13  an AEF, you know, we've talked about the
14  epigastric pain. You've talked about the
15  hematocrit levels. Do you include melena as
16  something that should have indicated to Dr. Weld
17  that this thing was concerning for AEF, or was one
18  instance seven days prior sufficiently in the past
19  that it really wouldn't have impacted it in your
20  opinion?
21     A   I think it's a data point that makes
22  you more suspicious. I mean, I think it's
23  consistent with all the sort of other things that
24  I talked about. I think it's just one more thing
25  that indicates that he should have done the study

Page 91

1  that wasn't done.
2     Q   Let's assume that that contrast study
3  had been done and it came back essentially clean,
4  that there was no evidence of blood leakage,
5  extravasation of contrast through a leak area or
6  any kind of a air or something to suggest there
7  was a clot there, if it had come back clean
8  essentially. At that point would you agree that
9  it was okay to discharge Mr. Johnson?
10     A   Yes.
11     Q   And is that answer the same even
12  knowing subsequently that 24 hours later he did
13  have that firehose situation and then expired?
14     A   Yes. If you act reasonably on clinical
15  suspicion and you do the best tests that you can
16  reasonably do under the circumstances and the test
17  comes back negative, then you've met your
18  obligation. You've done everything you can do.
19     If you don't order a test which I think
20  clinical circumstances demand you order, then
21  you've not met the standard of care.
22     Q   Okay. Let's assume then a different
23  hypothetical. Let's assume that a contrast study
24  had been done and it did show an active bleed,
25  something approaching a firehose like scenario.

Page 92

1  What would be then your opinion of what should
2  have happened then with this patient?
3     A   If she'd done a contrast CT which shows
4  extravasation of dye from the proximal end of that
5  endovascular graft, he'd have been on the
6  operating table about as soon as they can get him
7  there.
8     Q   Okay. And I think we talked earlier
9  about the mortality rates. Do you have any
10  opinion as to what Mr. Johnson's chances would
11  have been had that happened?
12     A   Oh, I think he would have survived.
13  There's no question in my mind because they're
14  operating on him before we opens up the firehose
15  and bleeds out. Again, I'm not a vascular
16  surgeon, but I think in this circumstance what
17  they do is they open him up and they cross-clamp
18  his aorta above the leak before the firehose
19  actually happens. Then you've cut off the source
20  of bleeding and you repair the damage.
21     Q   Uh-huh.
22     A   Again, I'm not a vascular surgeon, but
23  I think even your vascular surgeon expert
24  indicated that if you'd operate on these things
25  early before the firehose occurs that the recovery

Page 93

1   rate is good.
2       Q   And let me just be clear. Actually, my
3   hypothetical was assuming a CT scan with contrast
4   scan is done and actually shows a firehose.
5       A   Well, I mean, frankly I don't think you
6   need a CT scan to get the firehose presentation.
7       Q   Getting back to sort of the
8   conversation we had about keeping someone
9   inpatient versus outpatient. I want to ask you a
10  question about exploratory surgery. Have you ever
11  done exploratory surgery on somebody who is
12  hemodynamically stable and whose pain is
13  controlled but nonetheless still has some
14  complaints?
15      MR. SMITH: Objection. You're asking
16  whether he has done surgery?
17      MR. MEDINGER: Yeah.
18      MR. SMITH: Okay.
19      A   No.
20  BY MR. MEDINGER:
21      Q   Okay.
22      A   The only kind of exploratory surgery
23  I've done is someone with an icepick in their
24  heart. I've done that a couple times. That sort
25  of penetrating -- actually, when I worked at

Page 94

1   Greater Southeast, I did more than 50 open
2   thoracotomies from penetrating trauma, but that's
3   the only exploratory surgery I ever did, and I
4   wasn't all that good at it. I did manage to save
5   two of those people.
6       Q   Forgive the ignorance of this question,
7   but why was it exploratory surgery if there was an
8   icepick in there?
9       A   Well, because you didn't know what the
10  icepick was in.
11      Q   Okay. In terms of how far it had gone
12  in?
13      A   Well, the icepick wasn't really hanging
14  out of their chest. They just knew the puncture
15  wound was from an icepick or a bullet wound or a
16  knife and that sort of thing. I've done all
17  those.
18      Q   Looking at -- let's assume that, you
19  know, we have a patient like Mr. Johnson who was
20  hemodynamically stable, 1 out of 10 pain. Let's
21  assume you don't do a contrast-based study. Are
22  there any circumstances under which you'd
23  recommend doing exploratory surgery on a patient
24  like that?
25      A   If I had a huge suspicion that despite

Page 95

1   the normal contrast CT that this circumstance
2   still existed, I would probably get a vascular
3   surgical consult and they'd made the decision
4   about whether to operate or not. I think in the
5   vast majority of circumstances if the contrast CT
6   was normal that I would think the likelihood of
7   this problem was minuscule.
8       Q   And would it be then your opinion --
9   let's say they do the contrast CT and it does come
10  back clean, you wouldn't be of the opinion that
11  exploratory surgery should have been done?
12      A   Correct.
13      Q   Okay.
14      A   In fact, I think I said earlier I would
15  discharge the patient based on it.
16      Q   And one last point just on this
17  October 9th visit. I think we talked earlier
18  about how you do agree that he presented himself
19  as hemodynamically stable at that point.
20      A   Yes. His blood pressure and pulse were
21  normal. You said hemodynamically stable, I
22  didn't. I said his blood pressure and pulse were
23  normal.
24      Q   Okay. Do you agree with that
25  assessment? That's what Dr. Weld had written

Page 96

1   there.
2       A   No. I don't agree with the statement
3   because I can't make the judgment based on one
4   data point.
5       Q   Okay.
6       A   I mean, there's nothing in that chart
7   to indicate that he wasn't hemodynamically stable
8   but, again, as I've said probably three or four
9   times in this deposition, you can't make -- I
10  can't make that assumption reviewing this record
11  based on one data point.
12      Q   I see. I see. Again, you said with
13  respect to this October 9th visit as far as you
14  would be able to go is to say that there was not
15  evidence of an active bleed at that point --
16      A   Correct.
17      Q   -- given the pulse rate?
18      A   Correct. I think that's correct.
19      Q   Okay. I'd like to move forward then to
20  Hopkins and the treatment that Mr. Johnson got
21  there. First of all, do you contend that anyone
22  at Hopkins violated the standard of care in the
23  treatment of Mr. Johnson during that time?
24      A   No.
25      Q   And, actually, just let me ask it this

Page 97

1 way. Why do you say that? Why do you have no
2 fault with what they did?
3     A   Because when I reviewed the record, I
4 didn't see anything that looked untoward in their
5 treatment. He was -- I think when he got to
6 Hopkins he was beyond salvage, frankly.
7     Q   You mentioned in your report that the
8 autopsy said as much as 800 cc of blood was found
9 in Mr. Johnson's stomach, something to that
10 effect.
11     A   Yes.
12     Q   Okay. And just to give us a sense, is
13 that a significant amount of blood?
14     A   Sure.
15     Q   And I know significant is sort of a
16 variable term, but to an emergency room physician
17 is that a lot?
18     A   That's about at least 20 percent of
19 your blood volume.
20     Q   Based on the records we have in terms
21 of the time that he became hypotensive and the
22 amount of blood ultimately found in his stomach,
23 is there any way to determine when the firehose
24 like event happened?
25     A   I don't think so. I mean, you can make

Page 98

1 some judgment based upon his clinical history and
2 that's about it.
3     Q   Do you have any opinions as to when
4 that real active bleed started?
5     A   Shortly before the ambulance was called
6 and he went to the hospital.
7     Q   So there's nothing in the records that
8 suggest to you anyone at Hopkins violated the
9 standard of care?
10     A   No, there is not.
11     Q   And, again, I'll ask it so we're clear
12 on the record. You don't contend anyone other
13 than VA employees violated the standard of care?
14     A   Correct.
15     Q   I just want to be very clear about this
16 so we're -- to be fair to you. You're not saying
17 that Dr. Flanagan, who is the staff at that time
18 overseeing Dr. Weld that he violated the standard
19 of care?
20     A   Correct.
21     Q   Doctor, I'd like you to look at what
22 I'll mark as Exhibit 5.
23         (Deposition Exhibit No. 5 marked for
24         identification and attached to the
25         deposition transcript.)

Page 99

1     Q   Doctor, flip those pages. While you're
2 flipping I proffer to you these are copies of
3 medications that were found among the possessions
4 of Mr. Johnson at the McBetz facility after his
5 passing.
6     A   Okay.
7     Q   Can you just identify them by page
8 number, go through and tell us what the drug is
9 and what it's suppose to do, if you can?
10     A   Omeprazole is an acid blocker.
11     Q   Okay. And just for the record, that's
12 on page 484?
13     A   Yes.
14     Q   Okay.
15     A   485 is six pills. I don't know what
16 they are. 486 is Tylenol, pain reliever.
17 487 is -- I don't know what that is. It's a pill
18 box. Maybe it's another view of it. 488 is a
19 chewable aspirin.
20     Q   Okay. And I think, Doctor --
21     A   489 is a bar code.
22     Q   I think that's all of the medications.
23     A   Okay.
24     Q   The rest is directions given to him.
25     A   Okay.

Page 100

1     Q   With respect to these, can you just
2 refresh your recollection as to what these drugs
3 are and what they're supposed to treat?
4     A   Yeah. Omeprazole is an acid blocker,
5 presumably given to him, according to the record
6 for what was diagnosed as gastritis. Tylenol and
7 aspirin are both pain relievers.
8     Q   Okay. Do any of these have --
9     A   Well, let me add that in his
10 circumstance the aspirin was probably given to him
11 for other reasons than just pain relief. This is
12 probably medication he was taking because of his
13 atherosclerotic disease.
14     Q   Okay. Fair enough. Do any of these
15 drugs have any side effects that you're aware of?
16     A   All drugs have side effects.
17     Q   Are you familiar with any that are
18 specifically related to these?
19         MR. SMITH: Why don't we do them one at
20 a time. It might be easier.
21         MR. MEDINGER: Sure.
22 BY MR. MEDINGER:
23     Q   We'll just focus on the Omeprazole.
24     A   Omeprazole. Probably the most common
25 thing associated with that is diarrhea.

Page 101

1    Q   Okay.
2    A   Tylenol in sufficient dosages can cause
3  liver inflammation and failure, and aspirin can
4  cause gastric upset and GI bleeding, easy
5  bruisability but generally not in an 81 milligram
6  dose.
7    Q   Yeah. One would have to take a much
8  higher dosage in order to have those problems?
9    A   Presumably.
10   Q   Okay. Doctor, I'm almost finished here.
11 I just want to ask you a couple questions about
12 prior testimony that you've given, and if you look
13 at one of these exhibits --
14   A   Okay.
15   Q   So prior testimony, you list in the
16 back of your expert report six cases in which
17 you've given expert testimony?
18   A   Correct.
19   Q   Have any of the cases listed on there
20 dealt with AEF at all?
21   A   Oh, no. I've never testified in this
22 matter previously.
23   Q   In any case involving AEF?
24   A   That's what I'm saying. I never have.
25 When you said that this is a half of 1 percent

Page 102

1  complication in these grafts, and I said I don't
2  doubt that what you said is correct, you can
3  imagine that this doesn't come up all that often.
4    Q   Yeah.
5    A   Either clinically or forensically.
6    Q   I see. Looking at this list, can you
7  just tell us briefly what each of those cases was
8  about?
9    A   Maybe. Yarbourough is failure to
10 diagnose an abscess, a pharyngeal abscess or delay
11 in diagnosis, actually.
12      True is --
13   Q   Okay. I'm sorry. I just want to stop
14 you there. Were you testifying on behalf of the
15 defendant or the plaintiff?
16   A   Plaintiff.
17   Q   Okay. With respect to this Yarbourough
18 case, did you give a deposition or was it trial
19 testimony?
20   A   I did give trial testimony in that.
21   Q   Okay. Did you give a deposition as
22 well?
23   A   Yes.
24   Q   Okay. And what was the outcome of that
25 case?

Page 103

1    A   It was -- this was a -- I take that
2  back. I did not appear in court. I gave a
3  deposition. That was settled. That case was
4  settled with regards to the emergency physician.
5    Q   Okay. And what court was that pending
6  in, if you remember?
7    A   Towson. Baltimore County. Towson.
8  Baltimore County.
9    Q   Okay.
10   A   Do you want to go to the next one?
11   Q   Yes.
12   A   True -- I'm doing these backwards
13 because I'm hoping I can remember them. True was
14 a failure to treat a patient with ureteral colic
15 with a stone who had an infected urine with
16 consequent development of sepsis, septic shock and
17 the death of the patient.
18   Q   Okay. And did you testify in trial?
19   A   I did testify in trial, and that was in
20 Salisbury, Maryland, whatever jurisdiction that
21 is, whatever county is down there.
22   Q   Okay. And were you testifying for the
23 plaintiff there?
24   A   Plaintiff.
25   Q   And what was the result of that trial?

Page 104

1    A   It was a defense verdict.
2    Q   In that case you were qualified,
3  actually, as an expert to give testimony?
4    A   Yes.
5    Q   Okay. Do you recall if there was any
6  challenge to your expert qualifications in that
7  case?
8    A   There's always the voir dire process,
9  but I've never been voir dired out of a case. I
10 mean, every time I've ever been presented as an
11 expert, I've been accepted.
12   Q   Okay. If we could move then to Marvel.
13 Do you remember what that case is about?
14   A   Honestly, I don't. I should, but I
15 don't.
16   Q   Okay. Do you remember any particulars
17 in terms of the court, what kind of testimony you
18 gave?
19   A   It was plaintiff for me, and it was a
20 deposition. It didn't go to trial.
21   Q   Eisenstein.
22   A   Eisenstein is -- you know, I've got
23 these wrong. True. I gave a deposition on True,
24 but I did not testify in court. I've got these
25 confused. Eisenstein is what I told you True was.

Page 105

1    Q   Okay. I understand.
2    A   If you just want to circle and move the
3 arrow down.
4        True is a failure to diagnose actually
5 a septic condition with the death of the
6 plaintiff, and it's a plaintiff's case. That's in
7 Carroll County, Maryland. That hasn't been tried
8 yet. I gave a deposition.
9    Q   And Eisenstein then is the one with the
10 urine problem?
11   A   Exactly.
12   Q   Okay. And with Eisenstein, that's the
13 one that actually did go to trial?
14   A   Right. Yeah.
15   Q   Okay.
16   A   With the defense verdict.
17   Q   And True, were you testifying for the
18 plaintiff or for the defendant?
19   A   Plaintiff.
20   Q   And then let's go to Jimenez.
21   A   Jimenez is a 10-year-old kid who was
22 seen in the emergency department following a
23 bicycle accident and had laceration on her face
24 and was sent home and then bled to death overnight
25 from an undiagnosed ruptured spleen -- ruptured

Page 106

1 liver, actually. That's in Frederick County,
2 Maryland, and it's a plaintiff's case for me.
3        I don't remember Long. I just don't
4 remember. I gave a deposition on Jimenez, but
5 that has not gone to trial yet.
6    Q   And Long, you have no recollection --
7    A   None.
8    Q   -- of any of the particulars?
9        Other than these cases, in the last
10 four years do you recall specifically giving
11 testimony in any other case?
12   A   These are the ones that I had laying
13 around when I filled this thing out, whenever it
14 was. I'm just trying to remember what I did
15 recently. My memory should be better than this,
16 but it isn't.
17       I testified in deposition in a case in
18 Baltimore that's called Kitt, K-i-t-t. That was
19 recently. That was, like, earlier this month.
20   Q   Okay.
21   A   It might have been either late February
22 or early March.
23   Q   And what did that case involve?
24   A   It was -- and that's a plaintiff's case
25 for me too. It was a patient who had calf pain

Page 107

1 who got a sonographic procedure, which was a
2 two-point -- do you know what I'm talking about?
3 It was a two-point determination.
4    Q   Nope.
5    A   Okay. When you do a sonogram looking
6 for a clot in a calf, you can do a whole leg
7 sonogram, and it's about 90 percent some odd
8 likelihood of finding it if it's there.
9        You can do a two-point which basically
10 they look at the popliteal vein and the femoral
11 vein to see if there's clot in any of those
12 places. If there's no indication of clot, if
13 you're really concerned about a clot in the calf
14 you have to do a test to see if there's any
15 evidence of a clot anywhere in your body. If that
16 test is positive, you need to repeat the study in
17 five days, five to seven days. The test was
18 accepted as accurate, and none of the other things
19 were done, and the patient died of a pulmonary
20 embolus, like, seven or eight days later.
21   Q   Okay. And in that case you gave a
22 deposition recently?
23   A   Yes. Sometime end of February, early
24 March.
25   Q   Any others that you can remember, other

Page 108

1 than these seven that we've --
2    A   Not right off the top of my head. I'm
3 sure there are more.
4    Q   Okay. In any given year, how many
5 cases do you have in which you are retained as an
6 expert to write a report like you have in this
7 case?
8    A   Let me give you an overview of what I
9 do forensically, say, over the past five years.
10       On the average I review two to three
11 cases a month. On the average I give four to six
12 depositions a year, and on the average two to
13 three trial appearances.
14   Q   Uh-huh.
15   A   I think that's pretty accurate.
16   Q   And how does your forensic practice
17 work out in terms of the times in which you're
18 retained for the plaintiff and the times at which
19 you're retained for the defendant?
20   A   That's actually an interesting subject.
21 When I first started doing this, and that was,
22 like, the late '80s, early '90s, I did literally
23 100 percent defense work.
24       Around 1998, I started doing some
25 plaintiff's reviews and now I do probably 80

Page 109

1    percent plaintiff.
2        Q   Okay.  I think you've already said
3    this, but you don't know of any instance in which
4    you were barred from giving expert testimony in a
5    trial proceeding?
6        A   As far as I know, it's never -- well,
7    as far as I know.  I know it's never happened.
8        Q   Okay.  Have you yourself ever been
9    accused of medical malpractice?
10       A   Absolutely.
11       Q   Okay.  How many times?
12       A   Three times seriously.
13       Q   When you say "seriously," is there
14   sometimes in which you were just named and --
15       A   I wasn't there.  I was home in bed or
16   whatever.  I was the chair at Greater Southeast in
17   D.C. for -- I don't know, 10 years or 12 years or
18   something like that, and my name was legibly
19   imprinted on the top of every chart.  This was in
20   the heyday of D.C. plaintiff suits.  Literally
21   every time somebody in the department was sued and
22   there was an illegible signature on the chart at
23   the bottom it was assumed to be mine.  I got real
24   tired of that, but there's nothing you can do.  It
25   goes with the job.

Page 110

1        Q   Yeah.
2        A   Do you want to know about the three?
3    Should I just tell you?
4        Q   Please.
5        A   It will save you from having to ask.
6    The first was failure to diagnose retained foreign
7    body in a wound.  It was an injury that occurred
8    on a bicycle path in Alexandria.  It was a guy who
9    had Cerebral Palsy but was still riding a bicycle
10   and dodged over a bent -- missed a bent pole and
11   fell off a bike.  His long-term deficit was that
12   he had discomfort in the car if he left his arm on
13   a chair for more than 20 minutes.  The case was
14   settled after the jury was impaneled for about
15   $5,000.  In fact, for $5,000, minus what he paid
16   me to be his expert in terms of his injuries in
17   his case against the government for not
18   maintaining the bike path properly.
19       Q   Okay.  Were you yourself named as a
20   defendant in that?
21       A   I was.  I was a defendant in the
22   malpractice case against me.
23       Q   Okay.
24       A   The case was also against the
25   government for not maintaining the bike path.

Page 111

1    When we settled out for $5,000, I then testified
2    on his behalf and he paid me.
3        Q   I see.
4        A   I got schooled really early.
5        Q   And where was that?
6        A   Alexandria.
7        Q   And at what point in your career was
8    that?
9        A   I had been practicing a year.
10       Q   So we're talking --
11       A   -- '73-'74.
12       Q   Okay.
13       A   1980 or thereabouts, '81, the case was
14   a failure to diagnose pneumonia, wrongful death.
15   That case was dismissed with prejudice before I
16   was even deposed.
17       Q   Okay.  Do you know the circumstances
18   under why it was dismissed?
19       A   Yes.  Because the plaintiff's attorney
20   figured out that there really wasn't a case.
21       Q   So it was a voluntary dismissal?
22       A   Yeah.  It was dismissal with prejudice
23   by the plaintiff.
24       Q   Okay.  And the third case?
25       A   And the third case was failure to

Page 112

1    diagnose hemorrhagic pancreatitis and wrongful
2    death, and that was a two-week jury trial in D.C.
3    with a defense verdict.
4        Q   Okay.  The two-week jury trial, what
5    was the plaintiff's name in that case?
6        A   I don't know.
7        Q   Do you remember the year in which it
8    happened?
9        A   1986.
10       Q   Okay.  Any other case in which you've
11   been named as a defendant, other than these three?
12       A   Well, I've had multiple cases where I
13   was named as a defendant and I didn't have
14   anything to do with the patient's care.
15       Q   Okay.
16       A   Many.
17       Q   And just to qualify my question to you,
18   are there any cases where you weren't necessarily
19   the named defendant but your care was at issue?
20       A   One case.
21       Q   And what was that?
22       A   Failure to diagnose subarachnoid
23   hemorrhage.
24       Q   Do I gather that they just named the
25   hospital instead of the individual?

Page 113

1    A    They actually named our professional
2  corporation.
3    Q    Okay.  And what was the corporation?
4    A    It was Southeast Emergency Physician's
5  Group.
6    Q    Okay.  And what were the circumstances
7  of that case?
8    A    It was a woman who came in with the
9  worse headache in her life.  Normal CT scan whom I
10  tried to do a lumbar puncture on because I was
11  concerned she had a subarachnoid hemorrhage and I
12  couldn't -- I was going to admit her to the
13  hospital but she talked me out of it.  I told her,
14  you know, go home and if it gets worse you come
15  back.
16         She went home, it got worse and she
17  came back.  I admitted her to the hospital to the
18  care of the internist on-call and told them they
19  needed to get a neurologic consult and the lady
20  needed a spinal tap because I was pretty sure she
21  had a subarachnoid hemorrhage.  They kept her in
22  the hospital for three days and discharged her and
23  never did the LP, and then five days later after
24  that she came back I declared her dead.
25    Q    What happened in that case?  Was it

Page 114

1  actually tried?
2    A    It was settled before trial.
3    Q    And do you recall the year in which
4  that happened?
5    A    No.  Sometime in the '80s.
6    Q    Okay.  Any other cases other than these
7  four where the care that you gave was at issue in
8  some sort of malpractice action?
9    A    Not that I remember.
10    Q    Okay.
11    A    I've literally had nothing in the last
12  15 years.
13    Q    That's a good thing.
14    A    Keep ducking.
15    Q    Doctor, have your privileges ever been
16  suspended or revoked at any hospital?
17    A    No.
18    Q    Have you --
19    A    Nor have my license been acted upon
20  unreasonably or whatever you guys use.
21    Q    Okay.  Thank you.
22         MR. MEDINGER:  Doctor, I have no
23  further questions.  Mr. Smith might have some for
24  you.
25         MR. SMITH:  I have no questions.

Page 115

1         MR. MEDINGER:  Okay.  Do you want to
2  instruct him on reading and signing?
3         MR. SMITH:  Read and sign?
4         THE WITNESS:  Yes.  Absolutely.
5         (Signature having not been waived, the
6         Deposition of KENNETH LARSEN, M.D.,
7         was concluded at 12:11 p.m.)
8                * * * * *
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 116

1         CERTIFICATE OF NOTARY PUBLIC
2    I, SYLVIA L. JACOBS, the officer before whom
3  the foregoing deposition was taken, do hereby
4  certify that the witness whose testimony appears
5  in the foregoing deposition was duly sworn by me;
6  that the testimony of said witness was taken by me
7  in stenotype and thereafter reduced to typewriting
8  under my direction; that said deposition is a true
9  record of the testimony given by said witness;
10  that I am neither counsel for, related to, nor
11  employed by any of the parties to the action in
12  which this deposition was taken; and, further,
13  that I am not a relative or employee of any
14  counsel or attorney employed by the parties
15  hereto, nor financially or otherwise interested in
16  the outcome of this action.
17              SYLVIA L. JACOBS
18              Notary Public in and for
19              the State of Maryland
20  My commission expires:
21  June 26, 2012
22
23
24
25