(Condensed Transcript)

# IN THE MATTER OF:

## FAYE M. GOODIE, et al.
## V.
## UNITED STATES OF AMERICA

### _Testimony of:_

_Paul A. Skudder_

_April 30, 2012_

_Plaintiffs: Michael P. Smith, Esq._
_Defendants: Jason D. Medinger, Esq._

*CAPE COD COURT REPORTING*
*11 ELLIOTT WAY*
*HARWICH, MASSACHUSETTS 02645*
*(508) 430-7331*
*FAX: (508) 432-7384*
*cccr@capereporting.com*
*www.capereporting.com*

PLAINTIFF'S
EXHIBIT

12

**WORD INDEX ATTACHED WITH CONDENSED TRANSCRIPT**

Case 1:10-cv-03478-RDB   Document 20-15   Filed 07/13/12   Page 2 of 24
Paul A. Skudder, MD
Case 1:10-cv-03478-RDB   Document 17-17   Filed 06/08/12   Page 2 of 24
Goodie v. USA

April 30, 2012

--- SHEET 1   PAGE 1 ---

```
                IN THE UNITED STATES DISTRICT COURT
                    FOR THE DISTRICT OF MARYLAND

FAYE M. GOODIE, et al.,
                Plaintiffs,
        vs.                         NO: RDB-10-3478
UNITED STATES OF AMERICA,
                Defendant.


APPEARANCES:

MICHAEL D. SMITH, ESQ.
Salsbury Clements Bekman Marder & Adkins
100 N. Pratt St., Suite 450
Baltimore, MD 21201           FOR THE PLAINTIFFS
410.539.6633

JASON D. MEDINGER, ESQ.
Assistant U.S. Attorney
36 South Charles St.          FOR THE DEFENDANT
Fourth Floor
Baltimore, MD 21201
410.209.4800


     VIDEO TELECONFERENCED TESTIMONY OF PAUL A.
SKUDDER, MD, called as a witness by and on behalf of
the Defendant, taken pursuant to the District of
Maryland  Rules  of Civil Procedure, before Paula E.
Hogan, Notary Public in and for the Commonwealth of
Massachusetts; taken at Boudreau Business Center, 9
New Venture Drive, Unit 8, Dennis, MA, on Monday,
April 30, 2012, commencing at 3:33 p.m.
```

```
            CAPE COD COURT REPORTING
          11 Elliott Way      Harwich, MA  02645
          508.430.7331      508.432.7384-fax
               cccr@capereporting.com
```

--- PAGE 2 ---

2

```
1              I N D E X

2      DEPONENT:  PAUL A. SKUDDER, MD

3

4   Examination by Mr. Medinger:            3

5

6

7

8

9

10

11          E X H I B I T S

12  NO.   IDENTIFICATION              PAGE

13   1    Notice of Deposition; subpoena    5

14   2    Letter - 8-31-11; SKUDDER to Smith;   8
          Curriculum Vitae

15
```

--- PAGE 3 ---

3

1             STIPULATION
2        IT IS HEREBY STIPULATED AND AGREED by and
3 between counsel for the respective parties that the
4 deposition will be taken pursuant to the Federal
5 Rules of Civil Procedure.
6        The deponent produced a Massachusetts
7 license for purposes of identification.
8        The deponent will read and sign the
9 deposition, waiving the presence of a Notary.  If the
10 deposition is not signed within 30 days of receipt,
11 pursuant to Massachusetts Civil Practice, Section
12 460, the privilege will be deemed waived.
13 *********************************
14        PAUL A. SKUDDER, MD,
15        having been first duly sworn, was examined
16 and testified as follows:
17        EXAMINATION
18 BY MR. MEDINGER:
19   Q.   Good afternoon, Doctor.  My name is Jason
20 Medinger, and I represent the United States of
21 America in this case.  Here with me is counsel for
22 the plaintiff, Faye M. Goodie, Michael Smith.  We're
23 here to take your deposition.
24        As our court reporter, Ms. Hogan, just

--- PAGE 4 ---

4

1 related to you, we're going to be asking you a number
2 of questions this afternoon.  During that process
3 please make sure you give verbal answers.  If at any
4 point you don't understand the question I'm asking,
5 please feel free to stop me and I will clarify it.
6 If you want to take a break to stretch your legs,
7 just let us know.
8        Doctor, have you ever been deposed before,
9 sir?
10   A.   Yes, I have.
11   Q.   Do you have any questions before we get
12 started?
13   A.   No.  I think you're going to ask most of
14 the questions.
15   Q.   Yes.  Any reason why you can't give full
16 and truthful testimony today?
17   A.   No.
18   Q.   Can you please just state your full name,
19 for the record?
20   A.   Paul Skudder, S-k-u-d-d-e-r.
21   Q.   And can you give your address where you
22 currently reside?
23   A.   197 Walker Street in Falmouth,
24 Massachusetts.

Paul A. Skudder, MD    Case 1:10-cv-03478-RDB    Document 20-15    Filed 07/13/12    Page 3 of 24
Case 1:10-cv-03478-RDB    Document 17-17    Filed 06/08/12    Page 3 of 24
Goodie v. USA

April 30, 2012

PAGE 5

5

1  Q.  Sir, I'm going to ask the court reporter
2 to hand you deposition exhibit number 1. That's the
3 Notice of Deposition for this case.
4      (Whereupon, the document referred
5      to by counsel was duly marked for
6      identification as Exhibit #1.)
7      BY MR. MEDINGER:
8  Q.  And sir, looking at what's been marked
9 exhibit number 1, you've obviously seen that before,
10 correct?
11  A.  Correct.
12  Q.  And that subpoena asked you to bring
13 certain documents with you and I can see from the
14 video there that you brought a big set of documents
15 and CDs. Could you briefly tell us what you brought
16 with you today?
17  A.  Well, the first document here is a report
18 that I wrote to Mr. Smith, dated August 31, 2001.
19 The next is --
20  Q.  I'm sorry, just to stop you, Doctor. I
21 think you said 2001. Did you mean 2011?
22  A.  Yes, I did.
23  Q.  Just to make sure we're clear.
24  A.  The next document is a document from

PAGE 6

6

1 yourself that accompanied a report from Dr. Hader.
2 Attached to that is his curriculum vitae. And the
3 rest of this is all the medical records which I was
4 provided from the Veterans Hospital and from Johns
5 Hopkins Hospital. I did not know with certainty
6 whether they represent the complete medical records
7 from those institutions or not. I have also seen a
8 deposition of Dr. Hader that was transmitted to me in
9 electronic form as a PDF document. I have not printed
10 that as a hard copy, so I don't have it here to show
11 you.
12  Q.  Okay. I gather you also brought two CDs
13 there?
14  A.  Yes, there's actually three, but I think
15 two of them are identical. One of them is from the
16 Veterans Administration Hospital, and it includes a
17 CT-scan of the patient done on January 31st of '06;
18 and another done on October 9th of '07. And the
19 other two are both the same and include images of two
20 chest x-rays and a CT-scan done at Johns Hopkins
21 Hospital, on October 10, 2007.
22  Q.  Okay. And other than those documents
23 which you just listed, did you bring anything else
24 with you to this deposition?

PAGE 7

7

1  A.  The only thing I brought was a computer in
2 case we ended up looking at the CD, which that is
3 your decision.
4  Q.  Thank you, Doctor, I appreciate that.
5 Other than those things that you just listed there,
6 were you given any other information to form any of
7 the opinions that you were asked to form in this
8 case?
9  A.  I was not.
10  Q.  Other than those documents that you listed
11 there, did you consult with anyone else to form any
12 of the opinions you formed in this case?
13  A.  I did not.
14  Q.  And just to be crystal clear on the
15 record, you didn't consult with any medical
16 literature to form your opinions in this case?
17  A.  I did not.
18  Q.  And likewise any treatises?
19  A.  I did not.
20  Q.  Other than documents and such things, have
21 you consulted any people to form any opinions in this
22 case?
23  A.  The only discussions I have had were with
24 Mr. Smith and his office.

PAGE 8

8

1  Q.  Okay. Some of the documents that you
2 referenced were documents obviously that were created
3 after you formed your opinion in this case, the one
4 being I guess the deposition of Dr. Hader as well as
5 his opinion. Did anything you read in any documents
6 you got subsequent to writing your August 20 report,
7 did those change any of the opinions in your report
8 at all?
9  A.  No.
10  Q.  I think this is clear from your earlier
11 answers, but I want to make sure I'm right on this.
12 You did not read the deposition of Dr. Weld, W-e-l-d?
13  A.  No, I did not.
14  Q.  And likewise, Doctor, you didn't read the
15 deposition of Dr. John Braud?
16  A.  No, sir, just the single one I mentioned.
17  Q.  Okay. Let's look at exhibit number 2.
18 That is a copy of this report as well as your CV.
19      (Whereupon, the document referred
20      to by counsel was duly marked for
21      identification as Exhibit #2.)
22      BY MR. MEDINGER:
23  Q.  Doctor, is exhibit 2 a report that you
24 wrote in this case?

Paul A. Skudder, MD

Goodie v. USA

April 30, 2012

SHEET 2   PAGE 9

9

1 A. Yes.
2 Q. I want to first talk to you, Doctor, about
3 your background and expertise. You're a vascular
4 surgeon?
5 A. Correct.
6 Q. And your group is The Cardiovascular
7 Specialists?
8 A. Correct.
9 Q. And can you tell me how many doctors are
10 in that group?
11 A. Ten or 12.
12 Q. And are they all vascular surgeons like
13 yourself?
14 A. No.
15 Q. Can you tell me the makeup of doctors in
16 that group?
17 A. We have two full time vascular surgeons;
18 one part time vascular surgeon. He is in his late
19 60s and is no longer practicing full time. And the
20 remainder of the physicians are cardiologists.
21 Q. Okay. And where do you employ the
22 services that you provide as a part of this group?
23 A. I provide them in an office facility that
24 are operated by our group and I employ them in

PAGE 10

10

1 hospitals and related facilities that are owned and
2 operated by Cape Cod Health Care, which is
3 essentially the owner and operator of the two
4 hospitals on the Cape.
5 Q. Okay. You mentioned these office
6 facilities that your group owns. What kind of work
7 do you perform out of those offices?
8 A. Examination of patients; taking patients'
9 histories; performing procedures that we regard as
10 office based procedures. I guess that's redundant
11 but we do indeed have those in the office setting.
12 Q. Okay. What would be the circumstances
13 under which you perform surgery in the hospitals?
14 A. Consultations are offered and provided on
15 patients who are visiting the hospital in the
16 emergency room or patients who are otherwise
17 hospitalized. Surgery is done in the hospitals.
18 Other invasive procedures that are beyond the scope
19 of what we practice in the office are done in the
20 hospital. And the hospital operates out-patient
21 facilities. I provide what are services at a
22 facility we call the Wound Care Center.
23 Q. Okay. Doctor, I also know from your CD
24 that you're currently doing some work at the

PAGE 11

11

1 Uniformed Services University of the Health Sciences
2 in Bethesda?
3 A. My CV will point out that many years ago I
4 was employed in DC. During those years I became
5 affiliated with the Uniformed Services University of
6 the Health Sciences. Although I do very little
7 active work and I'm not on the payroll, I
8 occasionally have consulted but not for several
9 years.
10 Q. Can you tell me in last five years how
11 many occasions you've had to go down there?
12 A. I'm note sure I've been down there in the
13 last five years.
14 Q. What about in the last decade?
15 A. I would imagine one or two.
16 Q. And you mentioned that you're not on the
17 payroll there, under which office would you come down
18 on, pro bono, contract basis, how does it work?
19 A. On a pro bono basis is when I've been
20 asked to come down.
21 Q. And who would be there that asked you to
22 come specifically?
23 A. The senior faculty in vascular surgery.
24 Q. And give me a flavor for what kind of

PAGE 12

12

1 services you would do. Would you be teaching people
2 that want to become vascular surgeons? Would you do
3 rounds? What would be your role?
4 A. They're focused on vascular surgery
5 including vascular surgery from trauma or injuries,
6 which is of interest to a medical school. But that's
7 the military -- I'm sorry, the military medical
8 system also provides services to family men and
9 civilians associated with the military. I have given
10 talks and attended talks and commented upon them.
11 It's probably the best way to summarize in a sentence
12 or two.
13 Q. Doctor, do you have any other sub
14 specialties other than vascular surgery?
15 A. Critical care, which is a sub specialty of
16 running an ICU. My work is primarily around my own
17 patients that might require ICU care. I don't
18 practice outside my --
19 Q. Are there other specialties other than
20 that one?
21 A. I think wound care practice as a separate
22 sub specialty.
23 Q. Okay. And describe for me again what you
24 consider to be a wound care specialty?

Paul A. Skudder, MD  Case 1:10-cv-03478-RDB  Document 20-15  Filed 07/13/12  Page 5 of 24
Case 1:10-cv-03478-RDB  Document 17-17  Filed 06/08/12  Page 5 of 24
Goodie v. USA

April 30, 2012

PAGE 13

13

1   A.   This is something that has evolved in the
2 last decade or decade and a half, where many
3 institutions now operate an office that is dedicated
4 to the care of chronic wounds. It can refer to
5 ulcers on their legs or wounds of other types that
6 are not healing well in the context of their primary
7 physician and they come to the wound center. This
8 commonly require debridement that are done at the
9 wound care center and occasionally leads to an office
10 based procedure, connected to a non healing wound,
11 arterial disease, contributing to a non healing
12 wound.
13   Q.   Doctor, for this next line of questions, I
14 want to discuss vascular surgery and things you do in
15 that sub specialty. And particularly could you tell
16 me what your garden variety duties are, vascular
17 duties at present?
18   A.   Well, I guess there's four common areas
19 for vascular surgeons. And that is the treatment of
20 diseases of the aorta, carotid artery and lower
21 extremities; access to the vascular system; and then
22 finally treatment of venous disease which involves
23 insufficiency and also overlaps with varicose vein
24 disease.

PAGE 14

14

1   Q.   Okay.
2   A.   And my practice as it is currently is
3 typically of that vascular practice, being referred
4 to the office for evaluation. And during that
5 evaluation, they may or may not prove to be
6 individuals that would benefit from vascular surgical
7 procedures. Other times they simply need advice or
8 reassurance for the problem which they referred and
9 it turns out not to be a vascular service. From the
10 wound care center, patients are triaged and it might
11 or might not be of benefit to them. And then on
12 certain days the procedures themselves are performed
13 and on we go.
14   Q.   Doctor, you mentioned that there were four
15 areas and I didn't see the delineation. The diseases
16 of the aorta?
17   A.   Correct.
18   Q.   Correct?
19   A.   Yes.
20   Q.   And the second one was, had to do with the
21 arteries?
22   A.   I divided that in two ways. Disease of
23 the carotid artery, and then disease of the arteries
24 in the lower extremities, make up a specific portion.

PAGE 15

15

1 So I would characterize those number 2 and 3. Number
2 4 would be dialysis practice and number 5 is venous
3 practice.
4   Q.   I thought I heard five, I just wanted to
5 make sure I had them right. I think you mentioned
6 this, Doctor, but in your practice, patients are
7 referred to at times on an out-patient basis, is that
8 correct?
9   A.   Yes.
10   Q.   And who is it that is eventually referring
11 patients to you and your practice?
12   A.   Well, patient referral originates with
13 other physicians; physicians of almost any back-
14 ground. The more common are the primary care
15 physicians. Probably the next group would be the
16 cardiologists. Podiatry is a source of referrals.
17 Dermatology refers some patients. We see patients
18 referred from orthopedists from time to time. One
19 this morning was referred from an orthopedist.
20 There's not boundaries on that. The patients are
21 referred by individuals for problems that they may
22 regard as a vascular problem. And then there's the
23 occasional phone book or in the modern world, through
24 the web. Most patients' insurance discourage that.

PAGE 16

16

1 Mostly it's the primary care physician.
2   Q.   And you mentioned earlier, Doctor, at
3 times you're affiliated with the Cape Cod Health
4 system. Are there times at which you and your
5 practice are essentially seeing patients on an
6 inpatient basis at that time? Do you understand my
7 question?
8   A.   I'm not sure I do understand your
9 question.
10   Q.   I'll ask you a better one. What I'm
11 trying to figure out, the hospital has contracted
12 with your group so that you are essentially the in-
13 house or staff or attending vascular surgeon for the
14 hospitals?
15   A.   That's a fair question. At one of the two
16 hospitals, my partner and I are the two vascular
17 surgeons. There are two other vascular surgeons that
18 are not in our group. So, there's a schedule that
19 divides us up and different people are called for
20 different dates; if they're assigned. But the calls
21 may come from a referring physician to your group or
22 the other group based on the preference of the
23 referring physician.
24   Q.   Okay. So, there are times when you are

Paul A. Skudder, MD

Goodie v. USA

April 30, 2012

---

SHEET 3   PAGE 17

17

1  the vascular surgeon for the hospital and in the ER
2  room you would then see the person on an inpatient
3  basis?
4  A.   Yes.
5  Q.   Okay. And obviously the other scenario
6  you see them on an out-patient too, follow-up with
7  Dr. SKUDDER and his offices outside the hospital?
8  A.   Yes.
9  Q.   In your role as I guess the person who the
10 patients are referred, what is your understanding of
11 that criteria versus an inpatient basis?
12 A.   I'm trying to -- the question is an
13 interesting question in the context of how medicine
14 works. It's not that there is a criteria except if
15 the patient is in the hospital with pneumonia, and
16 during the time a vascular problem arises, then you
17 get called for an inpatient.
18 Q.   Yeah.
19 A.   I don't know if that's helpful to you.
20 Q.   There is someone in the ER department and
21 gets stabilized and then get follow-up with a
22 vascular surgeon at sometime later?
23 A.   Well, that would be the judgment of the
24 emergency room physician. Do they want me to see the

---

PAGE 18

18

1  patient while they're there, or see a patient with a
2  little less urgent problem, before the call comes to
3  me. If the call comes to me, and they'll say, this
4  is somebody you want to see here or sometimes you're
5  happy to see in the office.
6  Q.   As a vascular surgeon, do you have to do
7  imaging studies?
8  A.   Yes.
9  Q.   Do you rely on the experience of the
10 reading of radiologists or do you prefer to do your
11 own personal assessment?
12 A.   It's a mixture of both.
13 Q.   Can you give me some circumstances under
14 which -- well, let me back up. Strike that. Do you
15 have a mixture of some of which a radiologist and
16 yourself both read it and you come to some assessment
17 based on both opinions?
18 A.   The most common is the second that you
19 mentioned. There are very few studies that would not
20 be seen by both of us. And again, throughout my
21 career, I've always looked at this as a collegial
22 relationship that is a team that's looking to care
23 for a patient. One looks at the radiologist's
24 opinion with respect and usually you agree. But you

---

PAGE 19

19

1  look at this as a coming together with him to discuss
2  the care. And if there's a disagreement, it's a good
3  thing to go over the imagining and see why one person
4  sees it differently than the other.
5  Q.   Do you have any special training with
6  regard to reading imaging studies?
7  A.   As a vascular surgery, your training is in
8  vascular surgery. But I think all vascular surgeons
9  would say that that includes the understanding and
10 interpretation of vascular imaging. You don't have a
11 separate piece of paper that says you're a vascular
12 imaging specialist, if that's what you mean. But the
13 work depends on a certain degree on understanding and
14 looking at these images.
15 Q.   I think that's fair. Working with various
16 anatomy that has various issues, you see them through
17 the CT, you would have some familiarity with the
18 problems associated with it, is that fair?
19 A.   There's no question about that. Before we
20 operate on patients, we virtually always, as a rule,
21 virtually always review imagines ourselves and agreed
22 with the radiologist's interpretation. That's the
23 way it is in medicine. I bet that's the way it is in
24 law. And when there is room for disagreement, the

---

PAGE 20

20

1  time to sort that out in general is prospectively
2  before you get yourself into a situation that is
3  different than it was.
4  Q.   And when you say you work it out when
5  there's disagreement, how is it worked out with a
6  radiologist where you might disagree?
7  A.   You and I sit in a room together and look
8  at the same images and say what we think. We go in
9  looking to sort out the interpretation and generally
10 we get there.
11 Q.   Specifically what kind of imagining
12 studies do you use as a vascular surgeon?
13 A.   There are three or four that come to mind
14 prominently. One of them is ultrasound. In our
15 office we're primarily for the interpretation. In
16 the hospital, the radiologist does the primary
17 interpreting. And as I say, if it's a vascular
18 image, we're going to look at it before we make a
19 decision based on it.
20    MRI has also played a significant role in
21 vascular work. There's others but not as much as
22 ultrasound. And then contrast base imagining
23 arteriology is really in our daily diet. Some of the
24 arteriology we do ourselves so we are the primary

---

Paul A. Skudder, MD
Goodie v. USA

April 30, 2012

PAGE 21

21

1 interpreters of it. Some of it is done by a
2 radiology team in which they interpret films. But
3 before we make a clinical decision, I will very often
4 talk to the radiologist. We have a superb
5 radiologist, and he's incredibly helpful in sorting
6 these imagines. So, I very much value working with
7 him side by side. And now I've got a computer in
8 front of me and have a telephone in each of your
9 ears, look at this, number 65, and do you see this or
10 that by the carotid arteries. So, these can be
11 compared if we're not physically in front of them.
12 There are so many advantages to being face to face,
13 but it's gotten a lot easier.
14    Q.   Okay. Doctor, I know that when we were
15 talking about the imaging study, you mentioned it
16 with contrast base. Are there any other circum-
17 stances under which you use non contrast studies in
18 your practice?
19    A.   The CT-scan. Contrast or non contrast.
20    Q.   The question specifically is do you use
21 non contrast in the work you do in vascular surgery?
22    A.   Yes, and I probably put it out of line
23 when you put contrast up first.
24    Q.   What are the circumstances under which

PAGE 22

22

1 you've used the non contrast study for work that you
2 do?
3    A.   The CT that you would see without contrast
4 would probably be involving the aorta. And these are
5 CTs that are done to a certain degree in this case,
6 for other reasons. And the aorta comes up as
7 questions of pathology so we have an opinion, we end
8 up reviewing a non contrasted study.
9    Q.   And speaking with counsel for the
10 plaintiff, I understand you're being proffered mostly
11 as a causation expert. Are you going to offer
12 anything to do with what CT imaging in this case
13 would have shown, if different imaging processes were
14 used?
15    A.   If I were asked, I would offer such an
16 opinion based on my training as a vascular surgeon.
17 I will not attempt to state what a radiology or
18 emergency room physician should not have said or
19 something for individuals that are not vascular
20 surgeons.
21    Q.   Okay. And so, we mine some questions to
22 probe those opinions. I just wanted to do that at
23 the outset.
24    A.   I would not want a non vascular surgeon to

PAGE 23

23

1 give a opinion about my behavior. And I think Mr.
2 Smith agrees with me on that.
3    Q.   I didn't ask you any opinions with respect
4 to radiology or emergency medicine. So, Doctor, a
5 couple of questions about your CV. It looks like you
6 did the special fellowship at George Washington/
7 VA/USUHS in '84 and '85, it looks like?
8    A.   Something's a little mixed up there. In
9 '84/'85 my vascular fellowship was at the Lahey
10 Clinic in Burlington, Massachusetts.
11    Q.   Okay. Maybe I've gotten the dates wrong
12 then. What was the time with GW/VA/USUHS?
13    A.   Okay. This was my first job after
14 fellowship, and it was in '85 and '86, in DC, that's
15 correct.
16    Q.   Okay. So, let's talk about that. What
17 were the circumstances under which you were in that
18 job?
19    A.   Well, I was hired as an attending vascular
20 surgeon and packed up my family and moved off to DC
21 and engaged in the practice of vascular surgery.
22    Q.   Okay. And I notice you list all three.
23 Was there some sort of internship or fellowship under
24 which you were there?

PAGE 24

24

1    A.   Well, a fellowship, when you use that in
2 the medical world, you're talking about a person who
3 is in training, and I had completed my training. So,
4 that really isn't the right word. The contract that
5 I signed, as I remember -- this is a long time ago --
6 were with George Washington University and with the
7 Veterans Administration. George Washington was --
8 Georgetown was involved because the VA Hospital was a
9 teaching, training site for surgical residents and
10 medical students from both GW and Georgetown.
11    So, I was engaged in helping to teach and
12 train individuals, some of whom were trainees or
13 students at George Washington and some from
14 Georgetown, even though I was actually hired by
15 George Washington, but so what.
16    And by virtue of being in the federal
17 system at the VA, and some personal connections, I
18 pretty quickly became involved with the USUHS
19 vascular people, who were very, very good people.
20 And at that time, that was obviously before Walter
21 Reed was absorbed into Bethesda, and the vascular
22 service at Walter Reed was very well reputed and I
23 came to know and was very friendly for many years
24 long after I left with the vascular surgeons who had

Paul A. Skudder, MD

Case 1:10-cv-03478-RDB   Document 20-15   Filed 07/13/12   Page 8 of 24
Case 1:10-cv-03478-RDB   Document 17-17   Filed 06/08/12   Page 8 of 24

Goodie v. USA

April 30, 2012

SHEET 4   PAGE 25

**25**

1 been at Reed during the mid '80s.
2       Now, they didn't all stay in the army.
3 Some of them scattered out; some did work their whole
4 career in military medicine. And it was they who
5 really recruited me to help out on the faculty a
6 little bit at USUHS, which I basically did gratis.
7 It was fun to do and fun to be around the medical
8 students and it was a good place.
9   Q.   Okay. And just so I understand, did you
10 say GW was the one that hired you or was it the VA?
11   A.   Well, I believe there was a contract
12 signed with both of them. The chief of surgery at
13 George Washington was a guy named Ralph DePalma and
14 the chief of surgery at the VA was John Harmon. And
15 there must have been some corroborative agreement
16 between them that they would hire a new vascular
17 surgeon, and there I was.
18   Q.   Did you split your time between GW and the
19 VA?
20   A.   The time was almost completely at the VA.
21   Q.   And it looks like after that you went then
22 to Massachusetts. What was the reasons for moving
23 from the DC area up to that group in Massachusetts?
24   A.   Well, that was an interesting decision and

PAGE 26

**26**

1 in the end proved to be a mistake. I moved to my
2 wife's hometown. It was also a town where I had gone
3 to college. It's a small town. And it was an
4 irresistible temptation for the two of us to go
5 there. But I was never able to -- I spent five years
6 with my nose to the grindstone and was never able to
7 build a -- I wanted to say a successful vascular
8 practice, but when I say successful, it's not that we
9 didn't have success with the patients that we took
10 care of, it's just that there weren't enough patients
11 to take care of. So, that proved to be an
12 unsuccessful endeavor.
13   Q.   Okay. But regardless you voluntarily left
14 that position at the VA?
15   A.   I did. And I did it for reasons that were
16 sort of emotional and you might be able to ferret out
17 of all this that in many ways I wish I hadn't done
18 that. But you can't have it back.
19   Q.   True. Speaking about that, the patients
20 that you saw at the VA, can you tell me just
21 generally what kind of patient population you saw
22 there?
23   A.   Almost exclusively male; elderly veterans.
24 A tremendous amount of vascular disease which is

PAGE 27

**27**

1 related to age and smoking and high blood pressure
2 and diabetes. And there was a lot of cigarette use
3 and a lot of elderly males and there was a tremendous
4 amount of vascular disease. We did a lot of work in
5 the year I was there. It was very satisfying in that
6 sense, that's for sure. Mixed racially; mixed
7 socio economically. I don't know what else I can
8 tell you.
9   Q.   Did you see a portion of the patient
10 population that you saw there at the VA that were in
11 fact homeless?
12   A.   Yes.
13   Q.   And what about patients with extensive
14 drug use problems?
15   A.   Well, I think they're scattered throughout
16 our society now, but there may have been a few more
17 at the VA and elsewhere.
18   Q.   Okay. You mentioned smoking and we just
19 talked about drugs. How about alcohol dependency?
20 Was that part of the patient population you served
21 there?
22   A.   Well, it certainly was and it certainly
23 has been everywhere else we've been. Though I have
24 to say that alcoholism isn't tightly linked with

PAGE 28

**28**

1 vascular disease. That doesn't mean we don't see it,
2 but it -- smoking, which is tightly linked with
3 vascular disease, almost everybody that smokes,
4 whether it's at the VA or anywhere else. Alcohol is
5 linked to a lot of other health problems, but it
6 isn't tightly linked to vascular disease.
7   Q.   Based on your work and your time there,
8 did you form any opinions about the ability of the VA
9 to provide the standard of care to its patients?
10       MR. SMITH: Objection.
11       MR. MEDINGER: You can answer.
12   A.   Yes. And my opinions were basically
13 positive. I had not worked in a VA hospital in my
14 medical school or residency training, which many
15 people have. So, you heard various things about the
16 patient population and some of the other things.
17       But the time I spent there was not
18 negative, it was positive. And I thought the
19 patients under our care were well treated. I think
20 the VA has been a leader in establishment of certain
21 quality benchmarks and certain performance
22 improvement standards and whatnot that are now well
23 appreciated throughout American medicine and in
24 particular American surgery. And I think that some

Paul A. Skudder, MD
Goodie v. USA

April 30, 2012

PAGE 29

29

1 of that was in its early phases when I was there.
2 And I was able to see some of that sort of getting
3 started. And I think -- so, my opinions were more
4 basically positive.
5    Q.    Since the time you left -- and maybe this
6 might be in your offices as anything you've done with
7 USUHS -- have you had any occasion to practice again
8 in any VA hospital since leaving?
9    A.    I have not.
10    Q.    Doctor, I want to transition now to
11 talking just generally about your knowledge of aorto-
12 enteric fistula. And just for brevity of the
13 record, so I don't stumble over it every time I say
14 it, could we just refer to it as an AEF?
15    A.    Fine with me.
16    Q.    So, can you tell us, Doctor, what an AEF
17 is?
18    A.    An AEF is a connection between the aorta
19 and the intestinal tract.
20    Q.    Okay. Can you be more specific about why
21 they manifest?
22    A.    Virtually all of them are a complication
23 of prior aortic surgery. They carry the term
24 secondary aortoenteric fistula or secondary AEF; not

PAGE 30

30

1 because they are secondary in importance or secondary
2 in frequency, but because they occur secondary to the
3 prior operation. They didn't happen on their own.
4 They generally occur because there is an infection
5 around the graft or the artificial material that was
6 sewn in place to repair the original aortic problem.
7    The original aortic problem may have been
8 an aortic aneurysm or it may have been blockages in
9 the aorta impairing the circulation to the lower
10 extremity. It doesn't make a material difference
11 which of the two that it was.
12    These events are also precipitated in part
13 by trauma or inflammation that occurs around what we
14 call the proximal anastomosis, a-n-a-s-t-o-m-o-s-i-s,
15 where the aortic graft is sewn to the aorta. And
16 this occurs directly behind the duodenum,
17 d-u-o-d-e-n-u-m, which is part of the tract.
18    When you put everything back together, the
19 duodenum tends to rest directly on or almost directly
20 on the suture line where you put the aorta and the
21 aortic graft together. The constant thumping on that
22 suture line with every heart beat for the rest of the
23 patient's life can sometimes gradually erode its way
24 into the wall of the duodenum.

PAGE 31

31

1    And once it gets into the wall of it, and
2 you get a little leakage of intestinal contents, the
3 intestinal contents are inherently infected or at
4 least contaminated. And that then contaminates the
5 graft. And that infection then is slowly and
6 indolently can erode its way back the other way
7 through the anastomosis or the aorta and the duodenum
8 -- I'm sorry -- the aorta and the graft are sewn
9 together.
10    So, now you have the biggest blood vessel
11 in the body springing a leak into the intestinal
12 tracts or there's no resistance to it, and the
13 patient can very rapidly and dramatically bleed to
14 death into their intestines. That's internal
15 bleeding, the bleeding isn't coming out of the body,
16 but it's out of the blood vessels and the patient
17 rapidly exsanguinates.
18    It commonly occurs -- well, let me
19 rephrase that. It does not commonly occur at all,
20 but when it does occur, it's a commonly -- a pretty
21 long time after the aortic surgery was done; months
22 or years or sometimes even decades. The frequency
23 with which it's occurring seems to be decreasing over
24 time for a lot of reasons, some of which have to do

PAGE 32

32

1 with changes in the technique of aortic surgery. And
2 some of which we may not really understand. But it
3 does seem to be getting less frequent with time.
4    Q.    Okay. Doctor, you mentioned how, I think,
5 it does not commonly occur, are you familiar with
6 what the medical literature says about the incident
7 rate on a secondary AEF?
8    A.    Most of us would say it would be one
9 percent or less. And I must say that to a lot of
10 vascular surgeons, when you think of the AEF as a
11 special case of aortic graft infection, which is the
12 real problem.
13    Q.    Okay. You also mentioned how there is
14 some time lag between a graft being placed and a
15 subsequent development in AEF. Are you familiar with
16 what the medical literature says in terms of the
17 average time frame for this development post graft?
18    A.    I suspect if you looked in a number of
19 different places, you'd get very different answers to
20 that questions. And I think that speaking about an
21 average time is not helpful in a case like this. I'm
22 sorry, is not helpful in discussing AEF because the
23 range of times is going to be very, very broad. If
24 you think of an average as being the peak on the bell

Paul A. Skudder, MD

Goodie v. USA

April 30, 2012

SHEET 5   PAGE 33

**33**

1 curve, and a peak in the middle of it, this is a very
2 flat curve. And you can get AEFs occurring anywhere
3 along the curve. So if you say the average is two
4 years or five years or 12 years, it doesn't matter.
5 Because they're spread widely over this time frame.
6 Q. Precisely. So, in other words, there
7 could be an AEF that happened just weeks after a
8 graft. But by contrast there could also be an AEF
9 that happened 10 days after a graft?
10 A. That's true. And the decades after is
11 more likely than the weeks after. They generally do
12 not occur early.
13 Q. Okay. Are you aware of what the medical
14 literature says in terms of the post operative
15 survival rate of folks that develop AEFs?
16 A. Somewhere around 50 percent.
17 Q. And where are you getting that number
18 from? Are you getting that from any specific
19 literature or is that your understanding of what it
20 is?
21 A. That's my understanding of what it is
22 based on -- it is not based on referring to a
23 specific source in the literature but a culmination
24 of a lifetime of being somewhat familiar with the

PAGE 35

**35**

1 A. I might. I am confident that some of the
2 literature would say that that would be the mortality
3 rate, but I'm equally confident, again, without being
4 able to cite you a specific citation, I'm equally
5 confident that some of the literature would show a
6 mortality a little bit lower than that. I suspect
7 there are some papers out there that would show a
8 less than 50 percent mortality. I don't believe that
9 that would be the majority of patients. And I'm
10 confident that some of them show exactly what you
11 said.
12 Q. Okay. And I think your previous testimony
13 was it was about 50 percent?
14 A. I'd say 50 percent. That probably is what
15 I did say exactly. But I would say 50 percent is as
16 good as it's going to get. I think 90 percent is a
17 little too low. Let me rephrase it. I think a
18 mortality of 90 percent is a little too high. Though
19 again, I'm confident there are individual papers that
20 will say that the mortality in their experience was
21 90 percent. And they had a bad run and a series of
22 very unlucky patients. And likewise I suspect there
23 are some papers that are going to say we have a
24 mortality of 40 percent. And I think that's a very

PAGE 34

**34**

1 literature and the textbooks as well as experience
2 with some of these cases.
3 Q. I've seen a couple articles putting it
4 between 60 and 90 percent. Would you quibble with
5 that?
6 A. Sixty or 90 percent of survival? I would
7 say it would be too high.
8 Q. Okay.
9 A. I don't think 90 percent of patients with
10 AEFs are likely to survive. I would be more likely
11 to --
12 Q. Could you say that again, Doctor?
13 A. Well, you said -- if I understood your
14 question correctly, you were asking me if I would
15 quibble with a survival rate for AEFs between 60 and
16 90 percent. The answer is yes, I would quibble with
17 a survival rate of 60 to 90 percent for an AEF. I
18 think that's too high.
19 Q. Yes. And I think the word I meant to say,
20 Doctor, was mortality rate and not survival rate.
21 And thanks for being attentive to that. But the
22 literature that I saw put a mortality rate 30 days
23 after an operation for an AEF at 60 to 90 percent.
24 Would you quibble with that figure?

PAGE 36

**36**

1 fortunate group. And the truth lies somewhere in
2 between.
3 Q. Okay. And as you sit here today, you
4 couldn't pin point it more than just to say about 50
5 percent?
6 A. Fifty percent survival is as good as it's
7 going to get. Maybe a little less than that on
8 average.
9 Q. Okay. Doctor, in your practice obviously
10 you come in contact with patients that have had a
11 secondary AEF, right?
12 A. I have treated a number of these patients;
13 not a large number, but a number of them.
14 Q. Okay. Can you tell us how many throughout
15 your career that you've treated?
16 A. I would have to guess, but I might say six
17 to 10.
18 Q. And when we say you've treated -- I guess
19 they were your patients and you were doing something
20 with respect to their treatment and care, right?
21 A. Yes. Though your having said that, I will
22 qualify this to some degree in that I've always
23 practiced in groups, and I simply cannot sort out in
24 my mind, you know, whether some of these patients

Paul A. Skudder, MD Case 1:10-cv-03478-RDB   Document 20-15   Filed 07/13/12   Page 11 of 24
Case 1:10-cv-03478-RDB   Document 17-17   Filed 06/08/12   Page 11 of 24
Goodie v. USA

April 30, 2012

---

PAGE 37

37

1 were my patients or a partner's patient, but we were
2 all involved in their care together.
3   Q.   Okay. So, the 6 to 10 number would
4 include anything that peripherally would have been
5 with physicians, yourself or people in your group?
6   A.   Correct.
7   Q.   Okay. I just wanted to make crystal clear
8 that it wouldn't be 6 to 10 just for you and then
9 maybe another number with respect to people that a
10 partner of yours just asked you to consult on.
11   A.   I'm perfectly comfortable with that.
12   Q.   Okay. And with respect to what you can
13 recall, do you recall how their AEFs were diagnosed?
14   A.   Well, there are really three ways that
15 these can be diagnosed. And they all have their
16 limitations and imperfections. One is by CT-scan.
17 Another by endoscopy, and the other is a clinical
18 diagnosis generally when the patient collapses and
19 exsanguinates.
20   Q.   Okay. And do you remember in these six to
21 10 cases that you were involved in which method was
22 used, if any, to determine that they had an AEF?
23   A.   I do not have an individual memory of
24 which method was used for which case. But I have

---

PAGE 38

38

1 been familiar with all three of those; being the
2 diagnostic tool, being how we got to the knowledge in
3 each individual case.
4   Q.   Okay. Do you have any recollection as to
5 what the symptoms were of these patients at initial
6 presentation, either to yourself or to some hospital?
7   A.   GI bleeding, abdominal pain, fever and
8 exsanguination.
9   Q.   Okay. And when you say GI bleeding, what
10 specifically do you mean by that? What evidence was
11 there of it?
12   A.   Some patients were vomiting blood and
13 others were passing blood in their stool.
14   Q.   You mentioned fever, what kind of fever,
15 if you remember, what level at which were their
16 fevers?
17   A.   I cannot recall that exactly.
18   Q.   Did any of these patients have any kind of
19 surgical intervention to repair an AEF?
20   A.   Yes.
21   Q.   And how many of them, if you remember?
22   A.   Well, all of them did except for those
23 that passed away before we were able to do it.
24   Q.   Yeah. And that really was what my

---

PAGE 39

39

1 question was getting at. Of those six to 10, do you
2 have any sense for how many were able to survive at
3 least long enough to get a surgical intervention and
4 how many died before that could be undertaken?
5   A.   Well, the patients that stand out in my
6 memory are the ones that we fixed or tried to fix. I
7 would say most of them came to the operating room.
8   Q.   Can you ballpark it at all? Can you say
9 80 percent of them at least got as far as the
10 operating room?
11   A.   Yeah, I think that's reasonable.
12   Q.   Okay. And with respect to those then,
13 would you, yourself, the surgeon actually be working
14 on the intervention?
15   A.   I was either the surgeon or the assistant
16 surgeon. My hands were in the wound.
17   Q.   And what were -- what essentially did you
18 do? What procedures did you do to try to fix them?
19   A.   Well, you've got to replace the aortic
20 graft with a new graft.
21   Q.   Okay. And can you describe to me how it
22 was that you did that?
23   A.   Well, we went primarily to a retro
24 peritoneal incision since most of these originally

---

PAGE 40

40

1 were done through a trans peritoneal incision. And I
2 expose the aorta above the fistula. Plant and
3 controlled it and try to dissect the duodenum off
4 where the AEF is located; and replace the graft.
5 It's all about the proximal anastomosis, that's where
6 the trouble is. And then the anastomosis is going to
7 be done wherever it needs to be done in that
8 individual case, if they decide there's a diseased
9 process. But it's all about the proximal anastomosis
10 in these cases. That's where the fistula is. That's
11 where the rubber meets the road.
12   Q.   And so, of these patients that you
13 actually did try to do an intervention, what were the
14 patient outcomes?
15   A.   I think there were certainly one or two
16 survivors and others did not survive. These are very
17 major cases in very sick patients.
18   Q.   With respect to the patients that you did
19 a surgical intervention on, do you have any
20 recollection as to how long after their initial
21 presentation at a hospital that you were subsequently
22 surgically intervening them?
23   A.   Well, in most of these patients, they were
24 -- when they came to the hospital, they didn't leave

---

Paul A. Skudder, MD
Goodie v. USA

April 30, 2012

**41**

1 the hospital until the procedure was done.
2 Q. Okay. Were there any that you saw on an
3 out-patient basis to set up the surgical
4 intervention?
5 A. Emergency room, yes; out-patient, no.
6 Q. So, you're saying they all came to you via
7 the emergency room and then immediately referred to
8 vascular for an AEF repair?
9 A. Not necessarily. They may have been
10 admitted to a non vascular physician through the
11 emergency room, but as the work-up progressed, a
12 question of whether they had an aortic graft
13 infection contributing to the problem arose and
14 vascular surgeons were consulted.
15 Q. Okay.
16 A. I remember one where there was a GI bleed
17 and an endoscopist was looking into doing an endo-
18 scope. And he said, "Holy cow, I'm looking at
19 something white here, what the hell is that?" It
20 turns out he was looking right at the aortic graft
21 through the side of the duodenum. So, that didn't
22 come directly to us. Who knows who admitted to and
23 they consulted a GI to do the scope and the GI guy
24 did the endoscopy and called us. So, it isn't

**42**

1 necessarily -- the pathway isn't always a straight
2 line.
3 Q. When you are referred a patient to look at
4 for a possible AEF, do you do your own history and
5 physical of the patient?
6 A. Oh, yes.
7 Q. And what are the things that you're
8 looking for to confirm whether there is an AEF or
9 not?
10 A. Well, history and physical is not going to
11 confirm that. I don't think I would look for
12 anything, look for any specific thing to confirm that
13 because I know it's not going to confirm it.
14 Q. Really my question is asking what are some
15 of the things that would sort of raise your suspicion
16 that this is an AEF?
17 A. Well, there are signs and symptoms that
18 the patient might have an aortic graft infection,
19 because that's the real problem. And secondly, the
20 specific sign that the infection is taking a form of
21 an aortoenteric fistula would be signs of inter-
22 mittent GI bleeding, the so-called herald bleed.
23 Q. Would it essentially be something that
24 would raise your suspicion of an AEF?

**43**

1 A. The transmission wasn't good there. Could
2 you repeat your question?
3 Q. Sure. Any other signs or symptoms that
4 you would get just from the history and physical that
5 would raise your suspicion level for an AEF other
6 than this GI bleed?
7 A. And the answer to your prior question, I
8 didn't say just the GI bleed, but I said any signs or
9 symptoms that might suggest an aortic graft
10 infection. Those would include fever, night sweats,
11 abdominal pain, back pain, indigestion, et cetera.
12 Work-ups for infection in the preceding weeks or
13 months that had not resulted in a good diagnosis of
14 where the infection was coming from.
15 Q. Okay. Anything else other than those that
16 you mentioned?
17 A. Well, not that comes to my mind
18 immediately.
19 Q. Okay. Doctor, in some of the medical
20 literature I've read, one of the authors has
21 indicated that diagnosis of AEF is difficult to make
22 pre-operatively. Would you agree with that
23 statement?
24 A. Yes.

**44**

1 Q. The same article said that diagnosis is
2 rarely made before a laparotomy or an autopsy. Would
3 you agree with that statement?
4 A. Maybe.
5 Q. And why maybe? What's your hesitation one
6 way or the other or qualification one way or the
7 other?
8 A. I think that if the author is defining
9 what he means by making a diagnosis as establishing
10 absolute proof that the aorta is bleeding into the
11 duodenum, he may be right. It also is a little bit
12 time dependent on when the particular paper that
13 you're reading was written. Because some of the
14 imaging capacity, particularly CT-scans, has improved
15 so much in the last 15 years that it might not
16 reflect current knowledge or current technology, may
17 be a better line that current knowledge.
18 From my way of thinking, as I've stated
19 previously in answer to some of your questions, the
20 real issue is an aortic graft infection. And the
21 diagnosis of an aortic graft infection is a little
22 bit easier to make than the diagnosis of an aorto-
23 enteric fistula. And that's where our focus should
24 be. The aortoenteric fistula, if you will, is the

Paul A. Skudder, MD
Goodie v. USA

April 30, 2012

---

PAGE 45

45

1 final outcome or the final pathway of some aortic
2 graft infection.
3      So, the goal here should not be to focus
4 purely on whether there's an aortoenteric fistula,
5 but to say does my patient have an aortic graft
6 infection, which is a lethal condition with a very
7 high morbidity in mortality, in part because he may
8 develop an aortoenteric fistula as a result of the
9 aortic graft infection. And the diagnosis of aortic
10 graft infection is also difficult, but it isn't quite
11 as narrowly diagnosed and quite as difficult to make
12 as the diagnosis of aortoenteric fistula. So, that's
13 why I answer your question without an absolutely pure
14 yes or no.
15      As I approach a patient like this, I'm not
16 looking for, do I need to nail the diploma on the
17 wall that this is an aortoenteric fistula and nothing
18 else, but what I need to do is say is there enough
19 evidence in this patient of an aortic graft infection
20 that he needs to be – that he needs that problem
21 fixed before it kills him.
22   Q.   I see. Getting to your point, Doctor,
23 about fever being a potential concern, at what point
24 would you say someone clinically has a fever that

---

PAGE 46

46

1 might be concerning for some sort of graft infection?
2   A.   Infections that involve aortic grafts or
3 heart valves or things of that nature, which are very
4 similar in principle, tend to present with low grade
5 fevers that don't go away, and the patient's doctors
6 have done lots of cultures and done a lot of looking
7 around to try to figure out what the fever might be
8 coming from and haven't got an answer.
9      The fevers don't tend to be very high as a
10 general rule, sometimes they are. They don't tend to
11 be very high, but they tend to be persistent and
12 troublesome and we can't get to the bottom of this.
13 And those are the kind of questions I would ask the
14 patient.
15   Q.   Okay. And I know that there's probably
16 some range, but when you say low grade fever, are we
17 talking about somewhere between 99 degrees and a
18 hundred degrees as a temperature?
19   A.   Ninety-nine, a hundred, 101, but they're
20 not going to be 103, 104 that you have to look out
21 for.
22   Q.   Okay.
23      THE WITNESS: I need to excuse myself
24 for just a minute, if that's all right.

---

PAGE 47

47

1      MR. MEDINGER: Sure. We're at a good
2 breaking point anyway.
3      (A brief recess was taken.)
4      BY MR. MEDINGER:
5   Q.   Doctor, I just have one more question with
6 regard to the medical literature that I saw. One
7 author indicated that of the entire patient
8 population that has AEFs, of that population, he said
9 that 50 percent of those were instances where
10 physicians suspected there may be an AVS, and another
11 15 percent suspected AEF. Does that go with what
12 your understanding is?
13   A.   Did you say 50 and 50 or did you say 50
14 and 15?
15   Q.   50 and 15. And the remainder of the
16 percent is where it was somewhat unclear, they just
17 had no idea one way or the other.
18   A.   Well, I need a little more context than
19 just what kind of study it is that you're looking at.
20 But I think that always depends on a certain degree
21 of the background of who's caring for the patient. I
22 think, for example, if, this is for example, most
23 vascular surgeons when confronted with an individual
24 that had a prior aortic surgery and was not having GI

---

PAGE 48

48

1 bleeding, will recognize that this is a potentially
2 very dangerous situation. Possibility of an AEF.
3 Most people who are not vascular surgeons will not
4 necessarily understand that relationship. And the
5 possibility of a AVS may not occur to them with the
6 same combination of two events. So, I'm not sure I
7 can comment on what you cited there for me without
8 seeing the whole thing.
9   Q.   Okay. Fair enough. Doctor, I'd like to
10 transition to your actual report, which has been
11 marked exhibit 2, the specific record that you relied
12 on. I think you already mentioned it, but can you
13 confirm these are the documents you used in forming
14 your opinion?
15   A.   These are the documents I used in forming
16 my opinion.
17   Q.   Okay. And we talked about a CT that was
18 done in January of 2006. Do you remember that?
19   A.   Yes.
20   Q.   And you've had a chance recently to review
21 that CT, right?
22   A.   Yes.
23   Q.   And in your review recently you didn't see
24 any indications of AEF in that film?

Paul A. Skudder, MD
Goodie v. USA

April 30, 2012

--- SHEET 7   PAGE 49 ---

49

1  A.  No. Well, yes -- you are correct, no, I
2  did not see any such findings.
3  Q.  And in addition to the CT, was there
4  anything else about Mr. Johnson's presentation at
5  this January, 2006 visit that would suggest to you
6  any symptoms concerning an AEF?
7  A.  Not that I recall.
8  Q.  Was there anything about his presentation
9  that would lead you to confirm that he wasn't having
10  an AEF at that time?
11  A.  Repeat the question, please.
12  Q.  You said other symptomatology that he, the
13  question was sort of the -- is there anything in his
14  presentation that would lead you to say or rule out
15  that he was not having an AEF at that time?
16  A.  How about the fact that he was still alive
17  a year later.
18  Q.  That's probably a good factor. If he
19  didn't have a fever at that visit, would that suggest
20  that he didn't have a graft infection?
21  MR. SMITH: Objection.
22  A.  As long as you use terms like suggestive,
23  I agree with you.
24  Q.  Okay. What about the fact that he was

--- PAGE 50 ---

50

1  hemodynamically stable, he wasn't having an AEF at
2  that time?
3  MR. SMITH: Objection.
4  A.  With the same qualifications as the last
5  question, yes.
6  Q.  And do you agree with that, that generally
7  if the patient was hemodynamically stable, that that
8  is one data point of anybody not having an AEF?
9  A.  I think we're going to have to put some
10  qualifications on that agreement.
11  Q.  And what qualifications would you put on?
12  A.  Well, that tells you that they're not
13  aortically hemorrhaging at this time.
14  Q.  Okay. Any other qualifications you would
15  put on it before you would agree with it?
16  A.  Well, that's the big one. For example, in
17  the case here, Mr. Johnson, who almost essentially
18  had his AEF on October 9th. So, he had it even
19  though he was hemodynamically stable. So, I'll
20  acknowledge that it can be suggestive of the absence
21  of an AEF, so long as clearly suggestive means only
22  that, suggestive.
23  Q.  And, Doctor, just so I am clear, sometimes
24  I'm hearing you say AEF, AVF, AEF. This is a huge

--- PAGE 51 ---

51

1  difference. And something's lost in translation.
2  A.  I have not said AFV, never AVF, always
3  AEF. And one last point about the 2006 presentation,
4  he left and was discharged at that point without any
5  sort of acute pain, at least that's what the medical
6  records show.
7  Q.  Is that suggestive of him not having an
8  AEF at that point?
9  A.  Only in the subtlest way. Many of these
10  patients will not have pain. Pain is one way for the
11  patient, but it's not very useful.
12  Q.  Yeah. And just to complete your thought,
13  I think you suggested that pain is very useful in
14  determining these situations of whether it is an AEF
15  or not?
16  A.  What I mean to say is that the presence or
17  absence of pain is not very helpful. There's too
18  many patients with or without AEF that will be pain
19  free so you can't defend on the absence of pain to
20  estimate with any confidence that this condition does
21  not exist. And likewise, there's some other
22  competing source of pain that the presence of pain
23  alone is a very non specific indicator that a patient
24  may have an aortic graft infection.

--- PAGE 52 ---

52

1  Q.  Okay. And I took your earlier opinion to
2  say that sometimes the presentation of someone with
3  an AEF would have an abdominal pain?
4  A.  Correct. They may have abdominal pain or
5  back pain. This is a not specific finding.
6  Q.  Doctor, I want to flash forward to the
7  October 5, 2007 visit of Mr. Johnson and his primary
8  care physician, Dr. Anya.
9  A.  Okay.
10  Q.  And the question I wanted to ask you, if
11  you remember, the principal concern at that point was
12  bilateral knee pain.
13  A.  I haven't looked at the presentation from
14  October 5th in a long time.
15  Q.  Okay, Doctor. Do you have pages that are
16  stamped in the right hand corner with DO something?
17  A.  I do not have those. The biggest stack of
18  records I have does have page numbers in the bottom
19  right corner.
20  Q.  Okay. Doctor, I'll go with those page
21  numbers. They roughly match up. Page 57 is I think
22  where Dr. Anya's note is. Okay. And just take a
23  second for yourself to read it and then I'll ask you
24  some questions about it.

Paul A. Skudder, MD

Case 1:10-cv-03478-RDB    Document 20-15    Filed 07/13/12    Page 15 of 24
Case 1:10-cv-03478-RDB    Document 17-17    Filed 06/08/12    Page 15 of 24
Goodie v. USA

April 30, 2012

PAGE 53

53

1   A.   I might not be on quite the right page
2   because what I have here is an order for an EMG on
3   page 57.
4   Q.   So, we've got several copies.
5        MR. MEDINGER:  Can we go off the
6   record, Paula, so we can find this?
7        THE REPORTER:  Sure.
8        (A brief recess was taken.)
9        BY MR. MEDINGER:
10  Q.   Certainly, Doctor, I want you to take a
11  peak at October 5, 2007, at 1540, so 3:14 in the
12  afternoon?
13  A.   Yeah, I'm reading there.
14  Q.   And we're back on the record, so, Doctor,
15  your bilateral shows there's knee pain and some kind
16  of numbness when he wakes up.  Right?
17  A.   Correct.
18  Q.   That complaint standing alone, does that
19  suggest anything to you that is concern for an AEF at
20  that point?
21  A.   No.
22  Q.   If a patient came to you with bilateral
23  knee pain and some sort of numbness, you wouldn't say
24  that's something that is going to raise your

PAGE 54

54

1   suspicions for an AEF?
2   A.   No, I would not say that.
3   Q.   Anything else in the presentation that you
4   see there that you would say at that point should
5   have been concerning for an AEF?
6   A.   No.
7   Q.   Okay.  Doctor, the next notes that I want
8   you to look at are the ones from Dr. Weld, which were
9   from October 9, 2007.
10  A.   Okay.
11  Q.   And again, just to be fair, would you read
12  that real briefly to yourself and then I'll ask you
13  some questions about them?
14  A.   Okay.
15  Q.   Doctor, looking at Dr. Weld's notes
16  entered at 6:59 at night, she's indicating here the
17  presentation of acute onset of back pain, diffuse
18  abdominal pain, intermittent vomiting and a week
19  prior to coming to the hospital.  Given that
20  presentation, if you were the vascular surgeon on
21  call that night, would you expect to be consulted at
22  that point with that presentation?
23       MR. SMITH:  Objection.
24  A.   Maybe.  I think many people might have

PAGE 55

55

1   made that consultation based on the next line in the
2   note, which says status post aorta femoral bypass,
3   August '02.
4   Q.   Okay.  There's instances when you expect
5   that maybe you wouldn't be contacted at that point?
6        MR. SMITH:  Objection.
7   A.   Well, it might be that a CT-scan would be
8   performed first, and I would be consulted after the
9   CT-scan.
10  Q.   Are there circumstances under which you'd
11  be consulted that you would have been consulted given
12  that?
13       MR. SMITH:  Objection.
14  A.   Well, I think that speaks to the standard
15  of care of the emergency room physicians.  I think
16  that a vascular surgeon seeing this combination of
17  pain and prior bypass would be concerned.
18  Q.   Okay.  Doctor, you mentioned melena.  I
19  would like to talk about that for just a second.
20  Could you tell us what that is, for the record?
21  A.   In practical purposes it means blood in
22  the stool or blood in the feces.  Strictly speaking,
23  it means black feces, in other words, the patient is
24  not bleeding at this very instance, but the blood has

PAGE 56

56

1   been fermented in the colon, for lack of a better
2   term.
3        I believe that most physicians today are
4   not that precise in the use of language.  And I
5   believe that to be the case in this circumstance
6   because I don't think the patient came to the
7   physician; and I acknowledge there is a certain risk
8   of stereotyping here.  But I don't believe that our
9   homeless alcohol dependent veteran came to the
10  physician and said, "I'm having melena."  I believe
11  the patient came and said, "I had blood in my stool
12  last week."  And the physician rearranged the
13  language into melena, even though that's not really
14  what the patient said because he probably meant black
15  stuff, he wouldn't have recognized the black stuff as
16  blood.  Now, I admit I'm making some leap of faith
17  there, but that's what I believe happened.
18  Q.   Okay.  And what's the basis for that
19  belief?
20  A.   Well, it's the last line on this page,
21  which reads, says he had one episode of melena one
22  week prior.  And as I say, I don't believe that the
23  patient has the sophistication to use the word
24  melena, and I don't believe that I or the patient or

Paul A. Skudder, MD
Goodie v. USA

April 30, 2012

SHEET 8   PAGE 57

**57**

1  the physician is using its precise definition of
2  medical black tarry stools. I think they're using it
3  in a more liberal definition of saying, meaning
4  bloody stools.
5      Q.   Okay. So, I gather the distinction you're
6  making is between an actual blood or red stool versus
7  the oxidized or black tarry version?
8      A.   That's the distinction I'm making.
9      Q.   And what's your basis for that? I under-
10  stand the basis for saying that is what?
11      A.   My basis for saying it is that I find that
12  most physicians no longer use the term melena, with
13  it's precise definition of black tarry stool. Most
14  physicians have generalized this term to mean blood
15  in the stool which may be red or may be black and
16  tarry. I don't know Dr. Weld, and I have not seen
17  her deposition. So, I did not know whether in this
18  case -- I don't mean to criticize her, and I do not
19  know whether she confirmed that it was black tarry
20  stool or whether she simply heard from a patient that
21  he had black tarry stool; and went on to use the word
22  melena.
23      Q.   Okay. And if it's bloody as opposed to
24  black and tarry, what conclusions, if any, can we

PAGE 58

**58**

1  draw from that?
2      A.   The only conclusion you can draw is that
3  if it is black and tarry, it has remained in the
4  colon or in the large intestine for a period of
5  hours; which tells you a couple things. First off,
6  the patient may or may not be actively bleeding right
7  now. Or he may have actively bled several hours ago
8  and only now is it passing.
9          It also gives you some hint about volume
10  of bleeding because if the patient is bleeding a
11  whole lot, then the colon will drain the blood before
12  it has time to become black and tarry.
13      Q.   Sticking with just some of the clinical
14  definition of melena being black and tarry, what are
15  the causes of that?
16      A.   Blood in the bowel movement that has sat
17  there for long enough to become blackened.
18      Q.   Okay. And, Doctor, what would cause blood
19  to get there in the first place and stay for that
20  duration?
21      A.   The question is unanswerable. Only
22  because there are so many things that could cause it;
23  maybe the patient's a vampire and he drank it.
24      Q.   Okay.

PAGE 59

**59**

1      A.   In other words, it could originate from
2  anywhere, any source, anywhere between the mouth and
3  the rectum.
4      Q.   Okay. I can get more specific. But the
5  one answer I'm most curious about is can gastritis
6  cause a melena?
7      A.   Only if it's bleeding gastritis, which a
8  minority of them are. But yes, it can.
9      Q.   And can gastritis also cause the phenomena
10  that you talked about in terms of blood in the stool?
11      A.   They have to bleed a lot because there's a
12  lot of bowel between the stomach and the rectum. So,
13  there's plenty of time for it to become oxidized and
14  blackened, unless they're bleeding a lot.
15          So, if we accept this as true, that Mr.
16  Johnson had one instance of melena a week prior to
17  this visit, what conclusions can we draw from that,
18  if any?
19      A.   With or without the benefit of knowing the
20  remainder of the patient's history?
21      Q.   Let's go right now -- you're talking about
22  his post history?
23      A.   Well, essentially with the aid of retro-
24  spection which is really what happened to him, I

PAGE 60

**60**

1  reach one very strong conclusion in response to a
2  melena. And that is that if you know he died the
3  next day from exsanguination from his aortoenteric
4  fistula, then you state clearly that this is the
5  herald bleed, that so many of these patients have.
6          If one does not know the remainder of the
7  history, then all you can state is that the patient
8  has had some bleeding in his GI tract and it needs to
9  be worked up as to its source.
10      Q.   Would the fact that it happened only once
11  a week prior suggest that active bleeding had stopped
12  at the point of the visit?
13      A.   It may have. It might have stopped and
14  started and stopped again. It may be such a slow
15  trickle of blood that the next bowel movement will
16  have melena in it again. I think it's difficult to
17  take that anywhere beyond being a very soft
18  suggestion. The only thing you can conclude is that
19  the patient is hemorrhaging continually which would
20  eventually turn red.
21      Q.   Okay. If the patient was sort of actively
22  bleeding, let's say 24 to 48 hours before this visit,
23  one would certainly expect melena to be in his
24  immediate history over that 24 to 48 hours, right?

Paul A. Skudder, MD    Case 1:10-cv-03478-RDB    Document 20-15    Filed 07/13/12    Page 17 of 24
Case 1:10-cv-03478-RDB    Document 17-17    Filed 06/08/12    Page 17 of 24
Goodie v. USA

April 30, 2012

PAGE 61

61

1  A.  It depends on how constipated the patient
2  is and how well the active bleeding is, you know,
3  one, half an ounce every three hours or whether it's
4  an active bleeding at a higher rate. There's too
5  many moving part in the equation to answer based on
6  the one variable you've given me.
7  Q.  Okay. But at the very least you'd say
8  that if I'm bleeding on day one and then I have no
9  active bleeding after that, at the very least over
10 that next seven day period I would have passed
11 whatever GI bleed I had, right?
12 A.  That's a reasonable expectation, yeah.
13 Q.  We know that in this case there were some
14 vital signs taken of Mr. Johnson. And I'll proffer
15 some of them to you before I talk about them. One of
16 them was a temperature reading taken on him, and he
17 clocked out at 98.3.
18 A.  I see that.
19 Q.  That's not suggestive of him having a
20 fever, right?
21 A.  Correct.
22 Q.  Let's look at his blood pressure. It
23 looks like it was 117 over 66. Is that within normal
24 limits for blood pressure of that kind of patient?

PAGE 62

62

1  A.  I cannot say. There are some patients who
2  that would be perfectly normal for. There's others,
3  there's a lady checked fully this week who runs
4  around all the time with a blood pressure of 210.
5  And if she came in with 117, I would say, "Well, what
6  happened to you?" So, the isolated reading is just
7  too out of context. It's not an alarming reading,
8  but it's too out of context to agree with your
9  statement.
10 Q.  Okay. At the very least though, would you
11 say that if someone was actively having an active
12 bleed at a graft area, that their blood pressure
13 results would be different than 117 over 66?
14 A.  How much are they bleeding; how elevated
15 is the bleeding; what is their basic blood pressure
16 to start with? Again, there's a lot of moving parts
17 in that. And it's not as simple as just that.
18 Q.  And forgive me for trying to over
19 simplify. We do have some data obviously from
20 previous -- which we can certainly look at it and
21 benchmark it if you'd like.
22 A.  Well, we can. But there's still a lot of
23 moving parts. Did the bleeding just start; you say
24 actively bleeding. But has it been actively bleeding

PAGE 63

63

1  for 20 minutes or for three hours? So, when I go
2  every six weeks, and give 500 ml of blood, which you
3  would think is a lot of blood if it came out of my
4  rectum, I walked out of the blood bank with the same
5  blood pressure I walked in with.
6  So, your blood pressure doesn't
7  immediately drop the instant you start to, quote,
8  actively bleed. But it does eventually. So, all I'm
9  trying to say is that there's a lot of moving parts
10 in it. What's the patient's physiologic reserve? Is
11 he well hydrated? Et cetera, et cetera. I did not
12 conclude from isolated blood pressure of 117 over 66
13 that that patient is not bleeding at that time. I
14 can conclude that he hasn't bled to the point of
15 death and he's not in any immediate danger. He is
16 still hemodynamically stable.
17 Q.  Yet you mentioned the idea that maybe
18 three hours after an active bleed you might notice
19 some difference in the blood pressure. Can you
20 ballpark where it would go? In other words, would
21 you see numbers like 150, 140?
22 A.  Again, there's too many moving parts. I
23 don't know how fast the, quote, active bleeding for
24 three hours is. I don't know when the patient

PAGE 64

64

1  started. I don't know anything about his hydration
2  status. I don't know if he has a strong heart that's
3  going to keep his blood pressure up, in the face of a
4  certain amount of bleeding. There's just a lot of
5  variables in these questions. They're common
6  questions in this kind of a scenario. The finger
7  gets pointed at one reading and so it does or doesn't
8  mean this. There's a lot of moving parts. It's more
9  subtle than that.
10 Q.  You mentioned hydration. I gather the
11 more hydrated the higher the blood pressure?
12 A.  And not only will the blood pressure be
13 higher, but if the individual is very well hydrated,
14 they will maintain their pressure even though they're
15 bleeding for a longer period of time. Blood pressure
16 changes with bleeding are actually a result of volume
17 loss rather than the loss of the red cells. So, if
18 you start with a fuller tank, you'll maintain the
19 blood pressure for a longer period of time; before
20 the heart becomes incapable of maintaining it.
21 Q.  Dr. Weld made an assessment that Mr.
22 Johnson was hemodynamically stable. Do you have a
23 reason to disagree with that assessment?
24 A.  I do not.

Paul A. Skudder, MD
Goodie v. USA

April 30, 2012

SHEET 9   PAGE 65

65

1  MR. MEDINGER: And Doctor, do you
2  need to take a break to answer an urgent call or
3  something?
4  THE WITNESS: No, I do not. It's
5  nothing of any interest.
6  MR. MEDINGER: Okay. Off the record
7  for a second.
8  (Discussion off the record.)
9  MR. MEDINGER: We can go back on the
10 record.
11 BY MR. MEDINGER:
12 Q.   Doctor, looking back at your report and an
13 earlier conversation we had about you having recently
14 looked at the CT films that were done, I'd like to
15 ask you some questions about the CT exam that was
16 done by Dr. Weld prior to discharge here.
17 Specifically did you notice anything on the non
18 contrast CT that was done that would indicate
19 anything concerning for AEF?
20 A.   Yes.
21 Q.   And what was that?
22 A.   Several of the imagines of that CT show
23 evidence of swelling and induration surrounding the
24 aorta; near the proximal anastomosis, just behind the

PAGE 67

67

1  31 CT-scan. But as I say, it's really identical to
2  what we see on the October CT-scan at Johns Hopkins.
3  Although the Hopkins also shows the AEF -- well,
4  confirms the presence of the AEF because of the whisp
5  of contrast in the duodenum.
6  Q.   Okay. Anything else other than that
7  swelling that you saw that might be suggestive of AEF
8  in that study that was done at the VA?
9  MR. SMITH: Objection. He didn't say
10 anything about suggestive of AEF --
11 MR. MEDINGER: Oh, sorry, maybe I
12 misheard you then.
13 Q.   Doctor, are you saying that that is the
14 test of an infection at the graft area, not
15 necessarily confirming one way or another an AEF?
16 A.   That is what I'm saying. And this goes
17 back to the comments I made earlier in this
18 interview. The real issue here, the graft infection,
19 of which the AEF is one manifestation. But there is
20 evidence of a graft infection on the October 9th
21 CT-scan.
22 Q.   Okay. And Doctor, I've seen medical
23 literature suggesting that sometimes when you see air
24 around a graft site that that could be suggestive of

PAGE 66

66

1  duodenum. In precisely the area where one would
2  expect to see these in the context of an aortic graft
3  infection that might later develop an AEF.
4  Q.   Okay. And do you remember specifically
5  what images you looked at in order to see that
6  evidence?
7  A.   I think it is most evident on slice 32.
8  Q.   Okay. Any others that stick out to you as
9  the slices that you saw evidence of this?
10 A.   Those just above and just below that also
11 show this evidence. Which by the way, is almost
12 indistinguishable from the same evidence seen in the
13 CT-scan performed 26 hours later at Johns Hopkins
14 Hospital. The only difference being that in a
15 CT-scan performed 26 hours later, there is just a
16 whisp of contrast in the duodenum.
17 Q.   Okay. With respect to the things that you
18 saw on these slices, you said it was swelling at a
19 certain area. Can you describe with any more
20 particularity what you mean by that?
21 A.   There is a difference in the density of
22 the fluid or tissue, immediately anterior and to the
23 left of the aorta at the level of the proximal
24 anastomosis. And this was not there on the January

PAGE 68

68

1  an infection. Did you see any sort of evidence of
2  air around this graft site?
3  A.   On slice 33, there may be some tiny air
4  bubbles. But the real issues are inflammation,
5  induration or swelling on these slices.
6  Q.   Doctor, I know it's not in your report,
7  but I want to make sure I'm understanding. Will you
8  be positing any opinion at trial as to what the
9  October 9, CT would have shown if contrast had been
10 used?
11 MR. SMITH: I don't plan on asking
12 that question.
13 A.   If no one asks me, I won't express an
14 opinion.
15 Q.   Okay. I just wanted to make sure the
16 record was clear. I heard Mr. Smith saying that he
17 doesn't plan on asking any questions of that nature.
18 So that's fine. I just wanted to clarify.
19 Doctor, looking back at your report, it
20 indicates that you were asked to essentially assume
21 if there were evidence on that CT-scan that showed a
22 false aneurysm -- and I'll just stop there for a
23 second. What do you mean, sir, by a false aneurysm?
24 A.   The phrase to which you refer states

Paul A. Skudder, MD

Goodie v. USA

April 30, 2012

PAGE 69

69

1 "false aneurysm, leak or aortoenteric fistula," these
2 are all signs of the same thing, which is bleeding
3 from the aorta. An aortoenteric fistula or AEF, as
4 we've abbreviated it through this interview,
5 essentially is a false aneurysm that has ruptured
6 into the intestines. A false aneurysm is a leak from
7 the aorta that is contained and hasn't ruptured
8 anywhere. A leak means that blood is escaping from
9 the aorta.
10        In the context of this entire discussion,
11 all of these, whether it be a false aneurysm, a leak
12 or an AEF, are results of an aortic graft infection.
13 So, the primary process that led to this patient's
14 issues was an aortic graft infection. But in this
15 particular case manifested itself as an aortoenteric
16 fistula with hemorrhage on October 10th. So, does
17 that answer your question?
18   Q.   I think it does. I think essentially what
19 I hear your answer to mean is that the way you use
20 the terms here false aneurysm, leak or AEF are
21 essentially interchangeable for some sort of leak at
22 the aorta site?
23   A.   That's fair, yes.
24   Q.   Okay. Reading to the end of that

PAGE 70

70

1 sentence, your opinion was to say that he could have
2 undergone some sort of procedure within 24 hours.
3 Let's ask it this way. As long as the patient is
4 alive, obviously they can undergo a procedure, right?
5   A.   Correct.
6   Q.   I mean, generally you wouldn't operate on
7 someone who is deceased?
8   A.   No. In general, only the pathologists do
9 that.
10   Q.   And so, are you suggesting then that sort
11 of the window for which Mr. Johnson should have
12 gotten this procedure is 24 hours? Is that what you
13 mean to say there?
14   A.   As I understood the question that was
15 posed to me from Mr. Smith, he wished to know whether
16 it would have been logistically feasible for the
17 individual to have undergone surgery following the
18 emergency room visit on October 9th, but prior to the
19 patient's collapse on the evening of October 10. And
20 my answer to that question is yes, it would have been
21 logistically feasible and reasonable for him to
22 undergo surgery during that interval of time.
23   Q.   Okay. And I guess maybe my question then,
24 sir, is pushing you a little further. If you had

PAGE 71

71

1 that surgery within 24 hours, would that have been
2 sufficient, in your opinion as a vascular surgeon?
3   A.   Would it have been sufficient to do what?
4   Q.   To prevent the outcome that happened?
5   A.   Had the patient been operated upon prior
6 to developing the exsanguinated hemorrhage, I can
7 state to a reasonable degree, a strong degree of
8 medical certainty that he would have survived. And
9 actually in my reading of Dr. Hader's deposition, he
10 agrees with that statement very clearly. In other
11 words, I don't think the vascular surgeon experts on
12 either side of the table disagree on that issue. We
13 both agree if he's operated on preemptively, I
14 believe was the language that Dr. Hader used in his
15 deposition, if there was a preemptive strike, the
16 patient would likely have survived, was, I believe,
17 what his language was. And I agree with it. You got
18 to get there before he bleeds to death.
19   Q.   Let's assume you don't know the end
20 results and you just have a CT which comes forward
21 showing a bleed or some sort of infection in the
22 graft site area, must that patient then be taken
23 immediately to surgery or can that patient have
24 surgery at some later time?

PAGE 72

72

1        MR. SMITH: Objection.
2   A.   Well, let's see. You stated in your
3 question, I just have the CT. Do I also have the
4 history of the herald bleed, of the melena on the
5 single episode? And do I also have the history on a
6 new onset of pain in the left flange which correlates
7 to some degree with the abnormality on the left side
8 of the aorta in slice 32? Do I have all of these
9 pieces of information or do I just have the CT?
10   Q.   No, you have all of those pieces of
11 information. The only thing you don't have is the
12 ultimate result that there's a massive bleed sometime
13 later.
14   A.   I think that the vascular standard of care
15 would be to operate upon that patient if you knew
16 that entire constellation of facts, as soon as he
17 could be reasonably prepared for safe surgery. In
18 other words, you do him the next day unless there's a
19 good reason not to.
20   Q.   Doctor, the second sentence says --
21   A.   And I'd like to add just a little bit to
22 that answer. And when I say unless there's a good
23 reason not to, what you're saying is that if the
24 patient has an identifiable problem that will make

Paul A. Skudder, MD                Goodie v. USA

April 30, 2012

**73**

1 surgery even more dangerous than it otherwise is.
2 And you acknowledge that you're going to delay
3 surgery in order to take care of that problem.
4          Let's say his lungs are really bad and you
5 want to give him some lung medication and lung
6 treatments and antibiotics for a pneumonia that's
7 making his lungs really bad, you do it knowing that
8 the longer you wait, the more likely he is to have
9 his final hemorrhage from the AEF. And so, you weigh
10 the risks of delay against the benefits of delay.
11        But I think the vascular standard of care
12 is that this patient with CT abnormalities at the
13 proximal anastomosis, pain which, again, it's non
14 specific, but it may well be from that site – and a
15 single episode of melena, which may well be that
16 little herald bleed that a lot of these people have,
17 that you're obligated to operate early on that
18 patient, weighing the risks and benefits of delay for
19 further work-up with anything specific that that
20 patient gives you to drive the risk up.
21 Q.    Okay. Doctor, what you said there at the
22 end, as far as being a question I forgot to ask you
23 earlier about the melena, the question is this. At
24 some point melena is too far in the rear view mirror

**74**

1 of the patient's history to be suggestive of some
2 sort of AEF, right?
3 A.    I guess that's fair.
4 Q.    And my question then would be how far in
5 the rear view mirror does it have to be? If I have
6 one instance of melena one month ago, and then I
7 present, at that point is that melena not suggestive
8 of AEF?
9 A.    I would think that at a month ago, if it
10 was from a developing bleed, you would have ruptured it
11 by now. So, I would think that a month, it's
12 becoming very unlikely. At a year it's exceedingly
13 unlikely.
14 Q.    And can you pin point where this body line
15 would be, in terms of where it's sufficiently still
16 in a recent patient history that it should be in the
17 calculus?
18 A.    I certainly cannot pin point it, and I'm
19 not aware of any evidence in the literature that
20 really addresses the issue of how old a bleed can be
21 and still be a herald bleed. I would say that a week
22 is not unreasonable. But I can't give you hard stuff
23 to work from.
24 Q.    Okay. And that's fair. I think certainly

**75**

1 I hear you saying an outer marker at the 30 days
2 probably being something that is no longer
3 suggestive; as we get closer, it's harder to tell.
4 A.    Fair.
5 Q.    So, Doctor, getting back to this second
6 opinion you have about the likelihood of survive-
7 ability, you indicate here that it's more likely than
8 not that Mr. Johnson would have survived?
9 A.    Correct.
10 Q.    And you mentioned some procedure, what
11 specific procedure do you think should have been
12 undertaken here to give him that ability to survive?
13 A.    Historically, this required essentially
14 re-doing the aortic bypass. In recent years with the
15 evolution of the technique we know as EVAR –
16 endo vascular aneurysm repair – there has been a
17 growing number of reports in the literature of people
18 essentially relining the aorta with an endo vascular
19 graft, which is a much smaller procedure, and solving
20 these problems.
21        To an old time vascular surgeon like
22 myself, that seems counterintuitive because the
23 infected part is still there and it's hard to really
24 understand why the new part doesn't get infected.

**76**

1 But it seems to be working; despite the fact that
2 it's intuitively unpleasant to the old guys like me.
3        Now, that may seem a long winded answer to
4 your question, but I think it's necessary because
5 either of these procedures would have been acceptable
6 and within the standard of care, certainly in 2012.
7 Whether the endo vascular option was sufficiently
8 developed in '07 to have been in the October, '07
9 standard of care, I'm not quite sure. But in any
10 event, what I'm trying to do is leave the door open
11 for at least a couple different variances of
12 procedure.
13 Q.    Okay. I see. Doctor, going back to your
14 opinion as to whether Mr. Johnson would have survived
15 or not, what specific facts do you rely on to reach
16 your opinion that it is more likely than not that he
17 would have survived?
18 A.    I base that on the fact that he would now
19 have been undergoing an operation at a time when he
20 was hemodynamically stable beforehand; was not
21 bleeding to death; and in experienced hands.
22 Although this would be a higher risk operation than a
23 first time aortic operation. He should have well
24 over a 50 percent survival from that procedure.

Paul A. Skudder, MD

Case 1:10-cv-03478-RDB   Document 20-15   Filed 07/13/12   Page 21 of 24
Case 1:10-cv-03478-RDB   Document 17-17   Filed 06/08/12   Page 21 of 24
Goodie v. USA

April 30, 2012

PAGE 77
77

```
1    Q.   Any other specific facts other than those?
2    A.   I will say that in that thinking, I take
3  into consideration the fact that survival is less in
4  the presence of an aortic graft infection, but
5  nonetheless I believe that if this operation is done
6  before the true rupture into the bowel of the true
7  exsanguinating hemorrhage, I believe that his
8  likelihood of survival in the hands of an experienced
9  aortic surgeon is well over 50 percent, maybe 75
10 percent, maybe 85 percent; not the 95 or a hundred
11 that we would expect for a first time aortic
12 operation, but certainly well over 50 percent.
13   Q.   In reaching that opinion, Doctor, do you
14 have to make any assumptions as to what kind of a
15 bleed he was having at that point?
16   A.   Well, I guess so.  And the assumptions
17 that I make are that he was not bleeding on October
18 9th, and he was not bleeding on October 10th until
19 shortly before his presentation to the emergency room
20 at Hopkins Hospital.
21   Q.   Okay.  Because yeah, I think we would
22 agree, if he had certainly massive bleeding that
23 precipitated his trip to Hopkins, at that point his
24 survival ability rate of an operation at that point
```

PAGE 78
78

```
1  would be much different.
2    A.   That is the whole thrust of my opinion; is
3  that if the aortic operation is undertaken before the
4  hemorrhagic bleed, he has a high degree of survival.
5    Q.   Okay.  Doctor --
6    A.   And as I stated before, the other vascular
7  surgeon who had given an opinion in this case shares
8  that opinion.
9    Q.   Doctor, I notice in your opinion as to
10 whether he could have the procedure, you certainly
11 stated that you had a high degree of certainty and
12 that with respect to survivability, you prefaced it
13 by saying just more likely than not.  Is there some
14 reason for that?  Are you less certain about his
15 survivability than you were about the ability to have
16 the procedure?
17   A.   I guess you could say that.  I don't think
18 there is any reason in the world he could not have
19 the procedure at a VA hospital -- well, I don't know
20 anything about the VA Hospital in Baltimore.  I don't
21 know with any certainty that they do vascular surgery
22 there.  But if they do, he could have had it done
23 there.  And if they don't, he certainly could have
24 been transferred to another hospital in the community
```

PAGE 79
79

```
1  and undergone surgery well before the rupture.
2         In terms of the second opinion -- I'm
3  sorry -- in terms of the following opinion, as I
4  stated, I believe that his survival likelihood would
5  have been measurably better than 50 percent, but I
6  think saying 75 percent might be a reasonable guess.
7  And that is -- I guess it is fair to say that that to
8  me is less certain than the fact that you could have
9  operated on him.
10   Q.   Okay.  Doctor, just so I understand, when
11 you use the words in your report "survive the
12 procedure," I gather you're just indicating that he
13 would essentially not die in the operating room,
14 right?
15   A.   Well, actually that's not true.  When most
16 surgeons talk about survive the procedure, there's
17 two standards that are applied to that.  And one is
18 survive to discharge and the other is 30-day
19 survival.  It turns out that measured either way,
20 they're pretty much identical.  There are a few
21 patients who survive to discharge and are discharged
22 10 days after an operation, and something bad happens
23 to them after they are discharged.  But that's pretty
24 rare.  But that's how surgeons think about -- death
```

PAGE 80
80

```
1  on an operating table has become a rather rare event.
2  The anesthesiologists are too good.  They can keep
3  almost anybody alive through the operation.
4    Q.   Okay.  Are you familiar with what the
5  medical literature says with respect to the 30-day
6  rate of people after they've had surgeries?  We might
7  have talked about this previously, but I just want to
8  make sure we talked about it.
9    A.   Well, we did talk about it previously.
10 And you quoted a 60 to 90 percent mortality, but that
11 is for patients whose AEF has ruptured and who have
12 the obvious AEF that are hemorrhaging.  And what
13 we're talking about is operating on this patient when
14 he has an aortic graft infection but before he has
15 hemorrhaged.  And that is the difference.  And that's
16 why I have tried over and over again in this inter-
17 view to try to incorporate the concept that the
18 patient's real problem is an aortic graft infection
19 which culminates in an AEF.
20   Q.   Certainly.  Doctor, one clarification with
21 respect to your report.  I obviously don't see
22 anything in here with respect to any vascular work
23 done at Hopkins.  Do you have any quarrels with what
24 the vascular folks did at Hopkins to treat this
```

Paul A. Skudder, MD

Case 1:10-cv-03478-RDB   Document 20-15   Filed 07/13/12   Page 22 of 24
Case 1:10-cv-03478-RDB   Document 17-17   Filed 06/08/12   Page 22 of 24

Goodie v. USA

April 30, 2012

SHEET 11  PAGE 81

81

1 patient when he came in?
2    A.   I have none.
3    Q.   Okay. And why is that?
4    A.   Well, in the most practical terms, I
5 believe he was already -- I want to be respectful,
6 not talk like it's a surgical locker room -- in most
7 practical terms, I think the horse was already out of
8 the barn when he came in.
9    Q.   Yeah. Essentially it's at that point that
10 there's nothing that the Hopkins folks could do to
11 save him?
12    A.   Basically that's what my opinion is. I
13 realize medical legal things are not the time to be
14 facetious or lighthearted, but I've occasionally made
15 the statement that, you know, we can do
16 resuscitations, but resurrections are a different
17 department.
18    Q.   I see. Okay, Doctor. I'd now like to
19 talk to you just very briefly about your prior
20 testimony that you've given. You mentioned in the
21 report that you had given prior testimony at various
22 times. Do you maintain any kind of a list of that
23 testimony over the last four years?
24    A.   I do not.

PAGE 82

82

1    Q.   Is there a way that you could create such
2 a list and provide it to Mr. Smith?
3    A.   I could create at best a sketchy partial
4 list based on recollection. And there may still be
5 some outstanding invoices or that sort of thing. But
6 I make no effort to catalog or keep a score card on
7 these. So that if I were to provide Mr. Smith with a
8 record, it wouldn't be representative in any way.
9    Q.   I see. And I'm not going to hold you to
10 getting every one. But I would like, Doctor,
11 subsequently for you to try to put together some list
12 and provide it to Mr. Smith. This is just talking
13 about the last four years. That's all that the rules
14 require. It's just to give us some window, an
15 indication in which you provided testimony.
16    A.   I will make an effort to do that.
17    Q.   Okay. I appreciate that. And what I'll
18 do now is ask you a couple brief questions about this
19 and see what you can remember. And then if you can do
20 that subsequent list, that would be helpful.
21        Can you just tell us in very ballpark
22 terms the numbers of times over the last four years
23 you've had to give testimony?
24    A.   Deposition testimony or court room

PAGE 83

83

1 testimony?
2    Q.   Both, please.
3    A.   I would say that I have probably given
4 three or four depositions a year, and one or two
5 court room appearances.
6    Q.   Okay. Did any of those cases that you
7 just mentioned, whether you gave deposition testimony
8 or trial testimony, did any of those involve AEFs?
9    A.   No.
10    Q.   Did any of them involve infection at the
11 graft area?
12    A.   No.
13    Q.   In those cases, can you break down how
14 many times you were giving testimony for the
15 plaintiff versus how many were for the defendant?
16    A.   The closest I can say is about 50/50.
17    Q.   In any case you were retained as an
18 expert, were you ever not permitted to give expert
19 testimony for any reason?
20    A.   No.
21    Q.   In other words, to your knowledge, you
22 weren't disqualified for any reason?
23    A.   No.
24    Q.   Have you, yourself, ever been a party to a

PAGE 84

84

1 malpractice case?
2    A.   Yes.
3    Q.   And how many times have you been involved
4 in that kind of a case?
5    A.   I have received notice from whatever they
6 call the legal notice that you are being sued, five
7 or six times. One case went so far as to be tried in
8 Massachusetts. I'm going to guess in about '92 or
9 '93. It came to a defense verdict. And one case was
10 recently opened in New York.
11        You'll note that I moved from New York to
12 Massachusetts in 2009, and about a year ago I
13 received notice that I was one of several physicians
14 being named by a patient who lost her limb following
15 vascular surgery. At this point, there's been no
16 discovery or anything else in that case. And the
17 intentions of the plaintiff lawyer are opaque to the
18 defense team.
19    Q.   I see. And I certainly don't want to get
20 too involved in those discussions. Have any of the
21 cases to which you've been a party to a malpractice
22 case, were you a defendant that involved a verdict
23 that was received for the plaintiff?
24    A.   No. There have been no payments on my

Paul A. Skudder, M.D.
Case 1:10-cv-03478-RDB    Document 20-15    Filed 07/13/12    Page 23 of 24
Case 1:10-cv-03478-RDB    Document 17-17    Filed 06/08/12    Page 23 of 24
Goodie v. USA

April 30, 2012

PAGE 85

85

1 part through settlement or verdict.
2    Q.    And with respect to these five or six
3 cases, did they specifically name the care that you
4 gave or were you involved with the party just because
5 of your affiliation with some group?
6    A.    That's kind of interesting. The first one
7 I was a medical student, and I assisted on a case. I
8 guess it wasn't clear I was a medical student, from
9 the chart. I think Mr. Smith does his homework
10 better than that. And then the second one I was an
11 intern at the University of Rochester. And I think I
12 might have seen the patient at night or something of
13 that nature. There were two others where it was
14 actually the primary target of the lawsuit were
15 partners that I had over the years. So, I guess that
16 really answers your questions for the most part. The
17 case that went to trial I was clearly the defendant
18 physician.
19    Q.    Doctor, have you ever had your privileges
20 suspended or revoked at any hospital?
21    A.    No, sir.
22    Q.    Have you ever been the subject of any kind
23 of internal investigation for work that you performed
24 in a hospital or clinical setting?

PAGE 86

86

1    A.    Not to my knowledge.
2    Q.    A couple last questions, Doctor, a little
3 bit back to your CV. I notice you have a number of
4 writings on there. Are any of those writings having
5 anything to do with AEF?
6    A.    No. The only one that is even remotely
7 related to this was a book chapter from the '80s when I
8 was in my fellowship. It had to do with re operative
9 surgery after aortal bi-femoral bypasses, which is what
10 this patient originally had. But it dealt with issues
11 of clots in the graft and really did not deal with this
12 type of issue whatsoever. And even if it did, it's 30
13 years out of dates.
14    Q.    Is that the article about the hemodynamics
15 of an in situ bypass?
16    A.    No. That's a totally separate thing. I
17 don't know if you have my CV here. There was a book
18 chapter, written when I was a fellow, in a book
19 entitled "Re operative Surgery," the editor of the book
20 was Carlo Rossi, who was an attending at Lahey.
21 Probably Al Pierson, his name is probably also on it.
22    Q.    When did it appear?
23    A.    It appeared in a book that was simply
24 entitled "Re Operative Surgery."

PAGE 87

87

1    Q.    And who is the author of it, the larger
2 author?
3    A.    The editor of the book was Rossi, R-o-s-s-i.
4    Q.    And who published it?
5    A.    Lord knows.
6    Q.    Okay. And what were your contributions to
7 it?
8    A.    I was a fellow at the time and I worked with
9 my fellowship director, whose name was Albert Pierson.
10 And we essentially reviewed the literature and some of
11 our own experience regarding how to handle certain
12 problems that occur after aorto bi-femoral bypasses.
13    Q.    Do you still retain a copy of it?
14    A.    I rather doubt it. And as I say, it didn't
15 deal with the AEF issue, in my memory at all.
16    Q.    And remind me again, what did it deal with
17 then?
18    A.    It dealt primarily with how you handled in
19 those days the clotting of the left or the right limb.
20 In other words, the circulation of the right or the
21 left leg, after doing aortal femoral bypass. And in
22 those days, there were two or three choices:
23 Thrombectomy catheter or a fem-fem bypass or an
24 axillary-fem bypass.

PAGE 88

88

1        In today's world, it would probably be
2 handled very differently with thrombolysis and some
3 newer technologies. In other words, it's 30 years out
4 of date – it deals with a different topic and nobody
5 treats it that way anymore.
6    Q.    I see. I see about your presentations on
7 here, have you ever give a presentation dealing with
8 AEFs?
9    A.    Not in the sense it would ever appear on a
10 CV. It may be back when I was dealing with medical
11 students, I might have included management of aortic
12 graft infections to some degree. But it wouldn't be
13 the kind of presentation that would be recorded like
14 that. There wouldn't be any record of it.
15    Q.    Okay.
16        MR. MEDINGER: Doctor, that is all the
17 questions I have. Mr. Smith may have a couple for you.
18        MR. SMITH: I have no questions.
19
20    ...testimony concluded at 6:08 p.m...
21
22
23
24

Paul A. Skudder, MD
Case 1:10-cv-03478-RDB   Document 20-15   Filed 07/13/12   Page 24 of 24
Case 1:10-cv-03478-RDB   Document 17-17   Filed 06/08/12   Page 24 of 24
Goodie v. USA

April 30, 2012

SHEET 12   PAGE 89

89

1       ERRATA SHEET DISTRIBUTION INFORMATION
2       The original of the Errata Sheet has been
3   delivered to Michael P. Smith, Esquire.
4
5       When the Errata Sheet has been completed by
6   the deponent and signed, a copy thereof should be
7   delivered to each party of record and the offices of
8   Cape Cod Court Reporting and the ORIGINAL forwarded to
9   Jason D. Medinger, Esquire, to whom the original
10  transcript was delivered.
11
12
13       INSTRUCTIONS TO DEPONENT
14       After reading this transcript of your
15  deposition, please indicate any corrections or changes
16  to your testimony and the reasons therefor on the
17  Errata Sheet supplied to you and sign it.  DO NOT make
18  marks or notations on the transcript itself.  Add
19  additional sheets if necessary.  Please refer to the
20  above instructions for errata sheet distribution
21  information.
22
23
24

PAGE 91

91

1        CERTIFICATE
2        COMMONWEALTH OF MASSACHUSETTS
3   Barnstable, ss
    Re: FAYE M. GOODIE, et al. V. USA
4
        I, PAULA E. HOGAN, Notary Public in and for the
5   Commonwealth of Massachusetts, do hereby certify as
    follows:
6
        1.   That PAUL A. SKUDDER, MD, the witness
7   whose testimony is herein before set forth was duly
    recorded and transcribed by me;
8
        2.   That such deposition is a true record of the
9   testimony given by said witness to the best of my
    knowledge, skill and ability.
10
        3.   I further certify that I am neither attorney
11  or counsel for, nor related to or employed by, any of
    the parties, and further that I am not a relative or
12  employee of any attorney or counsel employed by the
    parties hereto or financially interested in this
13  matter;
14  IN WITNESS WHEREOF, I hereunto set my hand and notarial
    seal this 13th day of May, 2012.
15
16
17                    _____
                      PAULA E. HOGAN,
18                    Notary Public
                          My Commission Expires:
19                    September 19, 2014
20
21
22       ANY REPRODUCTION OF THIS TRANSCRIPT
         IS NOT AUTHORIZED BY THE CERTIFYING
23  REPORTER AND PHOTOCOPIES ARE NOT AN
             OFFICIAL RECORD.
24

PAGE 90

90

1  PLEASE ATTACH TO DEPOSITION OF: PAUL A. SKUDDER, MD
   CASE: GOODIE v. USA        TAKEN: 4-30-12
2        ERRATA SHEET
   Please refer to previous page for instructions.
3  PAGE LINE CHANGE        REASON
4  _____
5  _____
6  _____
7  _____
8  _____
9  _____
10 _____
11 _____
12 _____
13 _____
14 _____
15 _____
16 _____
17 _____
18 _____
19         I have read the foregoing transcript of my
20 deposition and except for any corrections or changes
   noted above, I hereby subscribe to the transcript as an
21 accurate record of the testimony given by me.
        Signed under the pains and penalties of
22 perjury this _____ day of _____,
   2012.
23
24       PAUL A. SKUDDER, MD