IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

FAYE M. GOODIE, *individually and as*       *
*Personal Representative of the Estate of Maurice*
*L. Johnson*; MAURICE SCOTT;      *
TIFFANY JOHNSON; and SHELLY
JOHNSON      *

        Plaintiffs,      *      Civil Action No. RDB-10-3478

          v.      *

THE UNITED STATES OF AMERICA *

        Defendant.      *

\*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*

## MEMORANDUM OPINION

The Plaintiffs—Faye M. Goodie, individually and as Personal Representative of the

Estate of Maurice L. Johnson; Maurice Scott; Tiffany Johnson; and Shelly Johnson

("Plaintiffs")—have brought this action against the Defendant the United States of America

("the Government"). The Plaintiffs allege claims of medical malpractice and wrongful death

relating to the medical treatment that the decedent Maurice L. Johnson ("Mr. Johnson" or

"the Decedent") received at the Veterans Administration Medical Center in Baltimore,

Maryland ("Veterans Hospital") on October 5 and 9, 2007. The Government's Motion for

Summary Judgment (ECF No. 17) is pending before this Court. The parties' submissions

have been reviewed and no hearing is necessary. *See* Local Rule 105.6 (D. Md. 2011). For

the reasons that follow, the Government's Motion for Summary Judgment (ECF No. 17) is

GRANTED IN PART and DENIED IN PART. Specifically, the Government's Motion

for Summary Judgment is GRANTED as to the Plaintiffs' negligence claim relating to Dr. Comfort Onyiah's treatment of Mr. Johnson on October 5, 2007.  The Government's Motion is DENIED as to the negligence claim relating to Dr. Ethel Weld's treatment of Mr. Johnson on October 9, 2007.  The Government's Motion is also DENIED as to the wrongful death claims contained in Counts II through V of the Plaintiffs' Complaint. Accordingly, JUDGMENT IS ENTERED in favor of the Government as to that portion of the Plaintiffs' negligence claim relating to Dr. Onyiah's treatment of Mr. Johnson on October 5, 2007.

## BACKGROUND

This Court reviews the facts and all reasonable inferences in the light most favorable to the nonmoving party.  *Scott v. Harris*, 550 U.S. 372, 378 (2007).  In July 2002, Maurice L. Johnson ("Mr. Johnson" or "the Decedent"), a veteran, was diagnosed at the Veterans Administration Medical Center in Baltimore, Maryland ("Veterans Hospital") with an acute aortic occlusion and left lower extremity ischemia.[1]  *See* Medical Records 2002, Pls.' Ex. 1, ECF No. 20-4; Surgical Information 2002, Def.'s Ex. 10, ECF No. 17-11.  On July 15, 2002, Mr. Johnson underwent an aorta-bifemoral bypass procedure, during which vascular surgeons from the Veterans Hospital located the occluded artery, removed the occlusion, and repaired the damaged vessel by installing a synthetic arterial graft.  Surgical Information 2002, Ex. 10.  This procedure went smoothly, and Mr. Johnson was discharged.  *Id.*

---

[1] An aortic occlusion is a blockage of an aorta along its path.  *See* Merriam-Webster Medical Dictionary, http://www.merriam-webster.com/medical.  Ischemia is a condition marked by an insufficient supply of blood to an area or body part, usually due to a blocked artery.  *Id.*

Mr. Johnson's vascular bypass and graft were evaluated at the Veterans Hospital in January 2006, when he was admitted to the hospital with chest pain. *See* Medical Records 2006, Pls.' Ex. 2, ECF No. 20-5; Progress Notes 2006, Def.'s Ex. 11, ECF No. 17-12. After Mr. Johnson was given an x-ray and CT scan with contrast, he was cleared of any acute problems. Progress Notes 2006, Def.'s Ex. 11. His graft was found to be without any problem. Medical Records, 2006 Pls.' Ex. 2. After Mr. Johnson stabilized, he was discharged. *Id.* Hematologic lab studies showed that his hemoglobin level was 14.6 and his hematocrit level was 43.9.[2] *Id.*

On October 5, 2007, Mr. Johnson went to the Veterans Hospital for a primary care visit and complained of bilateral knee pain and numbness below the knees. *See* Medical Records from Oct. 5, 2007, Pls.' Ex. 3, ECF No. 20-6; Def.'s Ex. 13, ECF No. 17-14. He was seen by Comfort Onyiah, M.D., a medical resident who was working under an attending physician, Nada A. Kiwan, M.D. Medical Records from Oct. 5, 2007, Pls.' Ex. 3. Dr. Onyiah scheduled Mr. Johnson to have lab work performed and to attend a follow-up appointment with a vascular specialist. *Id.* Dr. Onyiah discharged Mr. Johnson with the understanding that the lab results would not be available prior to his discharge. *See* Onyiah Dep., Def.'s Ex. 6 at 40:7, 49:4, ECF No. 17-7. The lab studies later showed that Mr. Johnson had a hemoglobin level of 10.8 and a hematocrit level of 32. *See* Medical Records from Oct. 9 at 3, 2007, Pls.' Ex. 4, ECF No. 20-7.

---

[2] Hemoglobin is the oxygen-carrying protein in red blood cells. Hematocrit is the proportion of blood that is composed of red blood cells. *See* Merriam-Webster Medical Dictionary, http://www.merriam-webster.com/medical.

Mr. Johnson returned to the Veterans Hospital four days later, on October 9, 2007, where he was seen by a resident, Dr. Ethel Weld. *See* Medical Records from Oct. 9, 2007, Pls.' Ex. 4; Progress Notes Oct. 9, 2007, Def.'s Ex. 17, ECF No. 17-18. Dr. Weld noted that Mr. Johnson had a "4 day history of left back pain, acute in onset, 10/10 in intensity" and had vomited five times prior to his arrival that day. Medical Records from Oct. 9, 2007, Pls.' Ex. 4. His vomiting was accompanied by "dull mid-epigastric and lower abdominal pain." *Id.* Additionally, Dr. Weld noted that Mr. Johnson had suffered one episode of melena[3] during the prior week and that his abdomen was soft with diffuse tenderness. *Id.* Lab results showed that his hemoglobin level was 10.2 (reduced from a level of 10.8 on October 5th). *Id.* The medical record also indicates that Mr. Johnson had bleeding in his gastro-intestinal tract. *Id.*

Dr. Weld first opined that Mr. Johnson's complaints were consistent with kidney stones. *Id.*; Weld Dep. 60:5, Def.'s Ex. 5, ECF NO. 17-6. Dr. Weld ordered a CT scan without contrast, which came back negative for kidney stones.[4] *See* Radiology Reports Oct. 9, 2007, Def.'s Ex. 18, ECF No. 17-19. As a result, Dr. Weld's next diagnosis was gastritis.[5] Progress Notes Oct. 9, 2007, Def.'s Ex. 17. Dr. Weld prescribed Mr. Johnson Zantac, which

---

[3] Melena is the passage of dark, bloody stools. *See* Merriam-Webster Medical Dictionary, http://www.merriam-webster.com/medical; *see also* Pls.' Opp'n 5.

[4] CT scanning *without contrast* will show whether a patient suffers from kidney stones but will not show potential bleeding in and around a graft. Larsen Dep. 75:6, Def.'s Ex. 14, ECF No. 17-15. A CT scan *with intravenous contrast*, the Plaintiffs argue, would have revealed the lack of integrity in Mr. Johnson's graft. *Id.* 89; 91-92.

[5] Gastritis is inflammation of the stomach lining. This condition can include symptoms such as epigastric pain, nausea, vomiting, and bloody stools. *See* Merriam-Webster Medical Dictionary, http://www.merriam-webster.com/medical; *see also* Weld Dep. 71, Def.'s Ex. 5, ECF No. 17-6; Larsen Dep. 30, 32-33.

is commonly used to control gastritis, and Toradol, a pain reliever. *Id.*; Larsen Dep. at 79:25-80-21, Def.'s Ex. 14. After approximately forty-five minutes, Mr. Johnson reported that his pain had decreased. Progress Notes Oct. 9, 2007, Def.'s Ex. 17. Mr. Johnson was then discharged,[6] and Dr. Weld planned a follow-up visit with a gastrointestinal specialist. *Id.*

Shortly after 10:00 p.m. the next day, October 10, 2007, Mr. Johnson became lightheaded and lost consciousness. Johns Hopkins Medical Records, Pl.'s Ex. 5. He awoke to find emergency medical services personnel by his side and began vomiting blood. *Id.* He was taken to Johns Hopkins Hospital in Baltimore, Maryland around 10:30 p.m. *Id.* After Mr. Johnson arrived to the hospital, his blood pressure trended downward. *Id.* He was transferred to the hospital's medical intensive care unit, where he began to have "continued, copious amounts of hematesis."[7] *Id.* His blood pressure continued to drop and he died at 1:35 a.m. on October 11, 2007. *Id.*

The cause of Mr. Johnson's death was determined to be aortoenteric fistula ("AEF"), a condition in which gastrointestinal bleeding occurs after aortic surgery. *See, e.g.*, Pabst, et

---

[6] The decision to discharge Mr. Johnson figures largely in this medical malpractice claim action. Although this issue will be discussed in greater detail *infra*, it is worth noting here a dispute among the parties. The Plaintiffs contend that Dr. Weld individually decided to discharge Mr. Johnson, while the Government argues that Dr. John Flanigan, a University of Maryland Medical Center ("UMMC") attending physician, concurred in Dr. Weld's plan before Mr. Johnson was discharged. *Compare* Pls.' Opp'n 5, *with* Def.'s Mot. 16. Dr. Weld has stated that she does not recall the day she treated Mr. Johnson, but would have discussed the treatment plan and diagnosis with Dr. Flanigan. Weld Dep. 74:3-22. Likewise, Dr. Flanigan has declared that though he does not remember the care given to Mr. Johnson, "the discharge determination would have ultimately been made by [him]." Flanigan Decl. ¶ 5, ECF No. 23-3. In Mr. Johnson's medical record from October 9, 2007, Dr. Weld certifies that she discussed her treatment plan and diagnosis with Dr. Flanigan. Progress Notes Oct. 9, 2007, Def.'s Ex. 17. That record also indicates that Dr. Flanigan did not cosign Dr. Weld's statement until October 18, 2007. *Id.*

[7] Hematemesis is the vomiting of blood. *See* Merriam-Webster Medical Dictionary, http://www.merriam-webster.com/medical.

5

al., *Gastrointestinal Bleeding After Aortic Surgery*, Def.'s Ex. 21, ECF No. 17-22.  A CT scan with contrast, performed after Mr. Johnson died, found evidence of "focal extravasion[8] of contrast material with high density soft tissue surrounding" Mr. Johnson's synthetic graft, "compatible with hematoma and active extravasation."  Johns Hopkins Medical Records, Pl.'s Ex. 5.  An autopsy performed at Johns Hopkins Hospital on October 12, 2007, revealed a "very focal dehiscence"[9] at the upper margin of Mr. Johnson's synthetic graft and "extravasation of blood beneath the graft."  Autopsy Report, Pls.' Ex. 6, ECF No. 20-9.  The doctor performing the autopsy discovered that the graft's suture was loose and allowing extravasation of blood; he identified blood in the stomach and multiple large blood clots in the small and large intestines.  *Id.*  His provisional diagnosis and cause of death was "hematemesis due to aorto-enteric fistula."  *Id.*

The Plaintiffs Faye M. Goodie, Maurice Scott, Tiffany Johnson, and Shelly Johnson ("Plaintiffs") are the four adult children of the Decedent.  They filed the subject action on December 13, 2010, against the Defendant the United States of America ("the Government" or "the Defendant") for the negligent acts of health care providers at the Veterans Hospital.  The Plaintiffs filed suit under the Federal Tort Claims Act, 28 U.S.C. §§ 2671 *et seq.*, because the Veterans Hospital is a government hospital.  Their Complaint includes five counts—one count of negligence for the medical treatment the Decedent received at the Veterans Hospital on October 5 and 9, 2007, Compl. ¶ 15, ECF No. 1, and four counts under

---

[8] Extravasation is the leakage of a fluid, as of blood, out of a vessel and into the surrounding tissue. *See* Merriam-Webster Medical Dictionary, http://www.merriam-webster.com/medical.

[9] A dehiscence is a bursting open or splitting along natural or sutured lines.  *See id.*

Maryland's wrongful death statute, Md. Code Ann., Cts. & Jud. Proc. §§ 3-901 *et seq.*, for the pain and suffering of each of the Decedent's four children.  Compl.  ¶¶ 18-33.

Pending before this Court is the Defendant's Motion for Summary Judgment (ECF No. 17).  The Government marshals six separate arguments for summary judgment in this case.  First, the Government argues that partial summary judgment should be entered in favor of the United States for any claims of negligence relating to the medical treatment provided by Dr. Onyiah, the resident who saw Mr. Johnson on October 5, 2007.  Second, the Government argues that it is not liable for the alleged negligence of Dr. Weld, because she was acting as the "borrowed servant" of Dr. Flanigan, an attending physician of the University of Maryland Medical Center ("UMMC").  Third, the Government maintains that the Plaintiffs and their experts have admitted that Dr. Flanigan was not negligent, and therefore Dr. Weld, privy to the same information as Dr. Flanigan, cannot be negligent under Maryland law.

Fourth, the Government asserts that summary judgment should be entered because, even assuming Dr. Weld were not a borrowed servant of Dr. Flanigan, Dr. Weld did not breach any standard of care.  Fifth, the Government claims that the Plaintiffs cannot demonstrate that any alleged breach by Dr. Weld was the proximate cause of Mr. Johnson's injuries, since Dr. Flanigan made the ultimate decision to discharge Mr. Johnson.  Finally, the Government believes that partial summary judgment should be entered as to Counts II, III, IV, and V of the Plaintiffs' Complaint, because Maryland law requires that wrongful death claims be filed within three years of the decedent's death.  *See* Md. Code Ann., Cts. & Jud.

Proc. § 3-904(g).  For the reasons articulated below, the Government's Motion for Summary Judgment (ECF No. 17) is GRANTED IN PART and DENIED IN PART.  Specifically, summary judgment is GRANTED as to the Plaintiffs' negligence claim relating to Dr. Onyiah's treatment of Mr. Johnson on October 5, 2007.  The Government's Motion for Summary Judgment is DENIED, however, as to the Plaintiffs' negligence claim relating to Dr. Weld's treatment of Mr. Johnson on October 9, 2007, as well as to the Plaintiffs' four wrongful death claims.

## STANDARD OF REVIEW

Rule 56 of the Federal Rules of Civil Procedure provides that a court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  A material fact is one that "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A genuine issue over a material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*  In considering a motion for summary judgment, a judge's function is limited to determining whether sufficient evidence exists on a claimed factual dispute to warrant submission of the matter to a jury for resolution at trial. *Id.* at 249.

In undertaking this inquiry, this Court must consider the facts and all reasonable inferences in the light most favorable to the nonmoving party. *Scott v. Harris*, 550 U.S. 372, 378 (2007).  However, this Court must also abide by its affirmative obligation to prevent factually unsupported claims and defenses from going to trial. *Drewitt v. Pratt*, 999 F.2d 774,

778-79 (4th Cir. 1993).  If the evidence presented by the nonmoving party is merely colorable, or is not significantly probative, summary judgment must be granted.  *Anderson*, 477 U.S. at 249-50.  A party opposing summary judgment must "do more than simply show that there is some metaphysical doubt as to the material facts."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *see also In re Apex Express Corp.*, 190 F.3d 624, 633 (4th Cir. 1999).  This Court has previously explained that a "party cannot create a genuine dispute of material fact through mere speculation or compilation of inferences." *Shin v. Shalala,* 166 F. Supp. 2d 373, 375 (D. Md. 2001) (citations omitted).

<u>ANALYSIS</u>

Under the Federal Tort Claims Act ("FTCA"), the Government is liable for the wrongful acts or omissions of an "employee" of the United States "while acting within the scope of his office or employment."  28 U.S.C. § 1346(b)(1).  At the outset, it is important to note that in determining whether a tort claim against the United States is cognizable under the FTCA, the "law of the place where the act or omission occurred" governs.  28 U.S.C. § 1346(b)(1).  Because the medical treatment at issue in this case occurred at the Veterans Hospital in Baltimore, Maryland, Maryland law applies.  *See, e.g., Miller v. United States*, 308 F. Supp. 2d 604, 607 (D. Md. 2003).  The FTCA also provides that the United States is liable for its employees' negligent acts "to the same extent as a private individual under like circumstances," meaning that state law immunities and defenses can apply to preclude liability.  28 U.S.C. § 2674.  As the Government has set out six independent reasons for granting summary judgment, this Court will address each argument in turn.

## I.   The Admission by the Plaintiffs' Expert that Dr. Onyiah Did Not Breach the Standard of Care

The Government argues that partial summary judgment should be granted as to the portion of Count I (the Plaintiffs' negligence claim) that relates to Dr. Onyiah's medical treatment of Mr. Johnson, because the Plaintiffs' expert admitted that Dr. Onyiah did not breach the standard of care.  The Government argues that where a plaintiff's expert admits that no breach occurred, judgment in favor of the defendant is warranted.

The United States Court of Appeals for the Fourth Circuit has affirmed district courts finding no violation of a doctor's standard of care where a plaintiff's expert admitted that no breach occurred.  For example, the Fourth Circuit in *Drennen v. United States*, 375 F. App'x 299, 304 (4th Cir. 2010) (per curiam), determined that a court's finding that no breach of the standard of care had occurred was strongly supported by the record, noting the plaintiff's expert came to the very same conclusion.  The Government points to another unpublished opinion, *Hall v. Sullivan*, 272 F. App'x 284, 288 n.4 (4th Cir. 2008) (per curiam), in which the Fourth Circuit, in the context of a legal malpractice claim, affirmed the district court's conclusion that there had been no breach of the standard of care since the plaintiff's expert testified that no breach had occurred.

In this case, the Plaintiffs' negligence claim involving Dr. Onyiah appears to involve Dr. Onyiah's decision to discharge Mr. Johnson before she reviewed the lab results that she had ordered.  If Dr. Onyiah had reviewed those lab results, she likely would have noted a 25% reduction in Mr. Johnson's hematocrit level.  The Plaintiffs' emergency medicine expert, Dr. Kenneth Larsen, was deposed regarding Dr. Onyiah's treatment of Mr. Johnson

10

on October 5, 2007.  Larsen Dep., Def.'s Ex. 14.  Specifically, Dr. Larsen was questioned regarding Dr. Onyiah's decision to discharge Mr. Johnson before knowing the results of the lab tests.  *Id.* at 68-69.  Dr. Larsen opined that in an emergency department, such a decision would have been a deviation from the standard of care.  *Id.* at 69:2-5.  Dr. Larsen explained, however, that if discharging a patient before the return of lab results is "the routine way things are done" in the primary care setting at the Veterans Hospital, then he could not say "that [Dr. Onyiah] has breached the standard of care."  *Id.* at 69:12-70:2.  In other words, Dr. Larsen opined that Dr. Onyiah "can't be held responsible for [Mr. Johnson's 25% reduction in hematocrit level] if she didn't know [of that reduction]."  *Id.* at 69:14-16.  Dr. Larsen also admitted that Mr. Johnson's complaints of knee pain were not related to aortoenteric fistula ("AEF") and the gastrointestinal bleeding which caused his death.  *Id.* at 67:24.  Additionally, the Plaintiffs' vascular surgery expert Dr. Paul A. Skudder admitted that neither Mr. Johnson's knee pain nor any other part of his presentation would raise a suspicion that Mr. Johnson was suffering from AEF.  Skudder Dep. at 54:2, 54:6, Def.'s Ex. 16, ECF No. 17-17.

In light of these admissions by the Plaintiffs' experts, it is clear that there is no genuine issue of material fact with respect to the standard of care exercised by Dr. Onyiah in her treatment of Mr. Johnson on October 5, 2007.  Because a breach of the standard of care is an essential element of the Plaintiffs' medical negligence claim, *see, e.g.*, *Weimer v. Hetrick*, 525 A.2d 643, 651 (Md. 1987), the Defendants are entitled to summary judgment as to that claim, but only as it relates to Dr. Onyiah's treatment of Mr. Johnson on October 5, 2007.

*See Drennen*, 375 F. App'x at 304; *Hall*, 272 F. App'x at 288 n.4.

Plaintiffs argue that the Government is not entitled to summary judgment because they intend to pursue Count I, their negligence claim, as it relates to Dr. Weld's treatment of Mr. Johnson on October 9, 2007. Pls.' Opp'n 8. The Plaintiffs acknowledge, however, that they do not intend to pursue any allegations of negligence relating to Dr. Onyiah. *Id.* Rule 56 of the Federal Rules of Civil Procedure allows a party to move for summary judgment on a claim, defense, or "part of" a claim or defense for which there is "no genuine dispute as to any material fact." *See* Fed. R. Civ. P. 56(a). In this case, there is no genuine dispute as to "part of" the Plaintiffs' negligence claim, *see* Fed. R. Civ. P. 56(c)—that portion relating to the medical treatment provided by Dr. Onyiah. Indeed, the Plaintiffs have stated that they do not intend to pursue negligence allegations against Dr. Onyiah. For this reason, the Government is entitled to partial summary judgment. *See, e.g., H.B. Limehouse v. Resolution Trust Corp.*, 862 F. Supp. 97, 102 (D.S.C. 1994) ("[A] partial summary judgment under Rule 56(d) is an appropriate procedure whereby a court can narrow the scope of trial." (collecting cases and commentary)). Accordingly, partial summary judgment is entered in favor of the Government as to that portion of Count I that relates to Dr. Onyiah's treatment of Mr. Johnson on October 5, 2007.

## II.    The Application of the Borrowed Servant Doctrine

The Government's second argument for summary judgment rests on the borrowed servant doctrine, which applies to master-servant relationships. As the Maryland Court of Special Appeals has explained, "a 'borrowed servant' can create liability in a third party who

is not his master for the servant's negligent acts, when that third party essentially 'borrows him' from his actual master." *Rivera v. Prince George's Cnty. Health Dept.*, 649 A.2d 1212, 1224 (Md. Ct. Spec. App. 1994). Essentially, the Government contends that Dr. Weld was at all relevant times acting as the "borrowed servant" of attending physician Dr. Flanigan, a doctor from the University of Maryland Medical Center ("UMMC"), which had contracted to furnish emergency room physician services to the Veterans Hospital. Because Dr. Weld was working under the direction of Dr. Flanigan, and because the "controlling policy documents" indicate that Dr. Flanigan was responsible for the care of emergency room patients, the Government's argument follows, the Government is not liable for the alleged negligence committed by Dr. Weld. Rather, the Government insists, any cause of action the Plaintiffs have lies against UMMC. Def.'s Mot. 4.

In order to properly address this argument, further facts surrounding the contractual arrangements between the Veterans Hospital and UMMC must be set out. Then this Court will address two arguments: (1) the Plaintiffs' argument that the Government waived its borrowed servant defense and (2) the Defendant's argument that the borrowed servant doctrine shifts liability from the Government to UMMC. This Court finds that the Government has not waived its borrowed servant defense. Nevertheless, because the Government expressly agreed that it would be liable for the negligent acts of UMMC residents working at the Veterans Hospital, the borrowed servant doctrine does not apply in this case, and summary judgment will not be granted.

A.  Contractual Arrangements Between the Veterans Hospital and UMMC

1.  *The Resident Agreement*

On May 16, 2007, the Veterans Hospital, the University of Maryland Medical Center ("UMMC"), and the University of Maryland School of Medicine (the "School of Medicine") entered into an agreement (the "Resident Agreement") "to enable residents in UMMC's Department of Internal Medicine . . . to gain additional clinical experience by rotating to [the Veterans] Hospital."  Resident Agreement, Def.'s Ex. 1, ECF No. 17-2.  Pursuant to the Resident Agreement, residents from UMMC would practice medicine during rotations at the Veterans Hospital.  Though the residents would be paid by UMMC, the agreement clearly provided that they would be appointed "Hospital employees" and "their activities within the scope of their Hospital duties [would] be covered by the Federal Tort Claims Act."  *Id.* ¶ III.F.  The Veterans Hospital agreed that it would remain "responsible for patient care at [the] Hospital."  *Id.* ¶ III.B.

The Resident Agreement also sets out the "educational experience and clinical objectives" to which the Veterans Hospital, UMMC, and the School of Medicine agreed.  *Id.* ¶ I.B; *id.* Attach. B at 4.  In particular, the Resident Agreement states that the residents working in the emergency room would be "responsible for evaluation, treatment and disposition of patients triaged to that area."  *Id.*  The agreement further states that residents would be "responsible for documentation of the visit and for arranging all appropriate follow-up services."  *Id.*  Listed among the most important educational content of this

rotation are the residents' "initial evaluations of many surgical and neurologic problems" and the "direct supervision of residents while they are evaluating patients, case reviews, and discussions with an attending physician." *Id.*

The parties to the contract also agreed that UMMC would furnish the Veterans Hospital with "the UMMC policies and procedures governing the Residents' education while rotating at the Hospital." *Id.* ¶ I.C.  One such policy was UMMC's Resident Supervision Policy, the purpose of which is "to establish institution wide standards for independent health care practitioners engaged in the supervision and teaching of residents . . . and to establish guidelines that program specific policies must meet."  Resident Supervision Policy, Def.'s Ex. 2, ECF No. 17-3.  Pursuant to this policy, a general attending physician is "responsible for and actively involved in the care provided to each patient, both inpatient and outpatient." *Id.* ¶ VIII.1.  The policy also sets out the following as requirements for an attending physician:

> An attending physician directs the care of each patient and provides the appropriate level of supervision for a resident based on the nature of the patient's condition, the likelihood of major changes in the management plan, the complexity of care, and level of education, ability, experience, and judgment of the resident being supervised.

*Id.* ¶ VIII.2.  Under the Resident Supervision Policy, a resident is required to be aware of her level of skill, knowledge, and experience, and not to perform any procedures or treatments that she is "unauthorized to perform or lacks the skill and training to perform." *Id.* ¶ IX.1. Further, a resident "is responsible for communicating to the attending physician any significant issues regarding patient care." *Id.* ¶ IX.2.

15

2.   *The Emergency Room Agreement*

On July 31, 2007, the Veterans Hospital and the University of Maryland Medical Center ("UMMC") entered into a contract (the "Emergency Room Agreement"), pursuant to which UMMC agreed to furnish the Veterans Hospital with "Emergency Care Physician Services" for a six-month period from August 1, 2007, through January 31, 2008. Emergency Room Agreement, Def.'s Ex. 3, ECF No. 17-4.  Emergency physicians covered by this contract would "provide professional direction of all clinical care and special procedures performed in the Emergency Department," as well as "professional direction and oversight to house staff at the [Veterans Hospital]."  *Id.* SCR-1, p. 7.  The Emergency Room Agreement further stated that "Emergency Physicians are responsible for the evaluation and management of patients presenting in the Emergency Department, 24 hours a day, 7 days per week."  *Id.* SCR-2.a., p. 7-8; *see also id.* SCR-2.b., p. 8 ("Contract physicians will be expected to directly examine and treat patients presenting to the Emergency Department."); *id.* SCR-2.g., p. 8 ("Provide direct patient care (obtain health history from patients, perform physical examination, formulate diagnostic, and therapeutic plans).").

It is important to note that the Emergency Room Agreement set forth UMMC's obligation to supply experienced, board-certified and board-eligible emergency room physicians to staff the Emergency Department at the Veterans Hospital.  *See id.* SCR-2.o., p. 9 ("Provide 24 hour, 7 day a week on site coverage by a Board Certified/Board Eligible physician in Emergency Medicine or Internal Medicine."); *id.* SCR-7.a., p. 11 ("One-year work experience in an emergency room setting of comparable complexity is required.").  The

Emergency Room Agreement did not involve any agreement to furnish residents to the Veterans Hospital's Emergency Room.  Nor did the agreement state whether residents would be covered by UMMC for liability purposes or be under the control of the UMMC attending physicians in the emergency room.

B.  The Plaintiffs' Argument Based on Waiver under Rule 12(b)

Because the Government has not asserted at any previous stage this borrowed servant defense, the Plaintiffs argue that the defense has been waived.  They contend that the borrowed servant defense is an affirmative one that must be timely pled in an answer to a complaint under Rule 8(c) of the Federal Rules of Civil Procedure.  To permit the Government to raise the defense after the close of the discovery period, the Plaintiffs argue, would be to unduly prejudice the Plaintiffs, who have not had the opportunity to conduct discovery on this issue.  Specifically, the Plaintiffs argue that they have not conducted discovery about "the relationship between the Veterans Hospital and the University of Maryland regarding the University's control over resident[s] working at the Veterans Hospital because they were not on notice that it was an issue in the case."  Pls.' Opp'n 10. Moreover, the Plaintiffs explain that they have not investigated "any control specifically exerted by the Veterans Hospital over Dr. Weld."  *Id.*

Assuming for purposes of the Plaintiffs' argument that the borrowed servant doctrine is an affirmative defense,[10] waiver would nonetheless not be appropriate.  The Fourth Circuit

---

[10] Neither the Plaintiffs nor the Defendant cite any case under Maryland law holding whether a defense based on the borrowed servant doctrine is considered an affirmative defense for the purpose of Rule 8's pleading requirements.  The Court of Appeals for the Fourth Circuit appears

has reasoned that while "it is indisputably the general rule that a party's failure to raise an affirmative defense in the appropriate pleading results in waiver," waiver is not appropriate if the defense is first raised in a pretrial, dispositive motion, "absent unfair surprise or prejudice to the plaintiff." *Brinkley v. Harbour Rec. Club*, 180 F.3d 598, 612-613 (4th Cir. 1999) (collecting cases), *overruled on other grounds*, *Desert Palace, Inc. v. Costa*, 539 U.S. 90 (2003). This Court has likewise ruled that where an affirmative defense is first raised at the summary judgment phase, it should not be deemed waived "absent a showing of prejudice to the plaintiff." *Cornell v. Council of Unit Owners Hawaiian Vill. Condos., Inc.*, 983 F. Supp. 640, 643 (D. Md. 1997).

In this case, the Plaintiffs cannot demonstrate prejudice or unfair surprise, because they were on notice of the defense during the discovery period and received information to rebut the Government's defense. First, in its Answer to the Plaintiffs' Complaint, the Government asserted a defense based on its own lack of control over the negligence. *See* Def.'s Answer, Def.'s Ex. 27, ECF No. 23-1 ("Any injuries sustained by Plaintiffs were proximately caused by the negligence or misconduct of individuals and/or entities over which Defendant United States had no control or right of control."). Further, in responses to the Plaintiffs' interrogatories, the Government contended that Dr. Flanigan "acted in a manner to cause or contribute to the matters complained of in the complaint." *See* Resp. to Interrogatory No. 10, Def.'s Ex. 28, ECF No. 23-2. In the depositions of Dr. Weld and Dr. Onyiah, Plaintiffs' counsel asked about the degree of control exercised by the attending

---

not to have reached this question. *See Ladd v. Research Triangle Inst. Int'l*, 335 F. App'x 285 (4th Cir. 2009).

physicians over those residents.  *See* Weld. Dep. 22-25; Onyiah Dep. 21-22.  Finally, the Government disclosed to the Plaintiffs the Emergency Room Agreement.  *See* Resp. to Interrogatory No. 16, Def.'s Ex. 28.

In short, the Plaintiffs discovered information relating to the control of the attending physicians over the Veterans Hospital residents—a crucial element in the borrowed servant doctrine analysis, *see Franklin v. Gupta*, 567 A.2d 524, 539 (Md. Ct. Spec. App. 1990)—as well as the Emergency Room Agreement itself.  Additionally, the evidence in the record indicates that the parties discovered information regarding the control exerted by the Veterans Hospital over the residents.  *See id.*  For these reasons, this Court finds that there has been no prejudice or unfair surprise to the Plaintiffs.[11]  Accordingly, the Government's defense under the borrowed servant doctrine will not be considered waived.

C. <u>Whether Dr. Weld Was the Borrowed Servant of University of Maryland Medical Center</u>

The borrowed servant doctrine is an agency law principle.  The doctrine is often associated with the Supreme Court's decision in *Standard Oil Co. v. Anderson*, 212 U.S. 215, 220 (1909), in which the Court explained that "[o]ne who employs a servant to do his work is answerable to strangers for the negligent acts or omissions of the servant, committed in the course of the service."  The Court went on to describe how one applies the doctrine to the facts of a particular case:

> The servant himself is, of course, liable for the consequences of his own carelessness. But when, as is so frequently the case, an attempt is made to

---

[11] The Plaintiffs have not requested additional time to take discovery on this issue pursuant to a motion under Rule 56(d) of the Federal Rules of Civil Procedure.

impose upon the master the liability for those consequences, it sometimes
becomes necessary to inquire who was the master at the very time of the
negligent act or omission. One may be in the general service of another, and,
nevertheless, with respect to particular work, may be transferred, with his own
consent or acquiescence, to the service of a third person, so that he becomes
the servant of that person, with all the legal consequences of the new relation.

*Id.* at 221.

Under Maryland law, the borrowed servant doctrine can apply in the context of

medical malpractice cases. *See, e.g.*, *Frankin v. Gupta*, 567 A.2d 524.  The Maryland Court of

Special Appeals explained in *Franklin v. Gupta*, for example, that "[w]here the evidence

suffices to support a finding that the surgeon *in fact* had or exercised the right to control the

details of another person's work or conduct in the operating room . . . the trier of fact may

find that the surgeon was the 'special employer' and is therefore liable for the negligence of

the borrowed servant." *Id.* at 539.  To determine whether the doctrine applies, Maryland

courts evaluate the "degree of control exercised by the third party over the [borrowed]

servant and the degree of autonomy given to the servant." *Rivera*, 649 A.2d at 1224.  "Full

dominion and control" is not required, while "the mere right to point out and direct the

servant as to the details of the work and the manner of doing it, leaving to the servant or his

general employer the right to determine what work he shall do and what means he shall

employ to do it" is not enough.  *Id.* (citing *Dippel v. Juliano*, 137 A. 514 (Md. 1927)).  The

court in *Rivera* set out the standard as follows:

> [W]here the work to be done is the borrower's work, and a part of his
> business, and [the borrower] has the power and authority to direct
> when and where and how it shall be done, and where the work is not
> within the scope of the general employment of the servant, it may fairly
> be said that so far as that work is concerned [the servant] is under the

> control of the borrower and that the latter will be responsible for his
> negligent acts.

*Id.* Accordingly, determining whether the borrowed servant doctrine applies involves two central questions. First, is the employee performing the work of his general employer or the borrower's work? Second, is the employee under the control of his general employer or under the control of the borrower?

The Government argues that the borrowed servant doctrine applies in this case to preclude the Government from having any liability. At the time of the alleged negligence, UMMC was an independent contractor furnishing emergency room physicians to the Veterans Hospital. *See* Emergency Room Agreement, Def.'s Ex. 3. The Emergency Room Agreement set out that UMMC would "provide professional direction of all clinical care and special procedures performed in the Emergency Department," as well as "professional direction and oversight to house staff at the [Veterans Hospital]." *Id.* SCR-1, p. 7. Thus, the argument follows, Dr. Weld was being used to do the "borrower's work"—providing emergency room care—and was under the borrower's control, as she was providing medical care under the direction of UMMC's attending physician Dr. Flanigan. The Government cites to several cases outside of the Fourth Circuit—primarily cases construing Texas's borrowed servant doctrine—to support its argument that the Government is entitled to summary judgment where it is sued for the negligent acts of a resident who was under the direction of an independent contractor. *See, e.g., Aylesworth v. United States*, No. SA-03-CA-0724-RF, 2005 WL 492831 (W.D. Tex. Feb. 28, 2005) (unpublished) (awarding partial summary judgment to the United States where veterans hospital residents alleged to have

committed negligence were under the control and direction of the University of Texas Health Science Center); *Moore v. Dorman*, No. SA-03-CA-248-H, 2004 U.S. Dist. Lexis 27394 (W.D. Tex. Oct. 28, 2004) (same).

The Plaintiffs, on the other hand, argue that the Government's defense based on the borrowed servant doctrine is misplaced for two reasons.  First, they argue that the doctrine is irrelevant where, as here, the parties expressly allocate the risk of negligence.  Plaintiffs assert that the Resident Agreement clearly sets out that the University of Maryland Medical Center residents rotating through the Veterans Hospital—including Dr. Weld—were appointed employees of the Veterans Hospital and would be covered by the Federal Tort Claims Act.  Resident Agreement ¶ III.F.  Furthermore, the Emergency Room Agreement did not state that residents such as Dr. Weld would be covered by UMMC for liability purposes.  Under Maryland law, "whatever the status of an employee under the 'borrowed servant' doctrine, the parties may allocate between themselves the risk of any loss resulting from the employee's negligent acts." *Krzywicki v. Tidewater Equip. Co., Inc.*, 600 F. Supp. 629, 639 (D. Md. 1985), *aff'd*, 785 F.2d 305 (4th Cir. 1986).  Likewise, the Court of Appeals for the Fourth Circuit explained in *NVR v. Just Temps, N.C.*, 31 F. App'x 805, 807 (4th Cir. 2002) that "if the parties contractually agreed that one or the other of them should bear the risk of a particular employee's negligent acts, that employee's status under the borrowed servant doctrine is immaterial."  Thus the Plaintiffs argue that in light of the plain language of the Resident Agreement, the borrowed servant doctrine has no place in this case.

Even if the borrowed servant doctrine were to apply, the Plaintiffs argue in the

alternative that the Government's argument still fails, because Dr. Weld was not a borrowed servant.   Under the Resident Agreement, residents were "responsible for evaluation, treatment and disposition of patients triaged to that area."  Resident Agreement, Attach. B at 4.  The agreement further states that residents would be "responsible for documentation of the visit and for arranging all appropriate follow-up services."  *Id.*  That the residents rotating through the Veterans Hospital would have this sort of responsibility over patient care, the Plaintiffs argue, contradicts the Government's argument that Dr. Weld was controlled by the third party UMMC.

The Government is simply not entitled to summary judgment on the borrowed servant doctrine in light of the genuine issues of material fact that exist.  At the outset, this Court notes that the Government cites no authority under Maryland law to support its argument.   Indeed, the primary cases on which the Government relies are unpublished opinions construing Texas's borrowed servant doctrine, which is immaterial to this case.  *See Aylesworth*, 2005 WL 492831; *Moore*, 2004 U.S. Dist. Lexis 27394.  Acknowledging that no Maryland court has construed the borrowed servant doctrine to have such a far-reaching effect as the Government suggests, this Court treads lightly in analyzing the doctrine's potential application to this case.

The questions that must be resolved in order to find that Dr. Weld was a borrowed servant involve genuine disputes as to the material facts.  Consequently, summary judgment may not be granted.  Fed. R. Civ. P. 56(a).  One dispute involves the contractual obligations of Dr. Weld and UMMC.  The Plaintiffs point to one contract, the Resident Agreement,

which establishes that the Government would be liable for the negligent acts of UMMC residents rotating through the Veterans Hospital and remain responsible for patient care. Resident Agreement ¶¶ III.B, III.F.   The Resident Agreement also states that UMMC residents would assume responsibility for the care of their patients.   *Id.* Attach. B at 4.   The Government points to another contract, the Emergency Room Agreement, as proof that UMMC supplied the Veterans Hospital with emergency room physicians, who would be responsible for the care provided in the emergency room.   Emergency Room Agreement, SCR-1 & SCR-2.a., pp. 7-8.   Significantly, the Emergency Room Agreement does not set out whether the status of UMMC residents—who were appointed employees of the Government and received FTCA protection, pursuant to the Resident Agreement—would be affected by the Emergency Room Agreement.   Nor does the Emergency Room Agreement state whether UMMC was assuming liability over those residents.

The other disputed issue involves the extent to which Dr. Flanigan was in control of Dr. Weld during her rotation through the Veterans Hospital's emergency room.   Facts pertaining to Dr. Weld's treatment of Mr. Johnson—facts which would suggest whether Dr. Weld or Dr. Flanigan was actually in control—are in conflict.   The Plaintiffs contend that Dr. Weld individually decided to discharge Mr. Johnson.   The Defendant argues, on the other hand, that Dr. Flanigan concurred in Dr. Weld's plan before Mr. Johnson was discharged. *Compare* Pls.' Opp'n at 5, *with* Def.'s Mot. at 16.   In accordance with the Veterans Hospital's Resident Supervision Policy, Dr. Weld has attested that she would have discussed the treatment plan and diagnosis with Dr. Flanigan.   Weld Dep. at 74:3-22; *see also* VA

24

Resident Supervision Policy, Def.'s Ex. 3. Dr. Flanigan has also declared that though he does not remember the care given to Mr. Johnson, "the discharge determination would have ultimately been made by [him]." Flanigan Decl. ¶ 5, ECF No. 23-3. In Mr. Johnson's medical record from October 9, 2007, Dr. Weld certifies that she discussed her treatment plan and diagnosis with the attending Dr. Flanigan. Progress Notes Oct. 9, 2007, Def.'s Ex. 17. Importantly, however, that record also indicates that Dr. Flanigan did not cosign Dr. Weld's statement until October 18, 2007. *Id.* Thus there are issues of fact with respect to whether Dr. Flanigan was in fact in control of and directing the care given to Mr. Johnson.

Ordinarily, the Government could still press a defense based on the borrowed servant doctrine at trial, where the fact finder would make the necessary factual determinations. *See Sea Land Indus., Inc. v. Gen. Ship Repair Corp.*, 530 F. Supp. 550, 563 (D. Md. 1982) ("[T]he issue whether a master and servant relationship exists in any case is essentially a factual question which must be determined by the trier of fact where the evidence is conflicting."). However, this defense is wholly inapplicable, because "if the parties contractually agreed that one or the other of them should bear the risk of a particular employee's negligent acts, that employee's status under the borrowed servant doctrine is immaterial." *NVR*, 31 F. App'x at 807. In the Resident Agreement, UMMC and the Veterans Hospital agreed that the negligent acts of UMMC residents rotating through the Veterans Hospital would be covered by the Federal Tort Claims Act. Resident Agreement ¶ III.F. The Resident Agreement's clear allocation of risk renders the borrowed servant doctrine inapplicable to this case. *See NVR*, 31 F. App'x at 807; *see also Krzywicki*, 600 F.

Supp. at 639 ("Under both federal and Maryland law, whatever the status of an employee under the 'borrowed servant' doctrine, the parties may allocate between themselves the risk of any loss resulting from the employee's negligent acts.").

While the Government suggests that the Resident Agreement should have no bearing on the outcome, and that the later Emergency Room Agreement controls, it offers no support for these arguments. The Emergency Room Agreement does not state that it was intended to supplant or displace the earlier-forged Resident Agreement to the extent it involved emergency room residents. Nor does the Emergency Room Agreement expressly shift liability for a resident's negligent acts from the Government to UMMC. The Government fails to offer facts suggesting that the Resident Agreement, which clearly expresses the Government's agreement to take on the risk of UMMC residents' negligent acts, should not apply to bar the borrowed servant defense from this case. Under clearly articulated Maryland law, if parties to a contract establish that one will be liable for the negligence of an employee, then that contractual allocation of risk trumps the outcome under a borrowed servant doctrine analysis. *See NVR*, 31 F. App'x at 807; *see also Krzywicki*, 600 F. Supp. at 639. For these reasons, this Court finds that the Resident Agreement controls and the result under borrowed servant doctrine is immaterial. Accordingly, the Government is not entitled to summary judgment as a matter of law on this ground, and it may not pursue the borrowed servant defense at trial.

### III.    The Plaintiffs' Experts' Statements Regarding Dr. Flanigan

The Government next asserts that the Plaintiffs' experts have admitted that Dr.

Flanigan is not negligent.   Because of this admission, the Government maintains that summary judgment is appropriate since Dr. Weld was privy to the same information as Dr. Flanigan.   The Government cites *East v. United States*, 745 F. Supp. 1142, 1157 (D. Md. 1990), for the proposition that where two doctors have the same information about a patient and one of the doctors is determined not to be negligent, the other cannot be found negligent.

In *East*, this Court found that the defendant, a United States physician, was not negligent, noting as one factor among many that another doctor with the same knowledge as the defendant was found not to have breached.   *Id.*   This Court did not find as a matter of law that whenever a non-party physician with the same information as the defendant was found to have met the standard of care, the defendant necessarily met his own standard of care.   *Id.*   The factual circumstances, as well as the particular position and specialization of each doctor, would be important factors in considering whether *East* applied similarly to this case.

This Court need not conduct such analysis, however, because it simply is not the case that the Plaintiffs' experts have admitted Dr. Flanigan's lack of negligence.   Contrary to the Government's argument, Dr. Larsen never admitted that Dr. Flanigan was not negligent. Rather, Dr. Larsen explained during his deposition that he was not contending that any other doctor involved in the care of Mr. Johnson was negligent.   Larsen Dep. 98: 11-20.   Put differently, Dr. Larsen stated only that he had no opinion as to Dr. Flanigan's possible negligence.

The Government also suggests that the Plaintiffs have admitted Dr. Flanigan's lack of negligence. The Government points out that Plaintiff Faye Goodie in her deposition responded in the negative to the question, "[Y]ou're not aware of any claims you're making against Dr. Flanagan [sic]?" Goodie Dep. 49:5, Def.'s Ex. 25, ECF No. 17-26. The Government also directs the Court's attention to certain of the Plaintiffs' answers to interrogatories, in which the Plaintiffs confirmed that they were not pursuing negligence claims against any other individuals. Considering that the Plaintiffs need not sue every possible party at fault, this argument holds no water. The Plaintiffs' decision not to sue Dr. Flanigan does not equate to an admission that Dr. Flanigan met his standard of care. The Government's attempt to construe the Plaintiffs' statements as such is an argument based on specious reasoning. Accordingly, this ground for summary judgment is denied.

## IV.   Dr. Weld's Alleged Breach of the Standard of Care

The Government insists that even if the borrowed servant doctrine did not apply to this case, summary judgment is nevertheless appropriate because Dr. Weld did not breach her standard of care. Instead, the Government contends, the medical record, the Plaintiffs' expert testimony, and the medical literature demonstrate that Dr. Weld made a "reasonable medical judgment" based on the facts available to her. Def.'s Mot. 35. Under Maryland malpractice law, the mere fact that an unsuccessful result follows medical treatment is not evidence of negligence. *See Lane v. Calvert*, 138 A.2d 902, 905 (Md. 1958). Indeed, where a doctor "exercise[s] a reasonable degree of care and skill under the circumstances as they exist[], though not as seen in perfect hindsight, then the doctor is not liable for malpractice."

*East*, 745 F. Supp. at 1149.

To support its argument, the Government points to three sets of facts.  First, the Government maintains that the medical records show that Dr. Weld exercised reasonable clinical judgment.  Dr. Weld first diagnosed Mr. Johnson with the most likely condition (in this case, kidney stones), and moved on to the next diagnosis (gastritis) only after ruling out the first, the Government asserts.  *See id.* at 1146 ("Physicians are trained to look for the most common and obvious explanations for problems, and reasonable medical care recommends this approach.").

Second, the Government argues that the Plaintiffs' experts testified that they would have made some of the same diagnostic decisions as Dr. Weld did.  *See* Larsen Dep. 74-75 (Dr. Larsen indicating that he would have considered kidney stones and gastritis in diagnosing Mr. Johnson, and that a CT scan without contrast is the proper protocol for testing whether someone has kidney stones); Skudder Dep. 46:19, 61-64 (Dr. Skudder stating that Mr. Johnson was not experiencing a low-grade fever typical of AEF when he was seen by Dr. Weld, and agreeing with Dr. Weld's assessment that Mr. Johnson was hemodynamically stable at that time); Larsen Dep. 18, 22-23, 35 (Dr. Larsen noting that some patients whose ailments are not very serious can be discharged with a scheduled follow-up appointment).

Finally, the Government cites medical literature as well as expert testimony that AEF is a rare condition and a difficult one to diagnose.  *See* Pabst 1 (finding that, in a study of 253 patients, AEF associated with GI bleeding occurred in 0.4% of grafts inserted); Chang et al.,

*Secondary Aortoduodenal Fistula*, Def.'s Ex. 22, ECF No. 17-23 (noting that AEF often occurs "months to years after the original surgery, with an incidence of 0.4%-4%"); *see also* Larsen Dep. 43:15 (Dr. Larsen noting that he has dealt with one case of AEF during his career); Holder Dep. 23:18-19, Def.'s Ex. 23, ECF No. 17-24 (Dr. Lawrence E. Holder, a radiology expert, stating that in the later part of his career, he documented "probably less than ten" AEF cases); Skudder Dep. 36:16, 43:24 (Dr. Skudder acknowledging that he has seen six to ten AEF cases, and agreeing with medical literature stating that AEF is difficult to diagnose preoperatively). Based on all three sets of evidence—the medical records, the experts' opinions, and the medical literature—the Government maintains that Dr. Weld met the standard of care as a matter of law.

The Plaintiffs, on the other hand, assert that a genuine dispute of material fact exists on this issue. The Government selectively quotes from the experts' opinions, the Plaintiffs argue, failing to take note of both Dr. Larsen's and Dr. Witman's opinions that the Government, acting through Dr. Weld, committed negligence in its treatment of Mr. Johnson. Larsen Dep. 89:5-14; 91:14-92:7; Witman Report, Pls.' Ex. 11, ECF No. 20-14. At this stage of litigation, the Court's role is to grant summary judgment only if it determines that a genuine dispute of fact does not exist. In this case, the Plaintiffs maintain, such a dispute exists.

Considering the evidence in the light most favorable to the nonmoving party, *Scott*, 550 U.S. at 378, this Court finds that on the issue of Dr. Weld's alleged negligence, there is a clear dispute of material facts. While the Government produces evidence tending to show

that Dr. Weld's treatment of Mr. Johnson was reasonable in light of the circumstances, the Plaintiffs likewise produce evidence leading to the conclusion that it was unreasonable for Dr. Weld to conduct only a CT scan without contrast and to discharge Mr. Johnson with a diagnosis of gastritis. "[I]f the evidence is such that a reasonable jury could return a verdict for the nonmoving party," a genuine dispute exists, and the moving party is not entitled to summary judgment. *Anderson*, 477 U.S. at 248. For these reasons, the Government's Motion for Summary Judgment is denied on this ground.

## V.    The Proximate Cause of Dr. Weld's Alleged Breach

The Government's fifth argument for summary judgment, made in the alternative, rests on the party's belief that any alleged breach of the standard of care by a federal employee was not the proximate cause of Mr. Johnson's injuries. Rather, if a breach did occur, then it was the decisionmaking of UMMC's Dr. Flanigan that led to Mr. Johnson's discharge without any other testing or inquiry. The third prong of the prima facie case for negligence under Maryland law requires "not only causal connection between the negligence complained of and the injury suffered . . . but [the negligence] must be the proximate cause." *Reed v. Campagnolo*, 630 A.2d 1145, 1148 (Md. 1993). To satisfy the proximate cause standard, a plaintiff must show a "natural and unbroken sequence, without intervening efficient causes, so that, but for the negligence of the defendant[], the injury would not have occurred." *Suburban Hosp. Ass'n v. Mewhinney*, 187 A.2d 671, 673 (Md. 1963). Since the FTCA only creates liability for the United States as to the acts or omissions of a federal "employee," 28 U.S.C. § 1346(b)(1), the Government argues, the Plaintiffs in this case must

show that Dr. Weld's care—not Dr. Flanigan's—was the proximate cause of Mr. Johnson's injuries.

The Government further emphasizes that the Fourth Circuit has recognized an "independent contractor exemption" to the FTCA. *See Berkman v. United States*, 957 F.2d 108 (4th Cir. 1992). Because the FTCA defines "employee" to exclude "any contractor with the United States," the Fourth Circuit has articulated an independent contractor exemption, according to which there is no FTCA liability if the action against the Government would be based solely on the negligence of an independent contractor. *Id.* at 112. In short, "Congress did not waive the sovereign immunity of the United States for injuries resulting from the actions of independent contractors performing work for the government." *Robb v. United States*, 80 F.3d 884, 887 (4th Cir. 1996). The independent contractor exemption can apply in the context of a medical malpractice claim, where the allegedly negligent physician who caused harm to the plaintiff is an independent contractor rather than a federal employee. *See, e.g.*, *Robb*, 80 F.3d 884. In *Robb*, the Fourth Circuit found for the Government where the negligent physician was an independent contractor providing medical services at Langley Air Force Base. *Id.* Applying the independent contractor exemption, the Fourth Circuit held that the Government could not be liable for the physician's negligence under the FTCA. *Id.*

Once again, this Court must consider the evidence in the light most favorable to the nonmoving party. *Scott*, 550 U.S. at 378. Construing all facts and inferences in favor of the Plaintiffs, this Court finds that there is a dispute of material facts regarding the proximate cause of Mr. Johnson's injuries. The Plaintiffs' case of negligence as to Dr. Weld involves

two major decisions—the decision not to conduct a CT scan with contrast, which would have revealed that Mr. Johnson was suffering from AEF, and the decision to discharge Mr. Johnson with a likely diagnosis of gastritis.  As to the first decision, the Plaintiffs' causation expert Dr. Skudder opined that in order to meet the "vascular standard of care" for a patient with "CT abnormalities at the proximal anastomosis, pain . . . from that site[,] and a single episode of melena," the treating physician should "operate early on the patient."  Skudder Dep. 73.  Dr. Skudder also stated that if Mr. Johnson had been preemptively operated on, he would have survived.  *Id.* at 71.  Thus a finder of fact could conclude that Dr. Weld committed negligence by not ordering a CT scan with contrast and not operating promptly, as Dr. Skudder has suggested.

The Government refers to policies in the Veterans Heath Administration Handbook and the Emergency Room Agreement indicating that the emergency room physicians were responsible for directing the sort of additional testing to which Dr. Skudder refers.  *See, e.g.*, Emergency Room Agreement, SCR-2.c., p. 8 ("The Contractor will provide physician coverage for 24 hours per day, 7 days per week."); *id.* at SCR-2.g., p. 8 ("Provide direct patient care (obtain health history . . . formulate diagnostic and therapeutic plans."); *see also* Veterans Health Admin. Handbook 1400.1, p. 13-14, Def.'s Ex. 4, ECF No. 17-5.  The Plaintiffs, on the other hand, refer to another set of policies in the Resident Agreement establishing that the residents themselves would be responsible for "evaluation, treatment, and disposition of patients."   Resident Agreement, Attach. B, p. 4.  This Court is not permitted to find facts at this stage—it may only enter judgment if the facts themselves

admit no dispute.  In light of the contradicting policies in the agreements that applied to the medical care Mr. Johnson received, this Court finds a genuine dispute of material fact as to whether Dr. Weld was negligent for not ordered a CT scan with contrast.

There is yet another genuine dispute of fact regarding which doctor ultimately discharged Mr. Johnson.  The Government suggests that only Dr. Flanigan had the authority to discharge Mr. Johnson.  *See* Veterans Health Admin. Handbook, p. 13 ("Discharge from Outpatient Clinic. The supervising practitioner, in consultation with the resident, ensures that the discharge of the patient from the clinic is appropriate.").  The Government also cites to statements of Dr. Weld and Dr. Onyiah, who stated that they would seek approval from an attending physician before discharging a patient.  *See* Weld Dep. at 22-23; Onyiah Dep. at 21-22.   As this Court alluded to earlier, the issue whether Dr. Weld or Dr. Flanigan discharged Mr. Johnson is not ripe for resolution at the summary judgment stage for two reasons.  First, no doctor involved in the events at issue on October 9, 2007, recalls the care given to Mr. Johnson that day.   Weld Dep. 74:3-22; Flanigan Decl. ¶ 5.   Further, Dr. Flanigan did not cosign Dr. Weld's statement that he concurred in her treatment plan and diagnosis until October 18, nine days after Mr. Johnson was treated by Dr. Weld and seven days after Mr. Johnson's death.  *See* Progress Notes Oct. 9, 2007.  Moreover, the Plaintiffs point out that Dr. Weld was the only physician who saw Mr. Johnson on October 9, 2007, a fact tending to show that Dr. Flanigan was not in control of Dr. Weld's medical care.  Accordingly, the Government's Motion for Summary Judgment is denied on the ground that Dr. Weld was not the proximate cause of Mr. Johnson's injuries, because the evidence on

34

this issue is in conflict.

### VI.    The Statute of Repose Governing the Plaintiffs' Wrongful Death Claims

Finally, the Government seeks partial summary judgment on Counts II through V of the Plaintiffs' Complaint, which contain the wrongful death claims of the Decedent's four adult children.  The Government argues that the Plaintiffs failed to file the wrongful death claims within the time period set by Maryland law.  Specifically, Maryland law provides that a wrongful death claim "shall be filed within three years after the death of the injured person." Md. Code Ann., Cts. & Jud. Proc. § 3-904(g) ("section 3-904(g)").  This provision has been construed not as a procedural statute of limitation but as a "substantive right of action" and condition precedent to maintaining such action.  *See Knauer v. Johns-Manville Corp.*, 638 F. Supp. 1369, 1375-76 (D. Md. 1986); *see also Waddell v. Kirkpatrick*, 626 A.2d 353, 355 (Md. 1993).  In this case, Mr. Johnson passed on October 11, 2007.  The limitations period for the wrongful death statute of repose began to run at that time, meaning that the Plaintiffs had to file by October 11, 2010.  Because the Plaintiffs filed the four wrongful death claims in this Court on December 13, 2010, *see* Compl. ¶¶ 18-33, the Government argues that these four claims are time-barred.

This argument is dispatched in relatively short order.  Under Maryland's Health Care Malpractice Claims Act, Md. Code Ann., Cts. & Jud. Proc. § 3-2A-01 *et seq.*, a plaintiff that intends to file a negligence claim against a health care provider must first file a claim with the Health Care Alternative Dispute Resolution Office.  Md. Code Ann., Cts. & Jud. Proc. § 3-2A-04.    Additionally, section 5-109 of the Courts and Judicial Proceedings Article of the

Maryland Code ("section 5-109") sets out that "the filing of a claim with the Health Care Alternative Dispute Resolution Office in accordance with § 3-2A-04 of this article shall be deemed the filing of an action." *Id.* § 5-109(d).  In this case, the Plaintiffs filed a claim with the Health Care Alternative Dispute Resolution Office on September 29, 2010.[12]  That date—which is within the three-year time period for filing a wrongful death action in this case—is considered the date of filing for limitations purposes.  Md. Code Ann., Cts. & Jud. Proc. § 5-109(d).

The Government argues that section 5-109(d) applies to the "general statute of limitations applicable to medical malpractice actions," but not to the statute of repose applicable to a wrongful death action.  Def.'s Reply 25.  Moreover, the Government points out that because the limitations period of Maryland's wrongful death statute has been construed as a statute of repose, it cannot be tolled.  Apparently this issue has not been addressed by any Maryland court.  For several reasons, however, this Court finds that the filing of a claim with the Health Care Alternative Dispute Resolution Office is deemed the filing of a wrongful death action.

First, while no Maryland court has directly confronted this question, courts have generally recognized that the filing of a malpractice action containing wrongful death claims

---

[12] Prior to filing with the Health Care Alternative Dispute Resolution Office, the Plaintiffs filed a claim in August 2009 with the Department of Veterans Affairs.  Section 2401(b) of the Federal Tort Claims Act requires a party to present a claim against the United States "in writing to the appropriate Federal agency within two years after such claim accrues."  28 U.S.C. § 2401(b).  If a party does not first present the claim to the applicable federal agency, that claim is "forever barred."  *Id.*  Because the Plaintiffs filed their claim with the Government within two years of Mr. Johnson's death on October 11, 2007, their claim against the Government was, for FTCA purposes, timely.

with the Health Care Alternative Dispute Resolution Office is deemed to be the filing of the action.  *See Powell v. Breslin*, 59 A.3d 531, 540-41 (Md. 2013); *see also Univ. of Md. Med. Sys. Corp. v. Muti*, 44 A.3d 380, 383 (Md. 2012) (noting that the plaintiffs filed their wrongful death claim with Health Care Alternative Dispute Resolution Office before the "third anniversary of [the decedent's] death").   Second, while tolling provisions are generally inconsistent with statutes of repose, there are circumstances in which a statute of repose is subject to tolling.  *See Anderson v. United States*, 669 F.3d 161 (4th Cir. 2011) (collecting cases under Maryland law that consider the statute of limitations for a medical malpractice claim a statute of repose despite the fact that it is subject to statutory tolling provisions); *Knauer*, 638 F. Supp. at 1384-86 (explaining circumstances under which Maryland's three-year time provision for wrongful death actions may be tolled).

Finally, this Court is convinced that to construe section 5-109 as the Government suggests would lead to an absurd result.  *See Blandon v. Maryland*, 498 A.2d 1195, 1196 (Md. 1985) ("[R]ules of statutory construction require us to avoid construing a statute in a way which would lead to absurd results.").   In establishing a mandatory arbitration requirement for medical malpractice claims, Maryland's General Assembly included section 5-109(d), which works to avoid the potential outcome that the arbitration process prevents a plaintiff from filing within the limitations period otherwise governing his claim.  Pursuant to section 5-109(d), the date of filing with the Health Care Alternative Dispute Resolution Office is deemed the date that the action was filed for limitations purposes.  Md. Code Ann., Cts. & Jud. Proc. § 5-109(d).  Like any other medical malpractice claim, a medical negligence action

that includes a wrongful death claim is filed with the Health Care Alternative Dispute Resolution Office. *See, e.g.*, *Kearney v. Berger*, 7 A.3d 593 (Md. 2010). There is no sensible reason for finding that the General Assembly meant to relieve a plaintiff of the general malpractice statute of limitations when he filed with the Health Care Alternative Dispute Resolution Office, yet intended that section 3-904(g)'s limitations period would remain in effect.

To illustrate this point, consider a plaintiff who intends to file a medical malpractice action, including both negligence and wrongful death claims, against his health care provider. Under Maryland law, this plaintiff must first submit his claims to the Health Care Alternative Dispute Resolution Office. Because he ultimately wishes to file suit in federal court, he must abide by the time limitation for waiving Maryland's arbitration process. Md. Code Ann., Cts. & Jud. Proc. § 3-2A-06B (permitting a claimant to "waive arbitration at any time after filing the certificate of qualified expert . . . by filing with the Director a written election to waive arbitration"). Assuming that section 5-109(d)'s filing rule did not apply to the statute of repose in section 3-904(g), then this plaintiff, awaiting the appropriate time to waive the arbitration remedy, might be forced to preemptively file suit under the wrongful death statute to ensure that those claims are timely filed. Because his malpractice action would still be subject to arbitration, it would be improper to file suit in federal court—his state arbitration remedy would not yet be exhausted. Yet section 3-904(g)'s statute of repose would compel the plaintiff to file a complaint alleging at least the wrongful death claims.

This hypothetical plaintiff is stuck between a rock and a hard place. If he chooses to

abide by Maryland's Health Care Malpractice Claims Act, he risks surrendering his wrongful death claims if a delay in the arbitration process prevents timely filing. If he decides to file suit to preserve his wrongful death claims, then he risks dismissal for failure to exhaust Maryland's arbitration remedy. This Court is hard-pressed to comprehend the rationale of such a statutory scheme. Moreover, the scheme would encourage some plaintiffs to file suit prematurely, undercutting the principal purpose of Maryland's Health Care Malpractice Claims Act, which is "to dispose of a majority of medical malpractice cases in the arbitration system and minimize the number of cases brought to trial in the traditional tort system." *Carrion v. Linzey*, 675 A.2d 527, 535 (Md. 1996); *see also Salvagno v. Frew*, 857 A.2d 506, 517 (Md. Ct. Spec. App. 2004), *vacated on other grounds*, 881 A.2d 660 (Md. 2005) ("The arbitration process was designed to screen medical malpractice claims before they reach the courts."). For these reasons, this Court rejects the Government's argument that the Plaintiffs' wrongful death claims are time-barred. Accordingly, the Motion for Summary Judgment is denied on this ground.

<u>CONCLUSION</u>

For the reasons stated above, the Government's Motion for Summary Judgment (ECF No. 17) is GRANTED IN PART and DENIED IN PART. The Government's Motion is GRANTED as to that portion of Count I (the Plaintiffs' negligence claim) that relates to Dr. Onyiah's treatment of Mr. Johnson on October 5, 2007. The Government's Motion for Summary Judgment is DENIED as to that portion of Count I relating to Dr. Weld's treatment of Mr. Johnson on October 9, 2007, as well as to the Plaintiffs' four

wrongful death claims, contained in Counts II through V of the Plaintiffs' Complaint.

Accordingly, JUDGMENT SHALL BE ENTERED in favor of the United States as to the

Plaintiffs' negligence claim only as it relates to Dr. Onyiah's treatment of Mr. Johnson on

October 5, 2007.

A separate Order follows.

Dated:        March 12, 2013                    ____/s/_____
                                                Richard D. Bennett
                                                United States District Judge

40