IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

FAYE M. GOODIE, individually and as     *
Personal Representative of the estate of
MAURICE L. JOHNSON; MAURICE     *
SCOTT; TIFFANY JOHNSON; and
SHELLY JOHNSON     *

        Plaintiffs,     *         Civil Action No.: RDB-10-3478

           v.     *

UNITED STATES OF AMERICA     *

        Defendant.     *

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

## MEMORANDUM OPINION

The Plaintiffs, Faye M. Goodie, individually and as Personal Representative of the estate of Maurice L. Johnson; Maurice Scott; Tiffany Johnson; and Shelly Johnson ("Plaintiffs"), filed this action against the United States of America ("United States" or "Defendant"), alleging claims of medical malpractice and wrongful death related to the medical treatment that the decedent Maurice L. Johnson ("Mr. Johnson" or "Decedent") received at the Veterans Administration Medical Center ("VA Medical Center") in October 2007. As these tort claims are brought against the United States pursuant to the Federal Tort Claims Act, 28 U.S.C. §§ 2671 *et seq.* ("FTCA"), federal jurisdiction is proper under 28 U.S.C. § 1402(b).

Prior to conducting a five-day bench trial from August 12 through August 16, 2013, the procedural posture in this case is as follows. The Plaintiffs filed a Complaint against the

United States on December 13, 2010. *See* Compl., ECF No. 1. The United States filed an Answer on March 2, 2011. *See* Answer, ECF No. 4. Briefly, the Complaint alleged that Mr. Johnson, a veteran with a history of vascular bypass surgery and an aortic graft,[1] presented to the VA Medical Center on October 5, 2007, and October 9, 2007. On the first visit, he was treated by Comfort Onyiah, M.D. ("Dr. Onyiah"), a medical resident. Compl. ¶ 7. On the second visit, he was seen by another medical resident, Ethel Weld, M.D. ("Dr. Weld"), who was working with John Flanigan, M.D. ("Dr. Flanigan"), an attending physician from the University of Maryland Medical Center ("UMMC"). *Id.* ¶ 8. The Plaintiffs further initially alleged that on both occasions the doctors who saw him failed to properly diagnose his condition, perform the appropriate diagnostic tests, and recognize the seriousness of his condition. *See id.* ¶ 15. About twenty-two hours after being discharged from the hospital on his second visit, Mr. Johnson began to suffer hematemesis, which is the vomiting of blood. He died at 1:35 a.m. on the morning of October 11, 2007. *Id.* ¶ 13.

On June 8, 2010, the United States filed a Motion for Summary Judgment (ECF No. 17), asserting six separate arguments. First, the United States argued that partial summary judgment should be entered in its favor for any claims of negligence relating to the medical treatment provided by Dr. Onyiah on October 5, 2007. Second, the United States argued that it was not liable for the alleged negligence of Dr. Weld on October 9, 2007, because she was acting as the "borrowed servant" of Dr. Flanigan. Third, the United States maintained that the Plaintiffs and their experts had admitted that Dr. Flanigan was not negligent, and

---

[1] In this case, Mr. Johnson underwent surgery for a blockage in his aorta, in which a surgeon implanted a Y-shaped structure, the graft, which replaced the blocked artery and bypassed the blockage.

therefore Dr. Weld, privy to the same information as Dr. Flanigan, could not be negligent under Maryland law. Fourth, the United States asserted that summary judgment should be entered because Dr. Weld did not breach any standard of care. Fifth, the United States claimed that the Plaintiffs could not demonstrate that any alleged breach by Dr. Weld was the proximate cause of Mr. Johnson's injuries, alleging that Dr. Flanigan made the ultimate decision to discharge Mr. Johnson. Finally, the United States sought partial summary judgment as to the Plaintiffs' four wrongful death claims, because Maryland law requires that wrongful death claims be filed within three years of the decedent's death. *See* Md. Code Ann., Cts. & Jud. Proc. § 3-904(g).

On March 12, 2013, this Court granted in part and denied in part the Defendant's Motion for Summary Judgment. *See* Summ. J. Op. & Order, ECF Nos. 24 & 25. Specifically, this Court granted partial summary judgment as to the Plaintiffs' negligence claim relating to Dr. Onyiah's treatment of Mr. Johnson on October 5, 2007. Based on admissions by the Plaintiffs' experts, it was undisputed that Dr. Onyiah met the standard of care in her treatment of Mr. Johnson.

However, this Court rejected all other arguments for summary judgment. Most importantly, this Court ruled that the borrowed servant doctrine did not apply in this case. The United States had argued that Dr. Weld, a resident from the University of Maryland Medical Center ("UMMC"), was at all relevant times acting as the "borrowed servant" of the attending physician Dr. Flanigan. Dr. Flanigan is an attending physician from UMMC, which had contracted to furnish emergency room physician services to the VA Medical Center. Because Dr. Weld was working under the direction of Dr. Flanigan, and because the

3

"controlling policy documents" indicated that Dr. Flanigan was generally responsible for the care of emergency room patients, the United States asserted that it was not liable for the alleged negligence committed by Dr. Weld, and any cause of action lay with UMMC.

Instead, this Court held that the Resident Agreement controlled. The Resident agreement, which was entered into by the VA Medical Center, UMMC, and University of Maryland School of Medicine, enabled residents in UMMC's Department of Internal Medicine to gain clinical experience by rotating through the VA Medical Center. *See* Pls.' Ex. 28. Crucial to this issue, the Resident Agreement provided that residents would be "Hospital employees" and specifically provided that "their activities within the scope of their Hospital duties [would] be covered by the Federal Tort Claims Act." *Id.* ¶ III.F. Under Maryland law, "whatever the status of an employee under the 'borrowed servant' doctrine, the parties may allocate between themselves the risk of any loss resulting from the employee's negligent acts." *Krzywicki v. Tidewater Equip. Co., Inc.*, 600 F. Supp. 629, 639 (D. Md. 1985), *aff'd*, 785 F.2d 305 (4th Cir. 1986); *see also NVR v. Just Temps, N.C.*, 31 F. App'x 805, 807 (4th Cir. 2002) ("[I]f the parties contractually agreed that one or the other of them should bear the risk of a particular employee's negligent acts, that employee's status under the borrowed servant doctrine is immaterial."). Because the Resident Agreement clearly allocated the risk of any such negligence by residents like Dr. Weld to the United States, the borrowed servant doctrine has no application to this case. *See* Summ. J. Op. 25-26.

Further, this Court identified genuine issues of material fact with respect to whether Dr. Weld breached the standard of care in her treatment of Mr. Johnson and whether that breach was the proximate cause of Mr. Johnson's injuries. Finally, the Plaintiffs' wrongful

death claims were not time-barred, because they first filed their claims with the Maryland Health Care Alternative Dispute Resolution Office, as Maryland law requires, on September 29, 2010. *See* Md. Code Ann., Cts. & Jud. Proc. § 3-2A-04. That date was within the three-year limitations period for wrongful death claims, as Mr. Johnson passed away on October 11, 2007.

Accordingly, the claims of negligence and wrongful death against the United States, arising out of the alleged actions of its employee Dr. Weld, proceeded to a five-day bench trial, from August 12 through August 16, 2013. At trial, the United States was not permitted to rely on the defense of the borrowed servant doctrine, as this Court found that defense wholly inapplicable under Maryland law. *See* Summ. J. Op. 25-26.

The Plaintiffs called six fact witnesses, including Faye M. Goodie, Maurice Scott, Tiffany Johnson, and Shelly Johnson, Mr. Johnson's four adult children. They also called Michael Whitehead, an employee of Maryland Management Company, where Mr. Johnson previously worked in maintenance, and Elouise Scott, the mother of Faye Goodie and Maurice Scott. In addition, four experts testified for the Plaintiffs: Paul A. Skudder, M.D. ("Dr. Skudder"), who is board certified in general surgery and vascular surgery;[2] Lawrence E. Holder, M.D. ("Dr. Holder"), who is board certified in radiology;[3] Kenneth Larsen, Jr., M.D.

---

[2] Dr. Skudder graduated with honors from Williams College and was a member of Phi Beta Kappa. He attended Cornell University Medical College, and was a resident and later chief resident in surgery at the University of Rochester in New York. He later completed a vascular fellowship at the Lahey Clinic in Burlington, Massachusetts.

[3] Dr. Holder received his bachelor of arts degree from Vanderbilt College, graduating with honors, and attending Washington University School of Medicine. He completed his residency in radiology at the University of Cincinnati, where he also served as the chief resident in radiology. He completed a fellowship in nuclear medicine at the University of Cincinnati.

("Dr. Larsen"), who is board certified in emergency medicine;[4] and Gary Witman, M.D. ("Dr. Witman"), who is board certified in internal medicine and practiced in emergency medicine.[5]

The United States called five fact witnesses: Dr. Ethel Weld;[6] Dr. John Flanigan;[7] Audrey M. Pinnock, RN, and Karen Hall, RN, the VA Medical Center nurses who treated Mr. Johnson on October 9, 2007; and Dr. Sandra Marshall.[8]  One expert, Dr. Shan Haider ("Dr. Haider"), testified for the defense.  Dr. Haider is board certified in general surgery and vascular surgery.[9]

---

[4] Dr. Larsen graduated from Rutgers University with honors and attended medical school at Georgetown University.  He served in the United States Army Medical Corps for two years.  He has been recertified as a physician in emergency medicine in 1990 and 2000.  He has forty years of experience as an emergency room physician.

[5] Dr. Witman graduated with honors from Rutgers University and attended medical school at the State University of New York: Downstate Medical Center.  He was a resident in internal medicine at Brown University and completed fellowship training at Yale University in the department of internal medicine.  He also completed training in pharmacology and medical oncology at Yale.  He has served as an attending physician in emergency medicine departments throughout his career.  Due to a serious health condition, Dr. Witman's testimony came in the form of a de bene esse deposition, which was taken on August 6, 2013.

[6] Dr. Weld attended college at New York University and medical school at the University of Chicago.  She completed a fellowship at the Albert Schweitzer Hospital in Gabon, focusing on maternal and infant health, and serving as a fellow in pediatric services.  She completed her residency in internal medicine and pediatrics at the University of Maryland, with shifts at the VA Medical Center and Mercy Hospital.

[7] Dr. Flanigan attended college and medical school at the University of Maryland.  He has been board certified in internal medicine since 1984, but has never had to renew that certification.  From 1996 to 1999, he took a three-year sabbatical and during that time he did not practice medicine.  He is currently an attending physician at the University of Maryland Medical Center ("UMMC").

[8] Dr. Marshall gave brief testimony on the contractual agreement by which UMMC agreed to furnish emergency room attending physicians to the VA Medical Center.

[9] Dr. Haider attended college at the University of Rochester, where he graduated with honors and was a member of Phi Beta Kappa.  He attended medical school at the State University of New York at Stony Brook.  He served as a resident in general surgery at the University of Rochester Medical Center and a fellow in vascular and endovascular surgery at the University of Pittsburgh Medical Center. His current practice is in vascular surgery.

Based on the exhibits introduced into evidence, the testimony of the fact and expert witnesses, the written submissions of the parties, and the oral arguments of counsel, the following constitutes this Court's findings of fact and conclusions of law pursuant to Rule 52(a) of the Federal Rules of Civil Procedure. The accompanying Order enters Judgment in favor of the Plaintiff, Faye M. Goodie, as Personal Representative of the Estate of Maurice L. Johnson, and against the Defendant the United States of America, on Count I of the Plaintiffs' Complaint, for Mr. Johnson's personal injuries. The Order also enters Judgment in favor of the Plaintiffs, Faye M. Goodie, Maurice Scott, Tiffany Johnson, and Shelly Johnson, and against the Defendant the United States of America, on Counts II, III, IV, and V, for the wrongful death of Mr. Johnson.

## I. FINDINGS OF FACT

### A. Background Information

Maurice L. Johnson ("Mr. Johnson"), the Decedent, was born on May 17, 1948. He served in the United States military from 1968 through 1970 and from 1974 through 1984. He died on October 11, 2007. At the time of his death, he had been living at the Maryland Center for Veteran Education and Training ("Mcvets"), at 301 N. High Street, Baltimore, Maryland 21202 since September 11, 2007. *See* Pls.' Ex. 1, at 69; Pls.' Ex. 7; Testimony of Faye Goodie.

Mr. Johnson had four adult children who are the Plaintiffs in this case. His eldest child is Faye M. Goodie. Faye M. Goodie was born on December 26, 1965. She is the Personal Representative of Mr. Johnson's estate. *See* Pls.' Ex. 8. Mr. Johnson had one son, Maurice Scott, born January 30, 1967. Mr. Johnson had two other daughters, Tiffany

Johnson, born November 12, 1970, and Shelly Johnson, born March 24, 1974. *See* Testimony of Faye M. Goodie, Maurice Scott, Tiffany Johnson & Shelly Johnson.

The Veterans Administration Medical Center ("VA Medical Center") is a United States military hospital in Baltimore, Maryland. In October 2007, Ethel Weld, M.D. ("Dr. Weld") was an employee of the VA Medical Center and as such, received the protection of the Federal Tort Claims Act ("FTCA"). *See* Pls.' Ex. 28, Resident Agreement ¶ III.F. Under the FTCA, the United States assumes liability for the wrongful acts or omissions of an "employee" of the United States "while acting within the scope of his office or employment." 28 U.S.C. § 1346(b)(1). Pursuant to the Resident Agreement between the University of Maryland Medical Center, the University of Maryland School of Medicine, and the VA Medical Center, Dr. Weld was responsible for the evaluation, treatment, and disposition of patients whom she saw in the emergency room. *See* Pls. Ex. 28, Resident Agreement at 13.

B. <u>Mr. Johnson's Aorta-Bifemoral Bypass Procedure and Graft in July 2002</u>

In July 2002, Mr. Johnson went to the Veterans Administration Medical Center ("VA Medical Center"), where he was diagnosed with an acute aortic occlusion[10] and left lower extremity ischemia.[11] *See* Pls.' Ex. 1, at 202-06. He underwent an aorta-bifemoral bypass procedure in which the surgeon used a graft, running from the aorta to the femoral arteries in each leg, as a replacement arterial structure to bypass the occlusion and restore normal

---

[10] An aortic occlusion is a blockage of an aorta.
[11] Ischemia is a condition marked by an insufficient supply of blood to an area or body part, usually due to a blocked artery.

blood flow to Mr. Johnson's lower body. *Id.* The surgery was completed without any problem. *Id.*

    C. <u>Secondary Aortoenteric Fistula: A Known Complication of Aortic Graft Surgery</u>

A known complication of an aortic graft surgery is a secondary aortoenteric fistula ("AEF"). *See, e.g.*, Pls.' Ex. 25, Vikram S. Kashyap, MD & Patrick J. O'Hara, MD, *Aortoenteric Fistulae*, *in* Rutherford's Vascular Surgery (6th ed. 2005) [hereinafter "Rutherford"]; Pls.' Ex. 24, G. Patrick Clagett, *Aortic Graft Infections*, *in* Complications in Vascular Surgery (Jonathan B. Towne & Larry H. Hollier, eds., 2d ed. 2004) [hereinafter Towne & Hollier]; Testimony of Drs. Skudder & Larsen. In general, there are two types of AEF: primary AEF, which occurs spontaneously with aortic or gastrointestinal disease, and secondary AEF, which occurs after prior aortic graft surgery. Rutherford 902-05. The prevalence of primary AEF is somewhere between 0.04 to 0.07 percent; secondary AEF is more common than primary, though still quite rare, occurring in approximately 0.4 to 1 percent of patients with a history of aortic graft. *Id.*

AEF is called "secondary AEF" when it is caused by an infection around or in the graft or by mechanical erosion of the graft. *See id.* at 903-04; Towne & Hollier 318, 320. A secondary AEF occurs, on average, two to six years after aortic graft surgery and is a life-threatening complication. Rutherford 905. The main clinical manifestation of an AEF is gastrointestinal bleeding. *Id.* An AEF requires early surgical intervention; the risk of mortality is high if surgery is not performed promptly. *Id.* at 908; Towne & Hollier 317. Early diagnosis of an AEF is, therefore, crucial. Towne & Hollier 321; Testimony of Drs. Skudder, Larsen & Witman.

Clinical signs of an AEF are variable and can be subtle.  Rutherford 905; Towne & Hollier 321.  For this reason, the diagnosis requires a high degree of suspicion on the part of the doctor.  Rutherford 902.  Any patient who has a history of an aortic graft surgery and presents with evidence of gastrointestinal bleeding should be assumed to have an AEF.  Towne & Hollier 320.  Although endoscopy is the most commonly performed preoperative test for evaluating whether an AEF is occurring, Rutherford explains that a CT scan with contrast has emerged as a good study to complement endoscopy, is likely the most reliable test, and has grown to be used in widespread fashion to diagnose an AEF prior to surgery.  Rutherford 906.  Towne & Hollier considers CT scanning "the mainstay of diagnostic imaging for a suspected graft infection."  Towne & Hollier 321.  Likewise, Dr. Skudder, Dr. Larsen, and Dr. Witman all testified that the standard of care for an emergency room doctor suspicious of an AEF is ordering a CT scan with contrast to evaluate the graft's integrity.  Testimony of Drs. Skudder, Larsen & Witman.  Dr. Skudder, in particular, testified that a CT scan with contrast had become "universally employed" since 2000.  Testimony of Dr. Skudder.

A secondary AEF can be preceded by a limited bleeding episode, called a sentinel or herald bleed.  Rutherford 905-06.  If a patient presents with a herald bleed but is hemodynamically stable,[12] there is likely time to complete a work-up and obtain surgical treatment before the onset of massive bleeding.  *See id.*; Testimony of Drs. Skudder & Haider.

---

[12] Hemodynamic stability indicates adequate blood circulation.

D. Mr. Johnson's Treatment at the VA Medical Center in January 2006

On January 31, 2006, Mr. Johnson returned to the VA Medical Center. *See id.* at 82-84. He presented to the emergency room with complaints of worsening left pectoral chest wall pain. *Id.* Mr. Johnson was evaluated by a medical resident, Douglas Sward, M.D., who ordered a computerized tomography, otherwise known as a CT scan. *Id.* Importantly Dr. Sward ordered that the CT scan be with intravenous contrast[13] of the chest, abdomen, and pelvis, in order to evaluate the graft and check for possible aortic dissection or aneurysm. *Id.* The CT scan with contrast, as documented in the radiology report, showed no evidence of aortic dissection or aneurysm, and the graft was found to be without any problem. *See id.* at 2A-2D.

Hematologic lab studies were also performed, and they came back negative for blood loss. Mr. Johnson's hemoglobin and hematocrit[14] were within normal levels. *See id.* at 3. Specifically, his hemoglobin level was at 14.6, and his hematocrit level was 43.9. *Id.* For a male, the normal hemoglobin levels fall within a range of 14 to 18, and hematocrit levels should be between 40 and 54 percent.

During Mr. Johnson's January 2006 visit to the emergency room at the VA Medical Center, Mr. Johnson was seen and evaluated not only by the resident Dr. Sward, but also by Dr. Donald Alves ("Dr. Alves"), the attending physician. *See id.* at 82-84. In the progress

---

[13] A CT scan can be with or without intravenous contrast. As will be explained in greater depth in Section I.F.2, the protocol that a doctor follows when he suspects aortic dissection or aneurysm is to order a CT scan with contrast, as the contrast will show the integrity of an aortic graft. Conversely, a doctor suspecting kidney stones should order a CT scan without contrast. *See* Testimony of Dr. Holder.

[14] Hemoglobin is the oxygen-carrying protein in red blood cells. Hematocrit is the proportion of blood that is composed of red blood cells.

notes recording the visit, Dr. Sward documented the care given to Mr. Johnson. *Id.* Dr. Alves added a separate addendum to the progress notes, explaining that he had evaluated Mr. Johnson with Dr. Sward and agreed with Dr. Sward's work-up, plan, and findings. *See id.* at 84. As this Court finds in its conclusions of law, the treatment given to Mr. Johnson on January 31, 2006, by Dr. Sward and Dr. Alves defined the standard of care for an emergency room physician in such circumstances.

E. <u>Mr. Johnson's Treatment at the VA Medical Center on October 5, 2007</u>

On October 5, 2007, Mr. Johnson went back to the VA Medical Center, complaining of bilateral knee pain and numbness below the knees. *See* Pls.' Ex. 1, at 33-34. At that time, he was living at Mcvets, the Maryland Center for Veteran Education and Training. Mr. Johnson was seen by a medical intern named Dr. Comfort Onyiah ("Dr. Onyiah"), who was working in the outpatient clinic. She ordered lab work and scheduled a vascular clinic appointment for November 1, 2007. *See id.* at 33-34, 57-59. Dr. Onyiah then discharged Mr. Johnson. *Id.* The lab studies, which were reported after Mr. Johnson's discharge, showed that his blood levels had fallen. *See id.* at 3. In particular, Mr. Johnson's hemoglobin level fell from 14.6 in January 2006 to 10.8 on October 5, 2007. *Id.* Likewise, Mr. Johnson's hematocrit level, which had been 43.9 in January 2006, was reported as 32.0 on October 5, 2007. *Id.* These reductions in blood levels—over 25 percent—indicated blood loss. *See* Testimony of Dr. Larsen.

F. <u>Mr. Johnson's Treatment at the VA Medical Center on October 9, 2007</u>

Mr. Johnson returned to the emergency room at the VA Medical Center four days later, on October 9, 2007, arriving around 3:33 p.m. *See* Pls. Ex. 1, at 53-55. He was seen in

triage by Karen Hall, R.N., who took his chief complaint—pain in the lower back, nausea and vomiting after eating, and mid-epigastric chest pain when vomiting—and then sent him to the non-acute area of the emergency room around 3:53 p.m.  *See id.* at 55-57; Testimony of Nurse Hall.  At that time, all four of the Plaintiffs' experts—Dr. Skudder, Dr. Holder, Dr. Larsen, and Dr. Witman—as well as the Defendant's expert Dr. Haider agree that Mr. Johnson was suffering from an AEF.  *See* Testimony of Drs. Skudder, Holder, Larsen, Witman & Haider.  Three hours passed before Mr. Johnson was seen by a doctor.

1. *Treatment by Dr. Weld; Lack of Involvement by Any Attending Physician*

At 7:10 p.m., Mr. Johnson was seen by Dr. Weld, a second-year medical resident doing rotations at the VA Medical Center.[15]  Pls.' Ex. 1, at 53-54.  Before discussing the care Dr. Weld provided, it is important to note that Dr. Weld made the ultimate decisions in this case, with no evidence of any assistance by any attending physician.  On October 9, 2007, Dr. Weld was working with the attending physician assigned to the non-acute area, Dr. Flanigan.  *See id.* at 53-55.  Dr. Flanigan's shift began at noon and ended at 8:00 p.m. that evening.  *See* Testimony of Dr. Flanigan.  Dr. Flanigan testified, however, that he made some electronic signatures after 8:00 p.m., indicating that he probably left the hospital around 9:00 p.m., before Mr. Johnson was discharged at 11:50 p.m.  *Id.*  He immediately went on a vacation, but could not recall where he went.  *Id.*

Neither Dr. Weld nor Dr. Flanigan has any memory of the care given to Mr. Johnson on October 9, 2007.  Testimony of Drs. Weld & Flanigan.  Both were only able to testify that the usual practice was for the attending physician to conduct his own physical exams,

---

[15] As set forth in Section I.A *supra*, Dr. Weld was an employee of the United States for purposes of the Federal Tort Claims Act in October 2007.  *See* Pls.' Ex. 28, Resident Agreement ¶ III.F.

decide which diagnostic tests to perform, and make ultimate patient care decisions. *Id.* Indeed, Dr. Flanigan noted that he only co-signed the progress notes of a resident if he had seen the patient. Testimony of Dr. Flanigan. Moreover, the contract by which UMMC agreed to furnish emergency room attending physicians to the VA Medical Center specifically required that attending physicians complete and sign written documentation related to patient care—either as an addendum to a resident's note or as a "separate Attending note"—at the time a patient was seen. *See* Pls.' Ex. 33, Emergency Room Contract ¶¶ SCR-2.l., 9.a. & 13.c.

Having observed Dr. Flanigan's testimony at trial, this Court makes a factual finding that it lacks credibility. Specifically, this Court finds that Dr. Flanigan did not comply with usual hospital practices and the Emergency Room Contract on October 9, 2007. He did not ever examine or diagnose Mr. Johnson, did not order any tests or studies, and did not make the ultimate patient care decisions for the treatment and discharge of Mr. Johnson. This finding is supported both by the testimony of Dr. Flanigan and Dr. Weld, as well as by the utter lack of evidence indicating any involvement by Dr. Flanigan in the care provided to Mr. Johnson. The only evidence on which the United States relies, other than the usual hospital practices and policies, is Dr. Flanigan's co-signature of Dr. Weld's progress notes. Yet Dr. Flanigan co-signed Dr. Weld's progress notes on October 18, 2007, nine days after Mr. Johnson's final visit to the VA Medical Center on October 9, and seven days after Mr.

Johnson's death. *See* Pls. Ex. 1, at 55; Testimony of Dr. Flanigan. He made this co-signature after he returned from his vacation. Testimony of Dr. Flanigan.[16]

Moreover, Barry Gold, M.D. ("Dr. Gold") became the attending physician assigned to the non-acute area at 8:00 p.m., when Dr. Flanigan's shift ended. Testimony of Dr. Flanigan. Based on the evidence in the record, it is clear that Dr. Gold was not involved in the care of Mr. Johnson—he did not see Mr. Johnson or discuss the treatment of Mr. Johnson with Dr. Weld. In sum, this Court finds that no attending physician ever examined Mr. Johnson. Rather, Dr. Weld was in charge of the evaluation, diagnosis, plan of treatment, and discharge of Mr. Johnson.

At the time Dr. Weld saw and evaluated Mr. Johnson, she was aware of the signs and symptoms that an emergency room physician would look for when considering complications of an aortic bypass surgery. *See* Pls.' Ex. 30, Weld Dep. 31:11-32:11. She also knew what tests and studies were available to her as an emergency room physician. *Id.* She particularly knew that an AEF was a complication of a graft and that the development of a secondary AEF would be catastrophic. *Id.*

### 2. *Dr. Weld's Differential Diagnosis and Treatment Plan*

When Dr. Weld saw Mr. Johnson at 7:10 p.m. on October 9, 2007, she took a detailed history, performed a physical exam, and reviewed some lab results. She learned that Mr. Johnson had undergone an aortobifemoral bypass. *See* Pl. Ex. 1, at 53-55. She also

---

[16] The evidence relied on by the United States—Dr. Flanigan's co-signature nine days after the fact—stands in stark contrast to the practice employed by the physicians that cared for Mr. Johnson on his visit to the VA Medical Center on January 31, 2006. As described in greater detail in Section I.D *supra*, Dr. Alves, the attending physician on duty that day, added a separate addendum to the progress notes explaining that he had evaluated Mr. Johnson with the resident Dr. Sward and agreed with Dr. Sward's work-up, plan, and findings. *See* Pls.' Ex. 1, at 84.

learned that he had a four-day history of left back pain ("flank pain") acute in onset and 10 out of 10 in intensity. *Id.* She discovered that Mr. Johnson had nausea, had vomited five times prior to his arrival at the VA Medical Center, and that each time he vomited he suffered dull mid-epigastric chest pain and lower abdominal pain. *Id.* She further noted that Mr. Johnson had had one episode of melena, which is blood in the stool. *Id.*

Upon performing a physical exam, Dr. Weld observed that Mr. Johnson was in mild distress. *Id.* She found his abdomen to be soft with diffuse tenderness. *Id.* She noted that he had a "heme positive" rectal exam, meaning there was blood in the stool. *Id.* Mr. Johnson's lab results showed continuing blood loss, with his hemoglobin level falling to 10.2 and hematocrit level falling to 30.4. *Id.* at 3. The reduction in Mr. Johnson's hemoglobin and hematocrit levels from January 31, 2006, to October 9, 2007, exceeded 30 percent. *Id.*

Though Mr. Johnson's presentation evidenced gastrointestinal bleeding—he had a history of melena, his rectal exam was heme positive, his hematocrit and hemoglobin levels had fallen over 30 percent since January 31, 2006, and he had left flank pain—Dr. Weld did not attempt to rule out AEF in her differential diagnosis.[17] Instead, Dr. Weld first suspected that Mr. Johnson was suffering from renal stones. *Id.* at 1. Around 8:00 p.m., she ordered a stone survey protocol, which calls for a CT scan of the abdomen and pelvis, *without contrast*.[18] *Id.* The CT scan was negative for renal stones. *See* Pls.' Ex. 1, at 1.

---

[17] A differential diagnosis is a method by which a doctor diagnoses a disorder. When performing a differential diagnosis, Dr. Witman testified that a doctor should first attempt to rule out the most life-threatening potential condition. *See* Testimony of Dr. Witman. Dr. Weld did not recall whether a secondary AEF was in her differential diagnosis of Mr. Johnson, Def.'s Ex. 34, Weld Dep. 68:3-6, but it is clear from her treatment plan that she did not include the condition.
[18] Contrast is not used when evaluating for renal stones, because the whiteness of the contrast obscures the whiteness of the stones on the images. Testimony of Dr. Holder.

However, it is very significant that in the radiology report for this CT scan, the radiologist noted that he saw Mr. Johnson's "aortobifemoral bypass graft," but that the "[e]valuation of this graft is somewhat limited secondary to the lack of intravenous contrast." *Id.* After learning the results of the CT scan, Dr. Weld did not order a CT scan with contrast. *See id.* at 53-55. However, Dr. Weld admitted that she reviewed the radiologist's report before making the decision to discharge Mr. Johnson. Weld Dep. 63:12-15.

Instead, Audrey Pinnock, RN ("Nurse Pinnock"), who was caring for Mr. Johnson, reported shortly after the CT scan that Mr. Johnson had said he was experiencing pain, at a level 9 on a scale of 1 to 10. *See* Pl.'s Ex. 1, at 51. As ordered by Dr. Weld, Nurse Pinnock administered thirty milligrams of Toradol, a pain reliever, by IV, beginning around 8:15 p.m. *Id.* At 9:00 p.m., Nurse Pinnock noted that Mr. Johnson was feeling relief from the pain due to Toradol, and his pain level was now 1 out of 10. *Id.* at 53.

Upon finding no indication of renal stones, Dr. Weld changed her diagnosis to "likely gastritis." *Id.* at 32. She placed an order for a routine gastrointestinal outpatient consult. *Id.* The reason for referral was described as "epigastric abdominal pain, vomiting, heme-occult positive stool, melena x 1." *Id.* At about 11:50 p.m., Dr. Weld discharged Mr. Johnson.[19] *Id.* at 53-55. Dr. Weld gave Mr. Johnson two pain medications and told him to follow up at the "GI outpatient" clinic in one week. *Id.* at 54. She also instructed him to return to the

---

[19] Dr. Flanigan testified at trial that he left the hospital before Mr. Johnson was discharged. There is no evidence suggesting that Dr. Flanigan was at all involved in the decision to discharge Mr. Johnson. Nor is there any evidence in the record indicating that Dr. Gold took part in the ultimate decision to discharge. Instead, the record reflects that Dr. Weld made this decision independently and with no assistance from an attending physician.

hospital if he suffered any further melena or hematemesis (vomiting of blood), or if "other worrisome symptom recurs." *Id.* at 55.

Dr. Weld noted that at the time of discharge, Mr. Johnson was "completely hemodynamically stable." *Id.* At trial, Dr. Weld testified that in general, she recognized that there was a window of opportunity to treat a patient suffering from an AEF if he was hemodynamically stable at the time of evaluation. *See* Testimony of Dr. Weld. All of the experts in this case agreed that even after Mr. Johnson was discharged, and while he remained hemodynamically stable, there was time to perform the necessary surgery to correct the secondary AEF. *See infra* Section I.H.

G. Mr. Johnson's Treatment at Johns Hopkins Hospital on October 10 and 11, 2007

After being discharged by Dr. Weld, Mr. Johnson returned home to Mcvets, still suffering from the undiagnosed secondary AEF. *See* Testimony of Drs. Skudder, Holder, Larsen, Witman & Haider. At around 10:00 p.m. on the next day, October 10, 2007, Mr. Johnson was playing pool or chess with friends at Mcvets, became lightheaded, and lost consciousness. Pls.' Ex. 4, at 2. He regained consciousness to find emergency medical services by his side and subsequently began to vomit blood. *Id.* He was taken by ambulance to Johns Hopkins Hospital ("Johns Hopkins") and arrived at 10:23 p.m. *Id.* at 2, 4.

The records from Johns Hopkins indicated that Mr. Johnson was conscious on arrival and was able to answer questions and provide a detailed history of his history and prior treatment. *See id.* at 2, 10, 12. He continued to vomit blood. *Id.* A CT scan performed at Hopkins around 11:53 p.m. on October 10, 2007, showed "focal

extravasation"[20] at the juncture of the superior aspect of the graft in the native aorta and a high density of soft tissue surrounding the graft in that region. *Id.* at 47-48. These findings were "compatible with hematoma and active extravasation." *Id.* at 47. Image 83 of 133 of the CT scan showed "high density material," compatible with blood, in the duodenum,[21] which was "highly suspicious for an aorto-enteric fistula." *Id.*

Upon arrival at the emergency room at Johns Hopkins, Mr. Johnson's blood pressure was 95/60. *Id.* at 2. His blood pressure rose to 115/92 after he received two liters of normal saline. *Id.* However, his blood pressure could not be maintained because he continued to vomit blood. *Id.* He was transferred to the medical intensive care unit, where his condition declined. *Id.* He died at 1:35 a.m. on October 11, 2007. *Id.*

After Mr. Johnson's death, an autopsy was performed at Hopkins on October 12, 2007. *See* Pls. Ex. 6. The autopsy report showed that Mr. Johnson had vomited approximately two liters of blood while he was being treated at Johns Hopkins. *Id.* at 1. The autopsy also revealed a small dehiscence[22] at the superior portion of the aortic graft; the suture was intact but loose, allowing extravasation of blood. *Id.* at 1-2. Approximately 800 cubic centimeters of blood were found in the stomach, and multiple large clots were identified in the small and large intestines. *Id.* at 2. The cause of death was determined to be "hematemesis due to aorto-enteric fistula, status post aortic aneurysm repair." *Id.* at 3.

---

[20] Extravasation is the leakage of a fluid, as of blood, out of a vessel and into the surrounding tissue.
[21] The duodenum is the first part of the small intestine.
[22] A dehiscence is a bursting open or splitting along natural or sutured lines.

H. Expert Testimony

As stated above, when Mr. Johnson arrived at the emergency room of the VA Medical Center on October 9, 2007, he was suffering from a secondary AEF. Every expert who testified in this case agrees on that point. *See* Testimony of Drs. Skudder, Holder, Larsen, Witman & Haider. Because Mr. Johnson had a history of aortic graft surgery and presented with evidence of gastrointestinal bleeding, he should have been worked up expeditiously for the appropriate study to rule out AEF. Testimony of Drs. Skudder, Larsen & Witman; Rutherford 908; Towne & Hollier 317, 320. Indeed, when performing a differential diagnosis, a doctor should attempt to rule out the most life-threatening conditions first. Testimony of Dr. Witman.

The appropriate study for Mr. Johnson was a CT scan with contrast. Rutherford 906; Towne & Hollier 321; Testimony of Drs. Skudder, Larsen & Witman. A CT scan with contrast has a sensitivity of 94 percent and a specificity of 85 percent, making it possibly "the most reliable test" available to a physician. Rutherford 906; *see also* Testimony of Dr. Holder. Dr. Skudder testified that a CT scan with contrast had become "universally employed" since 2000. Testimony of Dr. Skudder. The Defendant's expert Dr. Haider acknowledged that there was time to do this study, because Mr. Johnson was hemodynamically stable during his visit to the VA Medical Center on October 9, 2007. Moreover, Dr. Larsen and Dr. Witman both found the radiologist's report from October 9, showing the findings of the CT scan without contrast, very important. *See* Testimony of Drs. Larsen & Witman. The radiology report was a red flag, Dr. Witman explained, and Dr. Weld should have heeded the

radiologist's suggestion to order a second CT scan, this time with contrast, to evaluate the integrity of the graft. *Id.*

Had a CT scan with contrast been ordered by Dr. Weld, it would have shown evidence of a secondary AEF, as did the CT scan with contrast performed on October 10, 2007, at Johns Hopkins. *See* Testimony of Dr. Holder; Pls.' Ex. 4, at 47-48. Upon reviewing such a CT scan, Mr. Johnson would have been referred to a vascular surgeon to undergo corrective surgery on his graft. Testimony of Dr. Skudder. Not only Dr. Larsen and Dr. Witman but also the Defendant's expert Dr. Haider agreed that more likely than not, Mr. Johnson would have survived this surgery. *See* Testimony of Drs. Larsen, Witman & Haider.

I. Expenses and Pain and Suffering Resulting from Mr. Johnson's Death

Mr. Johnson endured 3.5 hours of physical and emotional pain and suffering when he began to vomit blood on the evening of October 10, 2007, until his death on October 11, 2007. He was alert and aware during that time. He suffered intense hematemesis, vomiting approximately two liters of blood before he died. *See* Pls.' Ex. 4. Although the United States Life Tables list the life expectancy of a black male aged 59 years old as 19.0 years, *see* Pls.' Ex. 21, Mr. Johnson likely would not have lived to 78, as he had had several health problems in his past.[23]

Faye Goodie, Mr. Johnson's eldest child, had a long relationship with her father. Testimony of Faye M. Goodie. At different periods, Mr. Johnson lived with his daughter at

---

[23] Mr. Johnson had a past medical history of drug and alcohol abuse. There was no proof of any income introduced at trial, and at the time of his death, Mr. Johnson had been living at the Maryland Center for Veteran Education and Training. The Plaintiffs have not sought any lost income as damages and the Court therefore need not make any factual findings as to Mr. Johnson's precise life expectancy.

her house in Aberdeen, Maryland, and worked part-time for her employer, Maryland Management Company. *Id.*; Testimony of Michael Whitehead. When they lived together, they participated in family activities, shared in house work, and spent time together. Testimony of Faye M. Goodie. When Mr. Johnson lived elsewhere, Faye Goodie saw her father often. *Id.* They also spoke frequently by telephone. *Id.* Because of her close relationship with her father, Faye Goodie suffered severe mental anguish and pain and suffering as a result of her father's death. *Id.* She lost companionship, comfort, care, attention, counsel, and support that her father would have provided. *Id.*

Maurice Scott, Mr. Johnson's surviving son, also had a long, continuing relationship with his father. Testimony of Maurice Scott. He saw his father frequently and engaged in family activities with him. *Id.* They also spoke often by telephone. *Id.* As a result of his father's death, Maurice Scott suffered severe mental anguish and pain and suffering, and lost companionship, comfort, care, attention, counsel, and support that his father would have provided. *Id.*

Tiffany Johnson, another daughter of Mr. Johnson, did not live with her father at any time during her life. Testimony of Tiffany Johnson. They occasionally spoke by telephone, and the last time she saw him was in 1980. *Id.* As a result, the pain and suffering that she felt hardly approached that suffered by Faye Goodie and Maurice Scott. Likewise, Shelly Johnson never lived with her father and had limited contact with him. Testimony of Shelly Johnson. She, like her sister Tiffany, suffered minimal pain from Mr. Johnson's death, because she was not as close with him.

Finally, the funeral expenses for Mr. Johnson's service totaled $5,012.00.  *See* Pls.' Ex. 9.  Moreover, Johns Hopkins has filed a claim against the Estate of Maurice L. Johnson for $6,260.00, for the care and treatment that Mr. Johnson received on October 10 and 11, 2007. *See* Pls.' Ex. 10.

## II. CONCLUSIONS OF LAW

This case arises under the Federal Tort Claims Act ("FTCA").  Under the FTCA, the Court must apply the law of the place where the alleged tortious act or omission occurred, in this case, Baltimore, Maryland.  Accordingly, Maryland tort law governs.  The Plaintiff Faye M. Goodie, as the Personal Representative of the Estate of Maurice L. Johnson, asserts a personal injury claim arising out of the allegedly negligent medical care provided by Dr. Weld, an employee of the United States.  In addition, the Plaintiffs Faye M. Goodie, Maurice Scott, Tiffany Johnson, and Shelly Johnson individually assert claims for the wrongful death of Mr. Johnson, arising out of the same claim of medical malpractice.

A. Medical Malpractice and Wrongful Death Claims

Under Maryland law, a prima facie case of medical malpractice consists of evidence that "(1) establishes the applicable standard of care, (2) demonstrates that this standard has been violated, and (3) develops a causal relationship between the violation and the harm complained of." *Weimer v. Hetrick*, 525 A.2d 643, 651 (Md. 1987).  The burden of proof rests on the plaintiff.  *Id.* at 651.  As to the first prong, Maryland law requires a physician to use an amount of care, skill, and diligence that would be "ordinarily exercised by others in the profession generally." *Lane v. Calvert*, 138 A.2d 902, 905 (Md. 1958).  In evaluating whether a physician has breached that standard of care, "a doctor's conduct must be viewed in light of

the circumstances existing at the time of diagnosis and treatment and not retrospectively." *East v. United States*, 745 F. Supp. 1142, 1149 (D. Md. 1990). Finally, in evaluating causation, a doctor's breach need not be "the *sole* cause of injury." *Stickley v. Chisholm*, 765 A.2d 662, 668 (Md. Ct. Spec. App. 2001) (emphasis in original). Rather, the breach must be a proximate cause of the injuries; in other words, the plaintiff must prove "that there is a reasonable connection between the defendant's negligence and the plaintiff's damages." *Id.*

At trial, the Plaintiffs met their burden of proving the prima facie case for medical malpractice against the United States, for the actions of its employee Dr. Weld. First, they established the applicable standard of care. When Mr. Johnson presented to the hospital with evidence of gastrointestinal bleeding and a history of an aortic graft, the standard of care required that the evaluating physician attempt to rule out the diagnosis of a secondary AEF. Towne & Hollier 320; *see also* Testimony of Dr. Witman. Specifically, the Plaintiffs proved that the standard of care, as of October 2007, was to order a CT scan with contrast in such circumstances. It is likely the most reliable test available, and has been universally employed since 2000. *See* Rutherford 906; Towne & Hollier 321; Testimony of Dr. Skudder; *see also* Testimony of Drs. Larsen & Witman.

The treatment that Mr. Johnson received on his visit to the VA Medical Center on January 31, 2006, helped to define the standard of care. Indeed, upon similar clinical presentation—Mr. Johnson had a history of an aortic graft and complaints of left chest wall pain—Dr. Alves and Dr. Sward performed an expeditious work-up for a diagnosis of secondary AEF, ordering a CT scan with contrast to evaluate the graft's integrity. *See* Pls.' Ex. 1, at 82-84. In addition, the October 9, 2007 radiology report, which hinted at the need

for a second CT scan with contrast to evaluate the integrity of the graft, was an important marker of the standard of care. *See* Pls.' Ex. 1, at 1.

The United States argued that because an AEF is so rare, it would be incredible to think that there is an established standard of care for the condition. That the condition is rare, however, does not lead to the conclusion that no standard of care has emerged. On the contrary, a secondary AEF is a known complication of an aortic graft surgery. *See* Rutherford 902-15; Towne & Hollier 317-36; Testimony of Drs. Skudder, Larsen & Whitman. The reliable medical literature—including Rutherford's Vascular Surgery, which the Defendant's expert Dr. Haider acknowledged as "the Bible" for vascular surgeons— thoroughly details the clinical manifestation, etiology, and evaluation and treatment for the condition. For example, these sources reflect that an AEF's main clinical manifestation is gastrointestinal bleeding, that it usually occurs between two and six years after aortic graft surgery, and that it requires early surgical intervention. Rutherford 903-08; Towne & Hollier 317-20; *see also* Testimony of Drs. Skudder, Larsen & Witman. Moreover, the same medical sources document the onset of a secondary AEF with a herald or sentinel bleed, before the massive bleeding episode and while the patient is hemodynamically stable. Rutherford 905-06; *see also* Testimony of Drs. Skudder & Haider. Thus, though a secondary AEF is not likely to occur, the medical literature and the expert testimony support the Court's finding of the applicable standard of care. In sum, that standard required Dr. Weld to attempt to rule out the possibility of a secondary AEF by ordering a CT scan with contrast.

Second, the Plaintiffs met their burden in proving that Dr. Weld breached that standard of care. On October 9, 2007, Mr. Johnson presented at the VA Medical Center

with a history of a graft, and Dr. Weld discovered evidence of gastrointestinal bleeding—an episode of melena, a heme positive rectal exam, hematocrit and hemoglobin levels that had fallen over 30 percent since January 31, 2006, and left flank pain. Despite this presentation, Dr. Weld did not do an expeditious work-up for a secondary AEF.

Importantly, Dr. Weld's diagnosis, treatment plan, and ultimate decision to discharge failed to meet the standard as it was defined by the medical care provided to Mr. Johnson on January 31, 2006. Moreover, though Dr. Weld reviewed the radiology report from the CT scan without contrast, she did not heed the suggestion in that report to evaluate the integrity of the graft. Considering the circumstances at the time of Dr. Weld's diagnosis and treatment, she failed to meet the applicable standard of care.

The United States argued at trial that the most likely condition was gastritis, and thus Dr. Weld met the standard of care in diagnosing that condition and performing the proper treatment for it. The experts in the case agreed that for a likely diagnosis of gastritis, Dr. Weld provided proper care. *See* Testimony of Drs. Skudder, Larsen, Witman & Haider. However, based on Mr. Johnson's presentation, a reasonable physician would have first had to rule out AEF. Dr. Weld testified that she knew of the complications from an aortic graft and that the risk of an AEF was catastrophic. Pls.' Ex. 30, Weld Dep. 31:11-32:11. By not including secondary AEF in her differential diagnosis, Dr. Weld failed to meet the standard of care.

Finally, Dr. Weld's breach was a proximate cause of the injuries suffered by Mr. Johnson. Dr. Weld's failure to rule out a secondary AEF as the cause of Mr. Johnson's gastrointestinal bleeding and failure to order a CT scan with contrast resulted in Mr.

Johnson's discharge with an undiagnosed secondary AEF. His discharge when he was suffering from a secondary AEF proved, as Dr. Weld testified, catastrophic. If a CT scan with contrast had been ordered, evidence of the AEF would have been identified, and Mr. Johnson would have undergone corrective surgery. Dr. Larsen and Dr. Witman, as well as the Defendant's expert Dr. Haider, agreed that more likely than not, he would have survived this surgery. *See* Testimony of Drs. Larsen, Witman & Haider. Accordingly, the Plaintiffs proved that Dr. Weld's breach of the standard of care resulted in Mr. Johnson's death.

At trial, the United States tried to assign the responsibility for Mr. Johnson's injuries to Dr. Flanigan. However, Maryland law only requires that the Plaintiffs prove Dr. Weld to be a proximate cause, not "the *sole* cause," of the injuries. *Stickley*, 765 A.2d at 668. The Plaintiffs proved a "reasonable connection" between Dr. Weld's negligence and the death of Mr. Johnson. *Id.* Moreover, Dr. Flanigan took no part in the diagnosis, treatment, and ultimate discharge of Mr. Johnson. The United States' argument that Dr. Flanigan is to blame for Mr. Johnson's injuries is simply unavailing. In conclusion, the Plaintiffs have proved their case against Dr. Weld, and this Court hereby ENTERS JUDGMENT in favor of the Plaintiffs and against the Defendant the United States on Count I, the personal injury claim on behalf of Mr. Johnson's estate, and on Counts II, III, IV, and V, the Plaintiffs' wrongful death claims.

B. Damages

As a result of Dr. Weld's breach of the standard of care, the Estate of Maurice L. Johnson is entitled to damages to compensate for funeral and hospital bills, as well as the physical and emotional pain and suffering that Mr. Johnson endured. *See, e.g., Jones v. Flood*,

716 A.2d 285 (Md. 1998). Additionally, the surviving children of Mr. Johnson are entitled to noneconomic damages—namely, for their mental anguish, emotional pain and suffering, and loss of society, companionship, comfort, protection, care, attention, advice, and counsel. *See* Md. Code Ann., Cts. & Jud. Proc. § 3-904(e). The Maryland cap on noneconomic damages in this case is $812,500.00. *See id.* § 3-2A-09(b), 11-108(b).

Mr. Johnson endured 3.5 hours of pain and suffering when he was experiencing intense hematemesis on the evening of October 10, 2007, until his death on October 11, 2007. He was alert and aware during that time. *See* Pls.' Ex. 4. For his pain and suffering during those hours, this Court AWARDS the Plaintiff Faye M. Goodie, as the Personal Representative of the Estate of Maurice L. Johnson, $75,000.00. Additionally, the Plaintiff Faye M. Goodie, as the Personal Representative of the Estate of Maurice L. Johnson, is AWARDED $5,012.00 for funeral expenses and $6,260.00 for the care Mr. Johnson received at Johns Hopkins Hospital on October 10 and 11, 2007. *See* Pls.' Exs. 9 & 10.

Faye M. Goodie and Maurice Scott both had long, close relationships with their father. For their mental anguish, emotional pain and suffering, and loss of companionship, comfort, care, and counsel, this Court AWARDS Faye M. Goodie, as a surviving child of Mr. Johnson, $150,000.00, and AWARDS Maurice Scott, as a surviving child of Mr. Johnson, $100,000.00. Finally, Tiffany and Shelly Johnson had very little contact with their father. As a result, for their pain and suffering, this Court AWARDS Tiffany Johnson, as a surviving child of Mr. Johnson, $5,000.00, and AWARDS Shelly Johnson, as a surviving child of Mr. Johnson, $5,000.00.

## III. CONCLUSION

For the reasons stated above, Judgment is entered in favor of the Plaintiff Faye M. Goodie, as Personal Representative of the Estate of Maurice L. Johnson, and against the Defendant the United States of America, for the personal injury claim in Count I of the Plaintiffs' Complaint (ECF No. 1). Judgment is also entered in favor of the Plaintiffs Faye M. Goodie, Maurice Scott, Tiffany Johnson, and Shelly Johnson, and against the Defendant the United States of America, for the wrongful death claims in Counts II, III, IV, and V of the Complaint.

On Count I, Faye M. Goodie, as Personal Representative of the Estate of Maurice L. Johnson, is AWARDED $75,000.00 for Mr. Johnson's pain and suffering, $5,012.00 for funeral expenses, and $6,260.00 for the care provided to Mr. Johnson at Johns Hopkins Hospital. On Count II, the Plaintiff Faye M. Goodie, as a surviving child of Mr. Johnson, is AWARDED $150,000.00. On Count III, the Plaintiff Maurice Scott, as a surviving child of Mr. Johnson, is AWARDED $100,000.00. On Count IV, the Plaintiff Tiffany Johnson, as a surviving child of Mr. Johnson, is AWARDED $5,000.00. Finally, on Count V, the Plaintiff Shelly Johnson, as a surviving child of Mr. Johnson, is AWARDED $5,000.00.

A separate Order and Judgment follows.


Dated: August 28, 2013 _____/s/_____
Richard D. Bennett
United States District Judge